

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BNSF RAILWAY COMPANY,<br><br>                             Plaintiff,<br><br>v.<br><br>PACIFIC STEEL, INC.,<br><br>                             Defendant. | Case No.:  23-cv-01202-JLB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF BNSF RAILWAY COMPANY'S MOTION TO EXCLUDE CERTAIN OPINION TESTIMONY OF DEFENDANT'S EXPERT WITNESSES DORINDA SHIPMAN**<br><br>**[ECF No. 104]** |

Before the Court is a Motion to Exclude Certain Opinion Testimony of Defendant's Expert Witness Dorinda Shipman ("Motion") filed by Plaintiff BNSF Railway Company ("Plaintiff" or "BNSF").  (ECF No. 104.)  Defendant Pacific Steel, Inc. ("Defendant" or "PSI") opposes the Motion.  (ECF No. 110.)  For the reasons set forth below, Plaintiff's Motion is **GRANTED** in part and **DENIED** in part.

## I.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is the owner of property located in National City, San Diego County, California ("the Property").  (ECF No. 1 at 3, ¶ 6.)  In 1977, Plaintiff's predecessor in interest, the Atchison, Topeka & Santa Fe Railway Company ("ATSF"), as lessor, executed a lease agreement ("1977 Lease" or "1977 Lease Agreement") with Scrap Disposal, Inc.

("SDI"), as lessee, for the use of the northern and central portions of the Property for the handling and storage of scrap materials.  (*Id.* at 3, ¶ 7.)  In 1978, ATSF and SDI entered into a second lease agreement ("1978 Lease" or "1978 Lease Agreement")[1] covering the southern portion of the Property.  (*Id.* at 7, ¶ 12.)

In May 1980, SDI filed for protection under Chapter 11 of the United States Bankruptcy Code.  (ECF No. 112-1 at 3, Plaintiff's Response to Defendant's Separate Statement of Undisputed Material Facts ("PRSSUF") ¶ 5.)  In July 1981, a trustee in SDI's bankruptcy proceedings assumed the Leases.  (*Id.* at 4, PRSSUF ¶ 7.)  The bankruptcy trustee assigned the Leases to Western States Investment Corporation, which in turn assigned the Leases to San Diego Steel, Inc. ("SDS").  (*Id.* at 4, PRSSUF ¶¶ 7-8.)  In August 1981, SDS filed a Certificate of Amendment of Articles of Incorporation changing its name to Pacific Steel, Inc.  (ECF No. 90-13 at 5; *see also* ECF No. 103-2 at 2, ¶ 2.)  In November 1982, the United States Bankruptcy Court for the Southern District of California entered an order approving a liquidating plan of reorganization for SDI.  (ECF No. 90-14.)

Plaintiff commenced the instant litigation against Defendant on June 29, 2023, seeking "redress against its former tenant [Defendant] . . . for damaging [Plaintiff's] property located immediately adjacent to and west of [Defendant's] property at 1700 Cleveland Avenue in National City, California . . . and for failing to pay rent."  (ECF No. 1 at 2, ¶ 1.)  In its Complaint, Plaintiff alleges the following:

Defendant operated a scrap metal recycling business on the Property pursuant to the Lease Agreements.  (*Id.* at 2 & 11, ¶¶ 1 & 16.)  The Lease Agreements contain provisions for payment of rent and indemnification by Defendant for all loss, damage, or expense incurred by Plaintiff arising out of Defendant's use of the Property, including any "fines,

---

[1] The 1977 Lease Agreement and the 1978 Lease Agreement were amended in 1983. (ECF Nos. 80-11, 80-12.)  The original lease agreements and the supplemental lease agreements shall be referred to collectively as the "Leases" or the "Lease Agreements."

23-cv-01202-JLB

penalties, clean-up and disposal costs." (*Id*. at 4–11, ¶¶ 8–15.)

The California Department of Toxic Substances Control ("DTSC") sued Defendant for environmental violations in 2004 and 2015, and the state court ordered Defendant to investigate and remediate the contamination. (*Id*. at 2, ¶ 1.)

As part of a July 2004 stipulated judgment, Defendant agreed to monetary terms and to enter into a Corrective Action Consent Agreement with DTSC. (*Id*. at 12–13, ¶¶ 21– 22.) As part of the Corrective Action Consent Agreement, Defendant was required to submit an Interim Measures Workplan ("IMW") containing proposals to remediate contamination and to reduce the threat of the release of hazardous waste or hazardous constituents on the Property. (*Id*. at 13, ¶ 23.) During inspections of the Property between 2010 and 2013, DTSC observed several violations of the Hazardous Waste Control Law ("HWCL"), the California Health and Safety Code, and the 2004 stipulated judgment. (*Id*. at 14, ¶ 28.)

In 2015, DTSC sued Defendant again, alleging that Defendant had "committed multiple violations of the HWCL," including by storing hazardous waste without authorization and by violating other provisions of the HWCL and the terms of the 2004 stipulated judgment. (*Id*. at 15, ¶ 30.) In a stipulated judgment approved by the state court in January 2016, Defendant agreed to both injunctive and monetary terms and conditions. (*Id*. at 16, ¶¶ 32–33.) In May 2019, Defendant submitted a draft IMW to DTSC. (*Id*. at 35, ¶ 35.) Defendant's draft IMW identified elevated concentration of metals, polychlorinated biphenyls, polycyclic aromatic hydrocarbon compounds, and petroleum hydrocarbons in the soil at the Property. (*Id*.) The IMW was approved by DTSC for implementation on May 31, 2022. (*Id*. at 16, ¶ 36.)

On December 6, 2022, DTSC sent Defendant a letter stating that Defendant was out of compliance with prior agreements. (*Id*. at 17, ¶ 38.)

On January 13, 2023, Plaintiff served on Defendant a Notice of Termination of Leases, providing the requisite 30-day notice under Section 14 of the Lease Agreements. (*Id*. at 18, ¶ 44.) After Plaintiff sent the Notice of Termination of Leases, Defendant sent a schedule for implementing the IMW to DTSC on February 3, 2023. (*Id*. at 17, ¶ 39.) A

little more than two weeks later, Plaintiff denied Defendant permission to access the Property. (*Id.*)  On April 11, 2023, Plaintiff entered into a Voluntary Cleanup Agreement with DTSC to promptly carry out the cleanup of the Property under DTSC oversight.  (*Id.* at 18, ¶ 47.)  Plaintiff tendered its claims to Defendant and demanded that Defendant indemnify Plaintiff for the cleanup, as required by the Lease Agreements.  (ECF No. 1 at 18, ¶ 48.)  Defendant responded on June 14, 2023, asserting that Plaintiff's breach of the Lease Agreements excused its obligation to indemnify Plaintiff under those agreements. (*Id.* at 18, ¶ 49.)

Plaintiff's June 2023 Complaint brings the following causes of action against Defendant: (1) specific performance; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; (4) express contractual indemnity; (5) nuisance; (6) trespass; (7) negligence; (8) waste; (9) equitable and implied indemnity and contribution; (10) contribution under California's Hazardous Substances Account Act; (11) contribution under federal common law; and (12) declaratory relief.  (*Id.* at 19–36, ¶¶ 53–138.)  Plaintiff seeks general damages, the costs of investigating, characterizing, removing, and remediating the Property, the total amount of outstanding rent, compensatory damages, an order confirming Defendant's indemnity and defense obligations, Defendant's equitable share of response costs with interest, punitive damages, attorney's fees, interest, and costs of suit.  (*Id.* at 36–37.)

Plaintiff and Defendant retained experts.  Dorinda Shipman ("Shipman"), a licensed Professional Geologist, Certified Hydrogeologist, and Vice President and Principal Hydrogeologist for Langan CA, Inc., prepared an expert report, dated March 24, 2025, on behalf of Defendant.  (*See* ECF No. 104-10 at 2–3.)  Shipman further prepared a rebuttal report, dated April 16, 2025, in response to an expert report prepared by Helen Dawson, PhD, one of Plaintiff's retained experts.  (ECF No. 104-11 at 2, 4.)

In July 2025, Plaintiff simultaneously filed the instant Motion (ECF No. 104), and a Motion to Exclude Certain Opinion Testimony of Defendant's Expert Witness Dr. Sigrida Reinis.  (ECF No. 105.)

23-cv-01202-JLB

## II.   LEGAL STANDARD

The Federal Rules of Evidence provide that expert testimony is admissible "if the proponent demonstrates to the court that it is more likely than not that":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  As the Ninth Circuit has explained:

> Under *Daubert* [*v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993)] and its progeny . . . a district court's inquiry into admissibility is a flexible one.  *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013).   In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder."  *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted).  "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'"  *Id*. at 564 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)).  "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry.   And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline."  *Id*. at 565 (citation and internal quotation marks omitted).  "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion."  *Id.* at 564 (citation omitted).  The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable."  *Alaska Rent-A-Car*, 738 F.3d at 969. Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury."  *Id*. at 969–70.

23-cv-01202-JLB

*City of Pomona v. SQMN. Am. Corp.*, 750 F.3d 1036, 1043–44 (9th Cir. 2014). "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge," as the judge "should not make credibility determinations . . . reserved for the jury." *Id*. at 1044. Determining admissibility under Rule 702 is within the district court's discretion, and the proponent of an expert's testimony bears the burden of establishing its admissibility. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 158 (1999); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025) ("confirm[ing] that a proponent of expert testimony must always establish the admissibility criteria of Rule 702 by a preponderance of the evidence and that there is no presumption in favor of admission").

Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). "That said, an expert witness cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Nationwide Transp. Fin. v. Cass Info Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (citation omitted).

## III. SHIPMAN MOTION

### A. Rule 702(b)—Sufficiency of Evidence

#### 1. Shipman's Opinion 1

##### a. Whether there is adequate factual support for Shipman's position in Opinion 1 that railroad operations were conducted "on" the Property

###### i. Arguments

Plaintiff argues that the Court should exclude pursuant to Rule 702(b) Shipman's statement in Opinion 1 that "[Plaintiff] and other railroad companies operated on" the Property as "plainly unsupported" by the evidence. (ECF No. 104-1 at 12-13, 20.) First, Plaintiff asserts that Figures 2a to 2d, appended to Shipman's Report, show that the ATSF railyards were located west of Plaintiff's right-of-way and, thus, not on the Property leased by Defendant, and that the spur track was located on former Harrison Avenue, land which

is now owned by Defendant. (*Id*. at 13 (citing ECF No. 104-10 at 55-58).) Plaintiff maintains that even Shipman's "superimposed representations" in Figures 2a to 2d do not indicate that ATSF railroad tracks were on the Property. (*Id*.) Plaintiff also contends that Shipman confirmed during her June 9, 2025, deposition that ATSF railyards were not located on Plaintiff's Property. (*Id*. (citing ECF No. 104-12 at 8, 10, 11, 24).)

Second, Plaintiff asserts that Shipman's statement in Opinion 1 that other railway companies operated on the Property possesses "zero" evidentiary support. (*Id*.) Plaintiff contends that despite admitting at her deposition that she is not an expert in aerial photographic interpretation, Shipman relied on aerial photographs of the Site[2] to create figures with labels purporting to identify objects in the photographs. (*Id*. at 12 (citing ECF No. 104-12 at 4-5; 104-10 at 55-58).) Further, Plaintiff asserts that Shipman improperly relies on an aerial photograph from 1928 (Figure 2a) to support her conclusion that railroads operated on the Property from 1887 to 1926.[3] (*Id*. at 13-14.) Plaintiff also maintains that despite a reference to "Atchison Topeka and Santa Fe Railroad Yards" or "A.T.&S.F. R.R. Grounds" on the edge of the maps to the west of Harrison Avenue, the Sanborn fire insurance maps do not depict any buildings, tracks, or other permanent features on the Property and suggest that the ATSF railyard operations are actually off the map. (*Id*. at 15 (citing ECF No. 104-10 at 71-88, Attachment 1).) Further, Plaintiff maintains that Shipman's citation to a 2017 draft TRC Companies ("TRC") memorandum

---

[2] Plaintiff refers to the area consisting of the property formerly leased by Defendant and the adjacent, larger property owned by Defendant as "the Site." (ECF No. 104-1 at 8.) Plaintiff asserts that Defendant used both properties for auto shredding and metal recycling. (*Id*.)

[3] Shipman opined that "[b]etween 1887 and 1926, railroad lines (Coronado and Southern Railway) were present along the former 9th Avenue/Harrison Avenue, running between the PSI and BNSF owned parcels (Figure 2a)." (ECF No. 104-10 at 14.) Figure 2a is an aerial photograph dated 1928, titled "Historical Site Uses 1888-1923." (*Id*.)

23-cv-01202-JLB

stating that a "Railroad" was a tenant on the Property from 1899-1953 and that the probable use of the Property was "Rail tracks" does not support Shipman's opinion, asserting that "Figure 2 of that memorandum indicates that the references to a railroad and tracks is in reference to the tracks already discussed (running near, but not 'on,' the [] Property)." (*Id*. at 15 (citing ECF No. 104-10 at 91, Figure 2).)  Thus, Plaintiff asserts that Shipman's deposition testimony regarding the poor quality of the aerial photographs combined with the absence of evidence that a railyard or railcars were located on Plaintiff's Property renders unsupported Shipman's conclusion in Opinion 1 that Plaintiff and other railroad companies operated on Plaintiff's Property from 1887 through the present.  (*Id*. at 15-16.)

Highlighting Shipman's deposition testimony as to her "belie[f] that it is difficult for any individual to call themselves an expert at aerial photograph interpretation," Plaintiff also asserts that Shipman's conclusions based on the aerial maps constitute lay opinion that would be unhelpful to the trier of fact.  (*Id*. at 16-17 (citing ECF No. 104-12 at 3).)

Defendant counters that Shipman's Opinion 1 is based on sufficient evidence and is thus admissible.  (ECF No. 110 at 7.)  Pointing out that "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned to that opinion rather than its admissibility," Defendant insists that such issues should be raised during cross examination at trial.  (*Id*. at 7-8.)  Defendant asserts that "Shipman routinely utilizes aerial photographs (along with other evidence) to render expert opinions," and maintains that Plaintiff's disagreement with Shipman's interpretation of the aerial photographs "is wholly inappropriate for a motion to exclude" expert evidence.  (*Id*. at 8.)  Defendant cites Shipman's deposition testimony that aerial photographs are a "key tool" used by environmental professionals, and that she has a "solid basis" for interpreting aerial photographs.  (*Id*. at 9 (quoting ECF No. 110-1 at 6).)  Further, Defendant contends that courts have held that "photographic analysis is a well-accepted technique in [assessing environmental contamination] so as to bear a sufficient indicia of reliability" and that experts can "interpret [] aerial photos based on [their] own experiences and expertise." (*Id*. at 9 (quoting *NutraSweet Co. v. X-L Eng'g Co.*, 227 F.3d 776, 788 (7th Cir. 2000).)

23-cv-01202-JLB

Moreover, Defendant asserts that one of Plaintiff's experts, Dr. Helen Dawson, likewise acknowledged that she is not an "expert" in evaluating such images but nonetheless relies on aerial photographs to support her opinions.  (*Id*. at 9 n.1.)  Defendant also notes that "Shipman is an expert in regulatory compliance and the investigation and remediation of hazardous waste sites in California[,] including industrial, semi-conductor, military, and disposal sites," and that "[Plaintiff] does not object to [] Shipman's qualifications or ability to provide expert opinions within these fields."  (*Id*. at 8 n.1.)

Defendant disputes that Shipman relied only on the aerial photographs, the Sanborn fire insurance maps, and the 2017 draft TRC memorandum.  (*Id*. at 10.)  Defendant asserts Shipman also relied on "lease maps, and other historical information indicating a railcar shop," and "historical evidence of a creosote treating plant and rail spur used by Charles M. Davis."  (*Id*.)

### ii.    Analysis

Shipman concluded in Opinion 1 that

> BNSF and other railroad companies owned and operated *on*, adjacent to, and west of the BNSF sites from 1887 to the present day.  For approximately 100 years, these companies had railyards, rail lines and spurs on the western boundary of the BNSF sites and along Harrison Avenue *on* and adjacent to the BNSF sites and adjacent to the PSI parcels.

(ECF No. 104-10 at 36 (emphasis added).)  Shipman also states in the introduction to her expert report that "BNSF and its predecessor-in-interest, [ATSF,] have operated at the western boundary and *on* the three BNSF sites since 1926 (Figures 2a and 2b)."  (*Id*. at 9 (emphasis added).)  In the section titled "Pre-PSI Operations," Shipman asserts that

> [b]etween 1887 and 1926, railroad lines (Coronado and Southern Railway) were present along the former 9th Avenue/Harrison Avenue, running between the PSI and BNSF owned parcels (Figure 2a).  From 1926 through at least 1961, the BNSF sites were occupied by the AT&SF Railroad Yards and an AT&SF spur track ran along the former 9th Avenue/Harrison Avenue alignment (Figure 2b through 2d).

23-cv-01202-JLB

(*Id.* at 14.) Further, Shipman states in Section 1.1 of her report, titled "Pre-PSI Operations," that "[a]dditional uses *at the BNSF sites* and adjacent properties prior to PSI's lease include[d] railroad operations . . . (Figures 2a through 2d)." (*Id.* at 12.)[4]

As the Ninth Circuit has explained,

> [t]he district court's "responsibility to screen expert testimony," *Elosu* [*v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022)], encompasses the requirement that expert testimony be "based on sufficient facts or data," Fed. R. Evid. 702(b). This element "requires foundation." *Elosu*, 26 F.4th at 1025. The "key inquiry" is "whether an expert had sufficient factual grounds on which to draw conclusions." *Hyer v. City & County of Honolulu*, 118 F.4th 1044, 1056 (9th Cir. 2024) (citation omitted).

*Engilis*, 151 F.4th at 1051.

Here, Shipman's conclusion that railroad operations were conducted on the Property prior to Plaintiff's lease with Defendant's predecessor and Defendant has an extremely limited factual foundation.

As conceded by Shipman in her deposition, the aerial photographs do not show railroad tracks, rail spurs, or an ATSF railyard on the Property. Shipman testified that Figure 2b indicates that an "AT&SF spur track" was not located on "the BNSF sites," but rather was "adjacent . . . to the east" and was "on what . . . [was] Harrison Avenue at that point in time," on the northern PSI parcel; that Figure 2b depicted AT&SF rail yards as "adjacent to the west" of the BNSF sites; and that Plaintiff "owned rail spurs that operated along Harrison Avenue." (ECF No. 104-12 at 8-11.) Defendant fails to cite to any portion of Shipman's deposition testimony in which she stated that any of these features appear *on* the Property in the aerial photographs.

Shipman testified somewhat equivocally that the three lines in the portion of Figure

---

[4] Emphasis added as to each.

2b labeled "AT&SF Railroad yards west of Harrison" "point[] to what appear to be railcars in the aerial photo image," testifying that one of the lines "may be" pointing to a railcar, though she would "need to go back and double-check" through a comparison with the Sanborn fire insurance maps, and admitting that it was "difficult to see from the quality of the photograph" whether one of the other lines indicated a railcar. (ECF No. 104-12 at 10-11; *see also* ECF No. 104-10 at 56.) Upon review of Figure 2b, consistent with Shipman's equivocation, the Court is unable to discern shapes associated with the three lines that bear any resemblance to rail cars. (ECF No. 104-10 at 56.) Most significantly, though, the three lines specifically referenced by Shipman, as well as three other lines to the south similarly labeled "AT&SF Railroad Grounds west of Harrison," point to locations *outside* of the Property. (*See id.*) Shipman herself, when asked if Figure 2b depicts ATS&F rail yards being located on the Property, responded, "It depicts them as adjacent to the west." (ECF No. 104-12 at 11.) This cannot be evidence of rail operations *on* the Property.

Moreover, the Sanborn fire insurance maps do not provide any foundation for an opinion that rail operations were conducted on the Property. On the edge of most of the Sanborn maps, outside of the Property to the west of Harrison Avenue, are the words, "Atchison Topeka and Santa Fe Railroad Yards" or "A.T.&S.F. R.R. Grounds." (ECF No. 104-10 at 73-83.) These maps do not put railway operations on the Property, and instead, serve as evidence that the ATSF railyard operated off the Property, consistent with the depiction in Figures 2b-2d.

Defendant mentions Shipman's reliance on "lease maps, and other historical information indicating a railcar shop," and "historical evidence of a creosote treating plant[5]

---

[5] In fact, Shipman's report does not discuss any historical evidence of a creosote treating plant or even a wood treating plant. (*See generally* ECF No. 104-10.) This is first suggested in her deposition testimony, where she states, "Specifically, I recall the Charles M. Davis lease of a spur, noting a treating plant on the BNSF sites. And those treating

23-cv-01202-JLB

and rail spur used by Charles M. Davis." (ECF No. 110 at 10.)  This is a general list of types of documents without specificity, with the exception of the reference to Charles Davis, so the Court analyzes whether the Charles Davis lease provides any foundation for the opinion that there were rail operations on the Property.  In the body of her report, Shipman mentions Charles Davis being a tenant of the property but does not mention that his lease included a rail spur.  Instead, when referencing Charles Davis in the body of her report, she mentions only metals recycling. (ECF No. 104-10 at 9, 12-15.)[6]  Then, without further explanation, in Figure 1a, pages 3-4, she includes a notation: "Leased to Charles Davis (scrap metal and scrap glass; includes rail spur)." (*Id*. at 51-52.)  If there is any evidence that the Charles Davis lease included a rail spur, it is not available to the Court. The Charles Davis lease is not listed in the References Shipman relied upon in forming her opinions (*Id.* at 40-44), and it has not been provided to the Court as an exhibit to any of the pleadings related to this motion.  However, Shipman did testify at her deposition, "Specifically, I recall the Charles M. Davis lease of a spur, noting a treating plant on the BNSF sites."[7]  As Shipman testified under oath that this lease document includes the lease

plants, from my understanding, are where wood was treated with creosote." (ECF No. 104-12 at 7.)

[6]  Shipman stated that

> [a]s shown [i]n Figure 2c, [t]he Charles M. Davis scrap metal facility operated on the Central and Northern BNSF sites and central portion of the Southern PSI parcel between approximately 1939 until 1956 (SCS, 2013).  Based on a review of available historical aerial photographs and Sanborn Fire Insurance Maps, the facility had two junk warehouses, an[] office and [a] garage building, a compressor house, a gasoline underground storage tank (UST) and dispenser, scales, and a large scrap metal pile (EDR, 2025 and SCS 2013.)

(ECF No. 104-10 at 15.)

of a spur, the Court accepts with some reluctance her testimony as some evidence in support of this aspect of her opinion.

Additionally, Defendant argues that this aspect of Shipman's opinion is supported by the 2017 draft TRC memorandum.[8] (ECF No. 110 at 10.) Plaintiff, on the other hand, asserts that the indication in the draft TRC memorandum of use of the Property as rail tracks does not provide foundational support for this aspect of Shipman's opinion because that "is in reference to the tracks already discussed (running near, but not 'on,') the BNSF Property." (ECF No. 104-1 at 15.) Unlike with respect to the aerial maps, there is no concession in Shipman's deposition testimony as to Plaintiff's interpretation of this reference in the draft TRC memorandum. Therefore, the Court accepts this, for now, as some factual foundation for this aspect of Shipman's opinion.[9] *See Hyer v. City & Cnty. of Honolulu*, 118 F.4th 1044, 1056 (9th Cir. 2024) (concluding that "the key inquiry under Rule 702 is whether an expert had sufficient factual grounds on which to draw conclusions,

_____

[8] At her deposition, Shipman testified, "Then we've got other information like the lease map, and even other historical information that indicates this – even TRC in their 2017 memorandum, where they're estimating remedial costs for BNSF, list rail operations on the properties from, I believe, 1899 to 1953, or some period similar to that." (ECF No. 110-1 at 8.)

[9] The Court includes the TRC draft report in its analysis with some reluctance, as Shipman only referenced this memorandum in her deposition testimony (ECF No. 104-12 at 7) and neither mentioned it as a basis for her opinion in her expert report nor included it in the list of references relied on in forming her opinions (ECF No. 104-10 at 40-44). *See Engilis*, 151 F.4th at 1051 (holding an expert cannot rely on information not disclosed in the expert report, explaining that "[t]he federal rules generally forbid the use of any information not properly disclosed" in accordance with Rule 26) (brackets, citation, and quotation marks omitted); *see also* Fed. R. Civ. P. 26(a)(2)(B)(i)-(ii) (providing that a retained expert witness must provide a written report containing "a complete statement of all opinions the witness will express and the basis and reasons for them," and "the facts or data considered by the witness in forming them"). However, Defendant does not object to Shipman's reliance on this evidence on the basis that it was not adequately identified in her report, so the Court considers it in its analysis.

not whether the expert's hypothesis is correct or corroborated by other evidence on the record") (citation and quotation marks omitted).

"Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564. "The judge is 'supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable.'" *Persian Gulf Inc. v. BP W. Coast Prods. LLC*, 632 F. Supp. 3d 1108, 1165 (S.D. Cal. 2022) (quoting *Primiano*, 598 F.3d at 564).

Here, because Defendant has demonstrated by a preponderance of the evidence that there is *some* foundation for Shipman's testimony that there were rail operations conducted on the property, the Court will not strike that portion of Opinion 1 on this basis at this time.

With respect to Shipman's opinion as to contamination from any railroad operations *on* the Property, Plaintiff also argues that even if there is evidence of any such operations, Shipman fails to provide evidence that lead or polychlorinated biphenyls (PCBs) were used, stored, or released on the Property. (ECF 104-1 at 16 (citing *City of Gary v. Auto-Owners Ins. Co.*, 116 N.E.3d 1116, 1124 (Ind. Ct. App. 2018) (affirming the district court's grant of summary judgment, and holding that any conclusion "that [the company] contributed to the contamination based solely on the fact that it used and stored petroleum products would be speculation, not a reasonable inference")).)

Shipman's Opinion 1 is based substantially on her training, expertise, and knowledge about contamination associated with the operation of rail lines generally, not the specifics of these railway operations. She cites to no field sampling data or evidence or releases. Instead, she relies on her specialized knowledge to conclude that "[a]ctivities associated with rail yard and railroad operations are known to release petroleum hydrocarbons, oil and grease, PCBs, heavy metals including lead, [volatile organic compounds ("VOCs")], and [polycyclic aromatic hydrocarbons ("PAHs")]." (ECF No. 104-10 at 4, 12, 36.) She states, "Railroads used dielectric fluids, including varying levels of PCBs, in capacitors and on-board transformers. PCBs may also be used as a degreasing

23-cv-01202-JLB

solvent associated with locomotive and engine maintenance ([United States Environmental Protection Agency ("USEPA")], 2002)."  (*Id*. at 34.)

Although the Court has reservations about the adequacy of Shipman relying on her expertise as to rail operations generally, without citing to evidence of how AT&SF conducted its rail operations on the Property, and without evidence of releases of the listed contaminants during the relevant time period, the Court recognizes the additional challenges when endeavoring to recreate historical events going back decades.  Further, "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."  *Vanguard Logistics Servs. (USA) Inc. v. Groupage Servs. of New England, LLC*, No. CV 18-0517 DSF (GJSx), 2022 WL 17369626, at *2 (C.D. Cal. 2022) (quoting *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004)).  Thus, for now, the Court will not strike this portion of Opinion 1 on this basis. *See Engilis*, 151 F.4th at 1050 (citations, brackets, and quotation marks omitted) (holding that "where experts' opinions are not the junk science Rule 702 was meant to exclude, . . . the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system . . . to attack shaky but admissible evidence").

Plaintiff's motion as to this portion of the opinion will be **DENIED** without prejudice, subject to renewal at trial.

> **b.    Whether there is an adequate factual basis for Shipman's conclusion in Opinion that neighboring railway operations conducted by Plaintiff contaminated the Property**
>
> **i.    Arguments**

Plaintiff also asserts that Shipman's conclusion in Opinion 1 that contamination migrated onto the Property from a neighboring railyard operated by Plaintiff is inadmissible pursuant to Rule 702(b) on the basis that it lacks sufficient evidentiary support, as Shipman failed to cite any field sampling data or "evidence or releases." (ECF No. 104-1 at 17-18.)  Highlighting Shipman's deposition testimony that she did not believe that sampling results were available to detect alleged contamination resulting from

Plaintiff's railroad or former railyard, Plaintiff takes issue with Shipman's other deposition testimony, based on aerial photographs, that "materials" such as metal particulates "were likely released." (*Id*. at 17 (quoting ECF No. 104-12 at 16).) Plaintiff also cites Shipman's statement in her expert report that "two 'low areas' [of the Property] appear to receive surface water runoff from the surrounding area," while acknowledging that "[t]idal influences" reportedly occurring at an adjacent property owned by Plaintiff "ha[d] not been confirmed using quantitative methods." (*Id*. at 18-19 (quoting ECF No. 104-10 at 18).)

Moreover, Plaintiff contends that Shipman's "primary evidence" in support of her opinion that Plaintiff's railroad operations impacted the Property—a figure from a 2004 cleanup plan containing arrows drawn by Defendant's own consultant, Envirologics Inc.—does not provide the requisite evidentiary support for Shipman's opinion. (*Id*. at 19 (citing ECF No. 104-10 at 17, 93 (Figure 4)).) Plaintiff maintains that "[t]here is no indication [i]n the figure that it evaluates stormwater from [Plaintiff's] right-of-way, and Envirologics' report from which it was drawn confirms that it evaluated [Defendant's] stormwater management—not [Plaintiff's]." (*Id*.) Further, Plaintiff also asserts that "gravity alone" does not constitute sufficient evidence to establish the migration of contaminants. (*Id*. at 19-20.) Thus, Plaintiff asserts that Shipmans' opinion should be excluded as speculative under Rule 702(b). (*Id*. at 20.)

Defendant counters that Shipman's conclusion that current and former railyard operations "likely" transported contaminants onto the Property is neither speculative nor lacking in evidentiary support. (ECF No. 110 at 9-10.) Defendant cites Shipman's deposition testimony that she reviewed Sanborn fire insurance maps, aerial photographs, a lease document noting Charles M. Davis's lease of a railroad spur, and the 2017 TRC memorandum. (*Id*. at 10 (citing ECF No. 110-1 at 7-9).) Defendant points out that "Shipman identifies and explains potential transport pathways of contaminants associated with rail operations by air dispersion or surface water runoff, given the higher land elevation of the rail lines, which would have occurred prior to modern surface water control regulations." (*Id*.) Further, Defendant maintains that Shipman's opinion passes muster

23-cv-01202-JLB

under Rule 702, even though "she did not conduct any field sampling or independently collect data demonstrating contaminant releases." (*Id*. at 10-11.) Moreover, Defendant insists that Shipman "relied upon the same type of evidence cited to by [Plaintiff's] expert witness." (*Id*. at 11 (citing ECF No. 110-1 at 23-24 (Deposition of Dawson)).)

### ii. Analysis

The entirety of Shipman's Opinion 1 reads as follows:

> **Opinion 1 – BNSF and predecessor-in-interest railroad operators caused soil and groundwater contamination, including releases of [total petroleum hydrocarbons (TPH)], PCBs and metals, on the Northern, Central, and Southern BNSF sites before PSI assumed the leases for those sites in 1981.**
>
> BNSF and other railroad companies owned and operated on, adjacent to, and west of the BNSF sites from 1887 to the present day. For approximately 100 years, these companies had railyards, rail lines and spurs on the western boundary of the BNSF sites and along Harrison Avenue on and adjacent to the BNSF sites and adjacent to the PSI parcels. Activities associated with rail yard and railroad operations are known to release petroleum hydrocarbons, oil and grease, PCBs, heavy metals including lead, VOCs, and PAHs. In addition to transport of contaminants via air emissions, surface water runoff from BNSF's current railroad line and former rail yards ran onto the BNSF sites (Attachment 2) for almost 100 years, *likely transporting these contaminants onto the BNSF sites and properties to the east (i.e., PSI parcels). It is reasonable to conclude that much of the contamination on the three BNSF sites was the result of BNSF and other historical railyard and railroad operations* and, as documented in Dr. Reinis' expert report, PSI has spent millions of dollars on environmental sampling, investigation, compliance efforts and waste management.

(ECF No. 104-10 at 36 (emphasis added).)

As was addressed with respect to contamination by rail operations *on* the Property, Shipman's Opinion 1 with respect to contamination by rail operations adjacent to the

Property is based substantially on her training, expertise, and knowledge about contamination associated with the operation of rail lines generally, not the specifics of these railway operations. She cites to no field sampling data or evidence or releases. Instead, she relies on her specialized knowledge to conclude that "activities associated with rail yard and railroad operations are known to release petroleum hydrocarbons, oil and grease, PCBs, heavy metals including lead, VOCs, and PAHs." (*Id.*) She states, "Railroads used dielectric fluids, including varying levels of PCBs, in capacitors and on-board transformers. PCBs may also be used as a degreasing solvent associated with locomotive and engine maintenance (USEPA, 2002)." (*Id.* at 34.) As noted above, the Court has reservations about the adequacy Shipman relying on her expertise as to rail operations generally, without citing to evidence of how AT&SF conducted its rail operations on the Property, and without evidence of releases of the listed contaminants during the relevant time period. However, recognizing the additional challenges of endeavoring to recreate historical events going back decades, the Court accepts Shipman's expert knowledge in this area as *some* evidence of contaminant release by the off-site rail operations.

Without offering analysis or any substantive discussion of air emissions as a conduit for contamination, Shipman concludes, "Air emissions . . . originating from these adjacent parcels would likely have carried PCBs onto the BNSF sites prior to PSI's leasing and use of the site." (*Id.*)[10]

Shipman also opines that run-off originating from the adjacent parcels "would likely have carried PCBs onto the BNSF sites . . . ." (*Id.*) For her opinion regarding this potential transit pathway, Shipman relies on her observation that the rail tracks sat at a higher elevation than the Property. (*Id.* at 17.) She also relies on, and analyzes, a 2004 schematic prepared by Defendant's consultant Envirologics, Inc., identified as Figure 4 of Attachment

---

[10] In fact, in her deposition testimony, Shipman concedes that she did not evaluate the prevailing winds at the relevant time, and her expert report does not include an analysis of aerial transport. (ECF No. 110-1 at 10–11.)

23-cv-01202-JLB

2 to Shipman's report.  (*Id*. at 17, 18, 93.)

Although Plaintiff questions the value of Figure 4, especially in light of the purpose for which it was created, this is an area for cross-examination, rather than a basis for exclusion.  *See Primiano*, 598 F.3d at 564; *Persian Gulf Inc.*, 632 F. Supp. 3d at 1165. Because Defendant has preliminarily shown by a preponderance of the evidence that there is *some* foundation for Shipman's testimony that neighboring rail operations contributed to the contamination of the Property, the Court will not strike Opinion 1 on that basis at this time.  *See Engilis*, 151 F.4th at 1050; *Hyer*, 118 F.4th at 1056.  Defendant's motion as to this portion of Opinion 1 will be **DENIED** without prejudice, subject to renewal at trial.

### 2. Opinion 2—Whether there is an adequate factual basis that operators other than railroad operators contaminated the Property

#### a. Arguments

Plaintiff contends that the Court should exclude Shipman's conclusion in Opinion 2 that previous tenants caused soil and groundwater contamination, releasing TPH, PCBs, and metals onto the Northern, Central, and Southern BNSF sites before Defendant assumed the leases for those sites in 1981.  (ECF No. 104-1 at 21 (citing ECF No. 104-10 at 36).) Specifically, Plaintiff urges that Shipman's Opinion 2 is inadmissible because she has no evidence of the release of contaminants by Plaintiff or prior tenants.  (*Id*. at 23.)  Plaintiff challenges as insufficient the following evidence cited by Shipman in support of her conclusion that prior tenants released lead and PCBs onto the Property: (1) leases and other contracts between ATSF/Plaintiff and prior tenants on the Property; (2) an aerial photograph interpreted by Shipman as depicting railcars on the Property (ECF No. 104-12 at 6-7); (3) a November 1992 letter from Defendant's former counsel, Latham & Watkins, referencing interviews with alleged former SDI employees; and (4) PCB contamination patterns which, according to Shipman, corroborate such interviews.  (*Id*. at 21.)  Further, Plaintiff maintains that "Shipman cannot rely on the bare fact of a prior tenant operating on the Property as evidence that such operations contaminated that property." (*Id*.)  Thus, Plaintiff insists that "[i]n essence, Shipman's argument that the [] Property was

contaminated is built on the assumption that every industrial entity will contaminate every property upon which it operates." (*Id*. at 22.)

Plaintiff, therefore, maintains that Defendant "has no direct evidence of any releases or disposal of hazardous substances by pre-[Defendant] operators on the [] Property." (*Id*. at 23.) Plaintiff asserts that while "Shipman's Rebuttal Report attempts to supply such evidence in the form of newspaper articles concerning explosions and air quality violations associated with SDI's historic operations at the Site," Shipman's rebuttal likewise fails to establish that "the incidents occurred on the [] Property (as opposed to the adjacent property operated by SDI), that contamination from those incidents migrated onto the [] Property, [and] that air quality violations are associated with soil contamination, or anything else to indicate that the widespread contamination BNSF remediated is attributable to any entity other than [Defendant]." (*Id*.) Contending that an expert in Shipman's field could not "reasonably rely solely on location and unreliable hearsay testimony . . . to affirm that releases of hazardous substances occurred during the tenancy of prior site operators," Plaintiff moves the Court to exclude Opinion 2 as unreliable speculation under Rule 702. (*Id*. at 23-24.)

Regarding the 1992 letter, Plaintiff asserts that "Shipman cannot rely on hearsay evidence—from undated interviews with unidentified persons purporting to be former SDI employees, all according to PSI's own lawyers—as evidence that SDI released PCBs or other contaminants onto the BNSF Property." (*Id*. at 22 (citing ECF No. 104-10 at 10, 15, 33, 34, 37).) Plaintiff contends that the foundation of an expert opinion is only reliable "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject[.]" (*Id*. (quoting Fed. R. Evid. 703).

Defendant counters that Plaintiff fails to establish a basis for excluding Shipman's Opinion 2, asserting that disagreements as to an expert's assumptions go to the weight of the evidence, rather than admissibility, and therefore should be resolved at trial rather than in a *Daubert* motion. (ECF No. 110 at 12). Further, Defendant maintains that in her expert report, Shipman "points to multiple lines of evidence showing a lengthy industrial history

23-cv-01202-JLB

and site contamination that pre-dates [Defendant] by decades, including historical petroleum storage and distribution activities on [Plaintiff's] and [Defendant's] parcels." (*Id.* at 12 (citing ECF No. 110-1 at 36–40) (Shipman Report).)  Moreover, Defendant contends that Plaintiff's own experts acknowledged that their former tenant, SDI, contaminated the Property.  (*Id.* at 12 (citing ECF No. 110-1 at 29 (Excerpt from Expert Report of Helen Dawson, Ph.D.) and 31 (Excerpt from Export Report of Michael H. Berman)).)  Defendant also notes that "[Plaintiff's] experts pointed to SDI's operations as a source of the pollution at issue in their expert reports."  (*Id.* at 13 (citing ECF No. 110-1 at 29 (Dawson Report) and 32 (Berman Report)).)  Thus, Defendant maintains that "[t]his motion is not the appropriate place for these issues to be litigated."  (*Id.*)

### b.    Analysis

Shipman's Opinion 2 reads as follows:

> **Opinion 2 – Previous tenant operations caused soil and groundwater contamination, releasing TPH, PCBs and metals onto the Northern, Central, and Southern BNSF sites before PSI assumed the leases for these sites in 1981.**
>
> Historical petroleum product storage and distribution is evident on both the BNSF sites and PSI parcels (Table 1, Figures 2b through 2d).  During grading activities conducted in 1997, odiferous, black stained petroleum impacted soil was found.  It was determined that a large petroleum pipeline from former Julian Petroleum had traversed beneath the Northern BNSF site and released [total recoverable petroleum hydrocarbons] (Figure 2b, [Kahl Environmental Services], 2002).  The fuel signatures documented by carbon ranges present in soil sampling results[] indicates that many decades of weathering and degradation has occurred, confirming this represents a release likely from the fuel distribution pipeline and not associated with PSI.
>
> In 2001, petroleum hydrocarbons were found in the subsurface by PSI at the Southern BNSF site where Caminol Oil, Southern Oil and SoCal Oil and Refining Corporation operated.  Operations from these companies released petroleum hydrocarbons in the subsurface.  These releases led to soil

23-cv-01202-JLB

characterization and removal actions conducted by BNSF. In a February 21, 2002[] letter to DTSC, BNSF noted that PSI notified BNSF of petroleum hydrocarbons contamination and acknowledged, after BNSF's consultant completed a site investigation, that the contamination was from another source and not from PSI (BNSF, 2002).

SDI also used the Northern and Central BNSF sites as a machinery repair facility. Based on employee interviews, waste oils were disposed of directly to the ground surface and electrical transformer oils were also discharged directly to the ground by SDI prior to shredding vehicles, equipment, and electrical transformers ([Latham & Watkins ("LW")], 1992). These electrical transformer oils contained PCBs. PSI's fluff stockpile, located on the Northern BNSF site, likely released PCBs to soil and the drainage ditch; however, PCBs found in other portions of the BNSF sites were not likely released by PSI activities.

As presented in Table 1, various scrap metal companies operated at the BNSF sites and portions of the PSI parcels, releasing pieces of metal and metal particulates to the ground and shallow soil. Through the course of their operations, the metal became mixed with soil. PSI supported the removal of metals from soil on the BNSF sites through their excavation and processing of the soil for metal recovery and beneficial reuse. Based upon the multiple lines of evidence discussed above, it is reasonable to conclude that much of the contamination on the three BNSF sites was the result of other previous historical industrial operations and, as documented in Dr. Reinis' expert report, PSI has spent millions of dollars on environmental sampling, investigation, compliance efforts and waste management.

(ECF No. 104-10 at 36-37; *see also id*. at 46.)

Here, once again, Shipman relies in substantial part on her expert knowledge related to the polluting potential of certain industrial activities, even in the absence of specific evidence of the time and place of any discharges related to the Property. Plaintiff characterizes this as Shipman offering an opinion "built on the assumption that every industrial entity will contaminate every property upon which is operates." (ECF No. 104-1 at 22.) Here, however, that is not the sole foundation for Shipman's Opinion 2. The

Court, therefore, turns to Plaintiff's objections to the other evidence upon which Shipman relies to form Opinion 2.

Plaintiff objects to Shipman's reliance on a 1992 letter by Defendant's former counsel, Latham & Watkins, reporting on statements from former SDI employees regarding the disposal of waste oils directly into the ground. (ECF No. 104-1 at 22.) Plaintiff notes that Shipman's report overstates the actual content of the letter (*Id*. at 22 n.7), but Plaintiff's main objection is that the evidence is hearsay from unidentified parties. Plaintiff notes that, although expert opinions are not per se inadmissible because they rely on hearsay evidence, the evidence upon which an opinion is based must be the type of evidence "experts in the particular field would reasonably rely on." (*Id*. (quoting Fed. R. Evid. 703).) Although Plaintiff does not provide the Court with declarations, other evidence, or citations to case law from which the Court can make a determination as to whether experts in this particular field rely on this kind of hearsay evidence, Plaintiff does not need to, as Defendant has the burden to show, by a preponderance of the evidence, that there is factual support for Shipman's opinion. The burden is on Defendant to show that hearsay such as that in the 1992 letter is the type of evidence experts in the field would reasonably rely on.[11] *See Engilis*, 151 F.4th at 1049; *see also United States v. W.R. Grace*, 504 F.3d 745, 763 (9th Cir. 2007) (citing Fed. R. Evid. 703)[12] (explaining that "an expert

---

[11] Defendant did not provide the 1992 Latham & Watkins letter in conjunction with its Opposition to Plaintiff's Motion. (*See* ECF No. 110-1.) However, Defendant attached the letter as Exhibit 5 to its Opposition to Plaintiff's Motion for Partial Summary Judgment. (*See* ECF No. 109-1 at 20–22.)

[12] Rule 703 of the Federal Rules of Evidence provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. *If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they*

reasonably may rely on inadmissible evidence in forming an opinion or delivering testimony," where the evidence is of a "type reasonably relied on by other experts in the field"). Defendant neither makes this argument nor offers support for that proposition.[13] As Defendant has the burden of proof and has not met it, the Court does not consider this letter to provide support for Shipman's Opinion 2. *See Engilis*, 151 F.4th at 1049.

Shipman also relies on contamination concentration and distribution patterns to opine on the likely sources of the contaminants. Specifically, she analyzed data related to PCBs (ECF No. 104-10 at 33-34 and 61-64 (Figures 4a through 4d)), TPH (*Id*. at 34–35 and 65–69 (Figures 51-5e)), and metals (*Id*. at 35–36). For the reasons set forth below in section B.1., the Court finds that Shipman's analysis in Opinion 2 with respect to PCBs, to include her conclusion that "PCBs found in other portions of the BNSF sites were not likely released by PSI activities," is inadmissible under Rule 702(c) and (d). However, the remainder of Shipman's Opinion 2 has an adequate factual basis. The Court therefore **GRANTS** Plaintiff's Motion as to Opinion 2 under Rule 702(b) with respect to PCBs and **DENIES** the Motion with respect to TPH and metals.

---

> *need not be admissible for the opinion to be admitted*. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703 (emphasis added).

[13] Defendant does include, as Exhibit 3 to the Declaration of Stephan Ma in support of its opposition, a portion of the expert opinion of Plaintiff's expert Dawson, which indicates that Dawson relied on newspaper articles published between 1956 and 1981 in forming her opinions. (ECF No. 110-1 at 28-29.) If this was intended to suggest that Plaintiff's expert also relies on hearsay in newspaper articles, and therefore hearsay in the 1992 letter is something upon which experts in this field also reasonably rely, no such argument was actually put forth by Defendant. The Court will not make that leap on its own.

**B.     Rule 702(c), (d)—Reliability of Method and of Application**

**1.     Whether Shipman's conclusion in Opinion 2 regarding PCBs fails to meet the requirements of Rule 702 (c) and (d)**

**a.     Arguments**

Plaintiff asserts that Shipman's Opinion 2 rests on her analysis of PCB data, and that that "analysis . . . must be discarded as an unreliable application of methods to the facts of the case under [Rule] 702(d)." (ECF No. 104-1 at 26.)  Specifically, Plaintiff takes issue with Shipman's conclusion that, unlike the highest concentrations of Aroclor-1242 that generally align with the footprint of the former PSI fluff stockpiles, "the concentration contours for the other PCB Aroclors reviewed do not align with the former fluff stockpiles indicating additional sources of PCBs." (*Id.* at 25 (quoting ECF No. 104-10 at 34).)  Plaintiff argues that Shipman's methodology is unreliable on the basis that it "cherry-picks and combines disparate data sets without explaining her exclusion of contrary data" and, further, that it "provides no analysis of possible alternative sources of contamination." (*Id.* at 26.)  Plaintiff maintains that Shipman relied on sampling from 1989, 2004, and 2012 and ignored more recent sampling conducted in 2018 and 2022. (*Id.* (citing ECF No. 104-5 at 17 (2021 IMW); ECF No. 104-7 (2023 TRC Revised Remedial Action Completion Report) at 17).)  Plaintiff highlights Shipman's deposition testimony where she concedes that her reference to the consideration of the 2022 sampling data in her PCB figures was a "typo," and that she did not, in fact, take that data into account. (*Id.* at 26.)  Critically, she testified that her analysis would have changed had this data set been included. (*Id.* (citing ECF No. 104-12 at 21-22).)  Plaintiff further points out that Shipman *did* use the 2022 data when conducting her TPH evaluation, just not when analyzing the presence of metals and PCBs. (*Id.* (citing ECF No. 104-10 at 33-34).)  Plaintiff protests that "Shipman cannot use different data sets from different time periods for different constituents without providing a valid scientific basis for doing so." (*Id.*)  Thus, Plaintiff contends that the Court should also exclude Shipman's opinion as to PCB contamination patterns under Rule 702(c). (*Id.* at 26-27.)

23-cv-01202-JLB

Plaintiff further contends that "[i]f Shipman's intent was to show that PCBs on the BNSF Property pre-dated PSI's operations, an established method for doing so is through radioisotope testing." *Id*. at 27 (citing *Innis Arden Golf Club v. Pitney Bowes, Inc.*, 629 F. Supp. 2d 175, 189 (D. Conn. 2009)).[14]

Finally, Plaintiff highlights Shipman's deposition testimony that "it is reasonable to assume [Defendant] contributed [only] a fraction of the existing contamination to the BNSF Property," but that the contamination caused by Defendant could "not be quantified based on the information at hand." (ECF No. 104-12 at 17, 137.)  Noting that Defendant "was named as the responsible party in dozens of notices of violations, criminal complaints, civil enforcement actions, and agency enforcement actions for having violated environmental laws related to the exact same constituents of concern now at issue—lead and PCBs," Plaintiff maintains that Shipmans' failure to address Defendant's "potential contribution and releases of the contaminants" as an "obvious alternative cause[]" renders Opinion 2 subject to exclusion under Rule 702(c) and (d).  (ECF No. 104-1 at 27-28 (citing *Innis Arden Golf Club*, 629 F. Supp. 2d at 189).)

Defendant counters that the Court should not exclude Shipman's Opinion 2, as an expert need not "rule out *every* possible alternative" and, further, because the failure to do so implicates the weight of evidence, rather than admissibility.  (ECF No. 110 at 14 (quoting *Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 693 (8th Cir. 2001)).)  Defendant does not substantively address Shipman's failure to include more recent data or her concession that consideration of that data would have changed her analysis.

---

[14]  In *Innis Arden Golf Club*, the United States District Court for the District of Connecticut noted that plaintiff's expert "recognized the potential relevance of date testing the PCBs found deep in the sediment, owing to the possibility that the PCBs might predate [defendant's] occupancy of [the property]," further observing that although "[r]adioisotope testing would have resolved this open question," the environmental-consulting firm retained by plaintiff "never dated the soil samples." *Innis Arden Golf Club*, 629 F. Supp. 2d at 189.

### b.   Analysis

Though not specifically discussed in Opinion 2, Shipman addresses PCB aroclors elsewhere in her report:

> The distribution of four PCB aroclors in the Northern and Central BNSF sites are shown in Figures 4a through 4d (WCW, 1989[15]; [SCS Engineers ("SCS")], 2012; TRC, 2004; TRC, 2022). Figure 4a shows the concentration contours for Aroclor-1242, which is most associated with fluff generated from auto shredding operations.  The highest concentrations of Aroclor-1242 generally align with the footprint of the former PSI fluff stockpiles.  However, the concentration contours for the other PCB Aroclors reviewed do not align with the former fluff stockpiles indicating additional sources of PCBs.
>
> Figure 4b indicates a "hot" zone for Aroclor-1248 (generally associated with hydraulic fluids) in the central portion of the BNSF Central site trending east to west.  The Aroclor-1248 concentration contours do not align with the former PSI fluff stockpiles and in fact exhibit the lowest concentrations beneath the footprint of PSI's former fluff stockpiles.  Instead, this "hot" zone aligns with SDI operations prior to PSI's leasing and use of the area, including reportedly draining transformer and waste oil to the ground (LW, 1992).
>
> Figure 4c shows that the highest concentrations of Aroclor-1254 (generally associated with transformers, capacitors, and hydraulic fluids) are located around boring BNSF9 outside and south of the former PSI fluff stockpiles, indicating a source of PCB contamination other than the fluff stockpiles.  This likely indicates contribution from SDI operations prior to PSI's leasing and use of the area.  Contours on the Northern BNSF site near borings B2 and B4 may indicate some contribution from the fluff stockpiles.

---

[15]  "WCW" is evidently a typographical error.  Shipman likely intended to refer instead to the Woodward Clyde Consultants 1989 Soil Contamination Investigation, referred to as WCC in the list of references contained in Shipman's report.  (*See* ECF No. 104-10 at 44.)

23-cv-01202-JLB

> Figure 4d indicates "hot" zones for Aroclor-1260 (generally associated with transformers and hydraulic fluids among others) near borings BNSF9 and B5. The "hot" zone around BNSF9 also aligns with the highest concentrations of Aroclor-1254 outside of the footprint of the former fluff stockpiles, indicating a source other than PSI. Although the "hot" zone around boring B5 is within the footprint of a former stockpile, it does not mirror the concentration contours for Aroclor-1242 (Figure 4a), which is most commonly associated with fluff. This also points to a source other than PSI's fluff stockpile fluff and may align with SDI operations prior to PSI leasing and using the BNSF sites.

(ECF No. 104-10 at 33-34.)

"Before admitting expert testimony, the trial court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Sanchez v. Jiles*, No. CV 10–09384 MMM (OPx), 2012 WL 13005996, at *7 (C.D. Cal. June 14, 2012) (quoting *Daubert*, 509 U.S. at 592–93). As the United States Supreme Court has explained,

> [t]rained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146–47 (1997) (citation omitted).

In reaching her conclusions ascribing responsibility for PCB contamination on the Property, Shipman relied primarily on her mapping of the PCB data on the site map and drawing conclusions from the distribution patterns. Shipman relied on sampling from 1989, 2004, and 2012 and ignored more recent sampling conducted in 2018 and refined in 2022. (ECF No. 104-10 at 33; ECF No. 104-12 at 23.) Moreover, she testified that her report erroneously stated that her analysis included the 2022 data, that she had intended to include the 2022 data, and that consideration of that data would have impacted the figures

28

23-cv-01202-JLB

in her report.

Q. Okay.  Turning back to Exhibit 2, which is your expert report, Ms. Shipman.  I have here Section 3.1, titled "Soil" and Section 3.1.1., "PCBs"; do you see that Ms. Shipman?

**A. I do.**

Q. And do you recall this portion of your expert report?

**A. I do.  And I have realized that there is, at the bottom of page 25, a reference to TRC 2022, which is incorrect in regards to what's being presented for PCBs.  The figures do not present 2022 data.  It's a typo.**

Q. Was it your intent that those figures would represent that 2022 data?

**A. It was.  It was—it was not included, unfortunately.**

Q.  Okay.  Would the figures that are referred to in Section 3.1.1. look different, had that 2022 date been included?

**A. They would.**

(ECF No. 104-12 at 22–23.)

Federal Rule of Evidence 702, subsections (b), (c), and (d), mandate that the Court exclude expert testimony if the proponent fails to demonstrate by a preponderance of the evidence that the expert's testimony is based upon sufficient facts and data, is the product of reliable principles and methods, and reflects a reliable application of the principles and methods to the facts of the case.  Here, Shipman testified that she did not include data she had intended to rely on.  She acknowledged that the data she inadvertently failed to include would have impacted the figures in her report, that is, the basis for her conclusions. Defendant has failed to address this in its opposition.  Defendant has not provided the Court with any basis for concluding that Shipman's failure to include this data was consistent with reliable scientific principles and methods.  Defendant has not provided the Court with

23-cv-01202-JLB

any evidence or argument that, notwithstanding the absence of the most recent, relevant data, Shipman's conclusions with respect to the possible sources of PCB contaminants are nonetheless still based on sufficient facts or data. *See Joiner*, 522 U.S. at 146–47 (holding that the district court did not abuse its discretion in deeming expert opinion inadmissible on the basis that "the studies upon which the experts relied were not sufficient, whether individually or in combination, to support their conclusions that [respondent's] exposure to PCB's contributed to his cancer"). Defendant has not argued that, notwithstanding the omission of this concededly relevant data, Shipman's application of the principles and methods to the facts of this case was nonetheless reliable. *See Daubert*, 43 F.3d at 1319 n.11 ("[T]he party proffering the evidence must explain the expert's methodology and demonstrate in some objectively verifiable way that the expert has both chosen a reliable scientific method and followed it faithfully.").

Thus, the Court **GRANTS** Plaintiff's challenge to the admissibility of Shipman's conclusion in Opinion 2 with respect to PCBs, to include her conclusion that "PCBs found in other portions of the BNSF sites were not likely released by PSI activities."

> **2.** **Whether Shipman's conclusion in Opinion 1 that contaminated stormwater ran onto the Property from an adjacent right-of-way and a nearby railyard operated by Plaintiff/ATSF prior to 1981 fails to meet the requirements of Rule 702 (c) and (d)**

> **a.** **Arguments**

Plaintiff contends that the Court should exclude as unreliable pursuant to Rule 702, subsections (c) and (d), Shipman's conclusion in Opinion 1 that, prior to 1981, stormwater runoff from an adjacent right-of-way and a nearby railyard operated by Plaintiff/ATSF contaminated the Property, because Shipman fails to account for obvious alternative sources of contamination and to explain her exclusion of certain relevant data. (ECF No. 104-1 at 24–25 (citing ECF No. 104-10 at 35–36).) According to Plaintiff, "Shipman provides no analysis to suggest that the lead in question is associated with railroad operations versus [Defendant's] operations—a potential alternative source that obviously requires analysis for her conclusion to be considered reliable." (*Id.*) Further, Plaintiff

23-cv-01202-JLB

contends that Shipman "ignores other relevant soil sampling data collected in 2018 and 2022, which show[] similar lead concentrations—at similar depths—in the locations of former automobile shredder waste piles." (*Id*. at 24–25 (citing ECF No. 104-12 at 23)) (Shipman's deposition testimony that she reviewed the data presented in the TRC 2022,[16] but that she "hadn't had a chance to include" that data in her expert report, further stating that "[i]t was not a purposeful omission").)

Defendant counters that the Court should not exclude Shipman's Opinion 1, because an expert need not "rule out *every* possible alternative." (ECF No. 110 at 14 (quoting *Lauzon*, 270 F.3d at 693 (citation omitted)).) Further, Defendant contends that "[w]hether [Plaintiff's] purported alternatives are truly as 'obvious' as it claims goes to the weight of the evidence, not admissibility." (*Id.* (internal quotation marks omitted).)

### b.   Analysis

As stated above, "[b]efore admitting expert testimony, the trial court must make 'a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.'" *Sanchez*, No. CV 10–09384 MMM (OPx), 2012 WL 13005996, at *7 (quoting *Daubert*, 509 U.S. at 592–93).

Shipman's analysis in her report regarding contaminated stormwater runoff includes the following:

> The BNSF railroad tracks are located on the western boundary of the BNSF sites as shown on Figure 4 in Attachment 2 from the Envirologic's 2005 IWM.[17] Based on the existence of the "brow" or drainage ditch shown on the west side of the BNSF

---

[16] Plaintiff notes that TRC, as its primary environmental consultant, conducted the scoping, sampling, and additional planning called for in the 2021 IMW. (ECF No. 104-1 at 9 (citing ECF No. 104-7 (TRC's 2023 Revised Remedial Action Completion Report)).)

[17] An evident typographical error, "Envirologic's 2005 IWM" is presumably a reference to the Interim Measures Workplan (IMW) developed by Envirologics and approved by DTSC in 2005. (ECF No. 104-10 at 10.)

property and the surface water flow arrows and "run-on" points indicated on Envirologic's Figure 4, the BNSF railroad tracks were situated at a higher elevation causing stormwater running onto the BNSF sites at least until 2005. During my visit to the PSI parcels in early March, the BNSF railroad tracks are still visibly higher in elevation than the BNSF sites grade which was raised in 2023 using fill material as part of the BNSF's IMW implementation.

(ECF No. 104-10 at 17.)

Attachment 2 presents historical surface water flow from the BNSF sites onto the PSI parcels. As shown in Figure 4 (Tetra Tech, 2005) of Attachment 2, the "non-processing area" located in the BNSF sites were subjected to surface water run-on from adjacent, surrounding parcels and features, including from the railroad tracks. Asphalt/concrete berms and sandbags are also located on portions of the BNSF sites' eastern (the area between the BNSF sites and the PSI parcels) and western boundaries (adjacent to a rail line). As shown on Figure 4 of Attachment 2, a concrete brow ditch, with a sediment trap, was located on the western side of the Northern BNSF site's boundary. The brow ditch drained to the municipal storm drain. In addition, Figure 2 (SCS, 2015) of Attachment 2 presents more recent surface water flow directions and other features including a vegetated swale along the western boundary of the BNSF sites and paved concrete swales throughout the BNSF sites and PSI parcels. As shown on this figure, the BNSF sites are in a "No Industrial Activities – unpaved" area and contain two "low areas." These two "low areas" appear to receive surface water runoff from the surrounding area. As presented on Figure 2 of Attachment 2, surface water from the adjacent PSI parcels does not appear to flow onto the BNSF sites.

(*Id*. at 18.)

Numerous surface water, soil, and groundwater assessments occurred in response to the [Regional Water Quality Control Board ("RWQCB") Cleanup and Abatement Order] between 1987 and 2002. The RWQCB was initially brought to the site in response to leachate that was generated from fire suppression water used by PSI to wet the auto shredding waste (ASW) or "fluff" stockpile as ordered by the National City Fire Department

23-cv-01202-JLB

to reduce fire danger. The leachate that migrated from the "fluff" stockpile into the "brow" ditch at the western side of the BNSF sites may have, in addition to BNSF railroad and SDI operations, been a source to the "brow" ditch (see section 3.1; [San Diego County Department of Environmental Health]). The water and sediment samples from the drainage ditches were found to contain PCBs, metals and TPH. Additionally, lead, zinc, and chromium concentrations in soil exceeded California hazardous waste limits. In response, PSI terminated the discharge of runoff, decreased the production of ASW, improved management methods, and excavated approximately 10 cubic yards (cy) of stained sediment from a drainage ditch. PSI removed the ASW fluff pile by 1988 ([Woodward Clyde Consultants], 1989; [Environmental Business Solutions], 2002). Soil was found to be contaminated with PCBs, metals and TPH at levels that required removal and could impact groundwater. As directed by the RWQCB, PSI's consultant WCC installed groundwater monitoring wells and conducted groundwater sampling. Additionally, WCC evaluated contaminant transport and developed remedial action alternatives.

(*Id*. at 22.)

SDI [] used the Northern and Central BNSF sites as a machinery repair facility. Based on employee interviews, waste oils were disposed of directly to the ground surface and electrical transformer oils were also discharged directly to the ground by SDI prior to shredding vehicles, equipment, and electrical transformers (LW, 1992). These electrical transformer oils contained PCBs. PSI's fluff stockpile, located on the Northern BNSF site, likely released PCBs to soil and the drainage ditch; however, PCBs found in other portions of the BNSF sites were not likely released by PSI activities.

As shown on Figure 4 in Attachment 2 . . . , the BNSF sites are subjected to surface water run-on from western adjacent, surrounding parcels owned and operated by BNSF and its predecessors-in-interest including historical operation of the railroad lines and use of the area further to the west as an AT&SF rail yard. Railroads used dielectric fluids, including varying levels of PCBs, in capacitors and on-board transformers. PCBs may also be used as a degreasing solvent associated with

23-cv-01202-JLB

> locomotive and engine maintenance (USEPA, 2002). Air emissions and run-on originating from these adjacent parcels would likely have carried PCBs onto the BNSF sites prior to PSI's leasing and use of the site. It is reasonable to conclude that a portion of the PCB releases on the BNSF sites are a result of historical operations by BNSF and other industrial operators prior to PSI's stockpiling activities.

(*Id*. at 34.)

Plaintiff criticizes Shipman's methodology, arguing that she selectively used data and ignored other relevant soil sampling data collected in 2018 and 2022 showing similar lead concentrations in the locations of former automobile shredder waste piles. Indeed, Shipman was asked in her deposition about the more updated soil sampling data, and she acknowledged that she did not incorporate it into her analysis of possible lead sources.

> Q. And did you consult or review the data—the 2022 TRC data in conducting your analysis of metals in soil at the BNSF property?
>
> **A. I have reviewed the data presented in TRC 2022.**
>
> Q. Is that reflected in your expert report, Ms. Shipman?
>
> **A. I did not comment on the data.**
>
> Q. And why not?
>
> **A. It was really just something that I hadn't had a chance to include. It was not a purposeful omission, as was alleged.**

(ECF No 104-12 at 23.)

Shipman here acknowledges that she reviewed the 2022 data but did not "comment" on it in her report. Unlike with respect to her analysis of PCB distribution patterns, here, Shipman does not testify that inclusion of the data impacted her analysis. It is the position of Plaintiff that it should have impacted her analysis, but that is an area for cross-examination. *See City of Pomona*, 750 F.3d at 1043-44; *Messick v. Novartis Pharms.*

23-cv-01202-JLB

*Corp.*, 747 F.3d 1193, 1199 (9th Cir. 2014) (citation omitted) (holding that issues regarding the correctness of an expert opinion, as opposed to its relevancy and reliability, are a matter of weight, not admissibility). The Court cannot conclude here that exclusion of the 2022 data necessarily means that her methods were unreliable or were unreliably applied.

Defendant also argues that Shipman's Opinion 2 is inadmissible because she fails to analyze an obvious alternative source, namely PSI, undermining the validity of her methodology. However, Shipman does address PSI as an alternative source. She does so in the context of discussing PSI's remediation measures. (ECF No. 104-10 at 22.) She does so when she discounts PSI's likely contribution by pointing out that surface water from the adjacent PSI parcels does not appear to flow onto the BNSF sites. (*Id*. at 18.) No doubt Shipman did not analyze PSI as an alternative source to the satisfaction of Plaintiff. Again, this is an area for cross-examination. But the Court cannot conclude that Shipman so failed to analyze an obvious alternative source that her methods are necessarily unreliable or unreasonably applied. *See California v. Kinder Morgan Energy Partners, LP*, 613 F. App'x 561, 564 (9th Cir. 2015) (reversing the district court's exclusion of expert opinion, reasoning that the expert's "assumption about the pre-contamination condition of the [c]ity's property [pertained] to weight and not admissibility").

Thus, the Court **DENIES** Plaintiff's motion to exclude Shipman's conclusion in Opinion 1 that contaminated stormwater ran onto the Property from an adjacent right-of-way and a nearby railyard operated by Plaintiff/ATSF prior to 1981 on the basis that it fails to meet the requirements of Rule 702 (c) and (d).

### C.    Rule 704(a)—Legal Opinion

#### 1.    Arguments

Plaintiff asserts that, under Rule 704(a), the Court should exclude Shipman's conclusion in Opinion 3 that Plaintiff is a responsible party for the contamination at the Property on the basis that Shipman impermissibly rendered a legal conclusion. (ECF No. 104-1 at 28-29.) Plaintiff contends that as an expert witness, Shipman is prohibited from providing expert opinion which applies law or policy to the facts of the case. (*Id*. at 29.)

Plaintiff seemingly takes issue with the following portion of Shipman's Opinion 3:

> As outlined in California Health and Safety Code, (CHSC) Chapter 6.8 and Chapter 6.5, and stated by DTSC's Imminent and/or Substantial Endangerment Policy, Procedures and Guidelines (DTSC, 1993), "current owners are considered a responsible party even if they made no contribution to the hazardous release." [Plaintiff] contributed to certain releases on their property. In accordance with CHSC Chapter 6.8, DTSC oversees the cleanup of sites in a manner that is generally consistent with the National Oil and Hazardous Substances Contingency Plan [] . . . .

> At the time [Plaintiff] filed the Complaint they knew, or should have known, that their properties had been contaminated by parties other than [Defendant] and that, as a property owner and discharger, they had a legal responsibility for the contamination.

(ECF No. 104-1 at 28 (quoting ECF No. 104-10 at 5).)

Defendant counters that the Court should not exclude Shipman's conclusion in Opinion 3 that Plaintiff is a responsible party for the contamination at the Property, asserting that an expert's testimony is not objectionable because it embraces an ultimate issue. (ECF No. 110 at 14.)    Defendant cites Shipman's deposition testimony that she is "well-versed" in "[r]egulations governing the quality of water, surface water, groundwater, soil, and air in California." (*Id.* at 15 (quoting ECF No. 110-1 at 5).)  Thus, Defendant maintains that "[i]n light of [] Shipman's experience working with the applicable regulations and regulatory authorities at issue here, her reference to those regulations in her expert opinion does not automatically render her opinion [] inadmissible[.]" (*Id.*)

### a.    Analysis

Pursuant to Rule 704(a), "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a).  "That said, an expert witness cannot give an opinion as to her *legal conclusion*, *i.e.*, an opinion on an ultimate issue of law.  Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Nationwide Transp. Fin.*, 523 F.3d at 1058 (citation omitted).

23-cv-01202-JLB

The challenged portion of Opinion 3 does not render an expert opinion as to the sources or distribution pathways of contamination on the Property. Rather, Shipman purports to opine on ultimate legal liability. (*See* ECF No. 104-10 at 5 (opining that Plaintiff bore "legal responsibility for the contamination" pursuant to California statute and policy).) Thus, the challenged portion of Opinion 3 constitutes an inadmissible legal conclusion. *See Nationwide Transp. Fin.*, 523 F.3d at 1058 (holding that the district court did not abuse its discretion in excluding portions of an expert's testimony and report which applied law to the facts of the case and discussed the parties' legal rights, duties, and obligations under the law).

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's Motions are **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

Dated:  July 2, 2026

Hon. Jill L. Burkhardt
United States Magistrate Judge

23-cv-01202-JLB