UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BNSF RAILWAY COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>PACIFIC STEEL, INC.,<br><br>Defendant. | Case No.:  23-cv-01202-JLB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART BNSF RAILWAY COMPANY'S MOTION TO EXCLUDE CERTAIN OPINION TESTIMONY OF DEFENDANT'S EXPERT WITNESS DR. SIGRIDA REINIS**<br><br>**[ECF No. 105]** |

Before the Court is a Motion to Exclude Certain Opinion Testimony of Defendant's Expert Witness Dr. Sigrida Reinis ("Motion") (ECF No. 105) filed by Plaintiff BNSF Railway Company ("Plaintiff" or "BNSF").  Defendant Pacific Steel, Inc. ("Defendant" or "PSI") opposes the motion.  (ECF No. 111.)[1]  For the reasons set forth below, Plaintiff's Motion is **GRANTED** in part and **DENIED** in part.

---

[1] Plaintiff filed a reply.  (ECF No. 116.)

23-cv-01202-JLB

## I.        RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is the owner of property located in National City, San Diego County, California ("the Property").  (ECF No. 1 at 3, ¶ 6.)  In 1977, Plaintiff's predecessor in interest, the Atchison, Topeka & Santa Fe Railway Company ("ATSF"), as lessor, executed a lease agreement ("1977 Lease" or "1977 Lease Agreement") with Scrap Disposal, Inc. ("SDI"), as lessee, for the use of the northern and central portions of the Property for the handling and storage of scrap materials.  (*Id.* at 3, ¶ 7.)  In 1978, ATSF and SDI entered into a second lease agreement ("1978 Lease" or "1978 Lease Agreement")[2] covering the southern portion of the Property.  (*Id.* at 7, ¶ 12.)

In May 1980, SDI filed for protection under Chapter 11 of the United States Bankruptcy Code.  (ECF No. 112-1 at 3, Plaintiff's Response to Defendant's Separate Statement of Undisputed Material Facts ("PRSSUF") ¶ 5.)  In July 1981, a trustee in SDI's bankruptcy proceedings assumed the Leases.  (*Id.* at 4, PRSSUF ¶ 7.)  The bankruptcy trustee assigned the Leases to Western States Investment Corporation, which in turn assigned the Leases to San Diego Steel, Inc. ("SDS").  (*Id.* at 4, PRSSUF ¶¶ 7-8.)  In August 1981, SDS filed a Certificate of Amendment of Articles of Incorporation changing its name to Pacific Steel, Inc.  (ECF No. 90-13 at 5; *see also* ECF No. 103-2 at 2, ¶ 2.)  In November 1982, the United States Bankruptcy Court for the Southern District of California entered an order approving a liquidating plan of reorganization for SDI.  (ECF No. 90-14.)

Plaintiff commenced the instant litigation against Defendant on June 29, 2023, seeking "redress against its former tenant[, Defendant,] . . . for damaging [Plaintiff's] property located immediately adjacent to and west of [Defendant's] property at 1700

---

[2] The 1977 Lease Agreement and the 1978 Lease Agreement were amended in 1983. (ECF Nos. 80-11, 80-12.)  The original lease agreements and the supplemental lease agreements shall be referred to collectively as the "Leases" or the "Lease Agreements."

23-cv-01202-JLB

Cleveland Avenue in National City, California . . . and for failing to pay rent." (ECF No. 1 at 2, ¶ 1.)  In its Complaint, Plaintiff alleges the following:

Defendant operated a scrap metal recycling business on the Property pursuant to the Lease Agreements. (*Id.* at 2 & 11, ¶¶ 1 & 16.)  The Lease Agreements contain provisions for payment of rent and indemnification by Defendant for all loss, damage, or expense incurred by Plaintiff arising out of Defendant's use of the Property, including any "fines, penalties, clean-up and disposal costs." (*Id.* at 4–11, ¶¶ 8–15.)

The California Department of Toxic Substances Control ("DTSC") sued Defendant for environmental violations in 2004 and 2015, and the state court ordered Defendant to investigate and remediate the contamination. (*Id.* at 2, ¶ 1.)

As part of a July 2004 stipulated judgment, Defendant agreed to monetary terms and to enter into a Corrective Action Consent Agreement with DTSC. (*Id.* at 12–13, ¶¶ 21–22.)  As part of the Corrective Action Consent Agreement, Defendant submitted a draft Interim Measures Workplan ("IMW") containing proposals to remediate contamination and to reduce the threat of the release of hazardous waste or hazardous constituents on the Property. (*Id.* at 13, ¶ 23.)  DTSC approved the IMW in September 2005. (*Id.*, ¶ 24.)

During inspections of the Property between 2010 and 2013, DTSC observed several violations of the Hazardous Waste Control Law ("HWCL"), the California Health and Safety Code, and the 2004 stipulated judgment. (*Id.* at 14, ¶ 28.)  In 2015, DTSC sued Defendant again, alleging that Defendant had "committed multiple violations of the HWCL," including by storing hazardous waste without authorization and by violating other provisions of the HWCL and the terms of the 2004 stipulated judgment. (*Id.* at 15, ¶ 30.)  In a stipulated judgment approved by the state court in January 2016, Defendant agreed to both injunctive and monetary terms and conditions. (*Id.* at 16, ¶¶ 32–33.)  In May 2019, Defendant submitted another draft IMW to DTSC. (*Id.* at 35, ¶ 35.)  Defendant's draft IMW identified elevated concentration of metals, polychlorinated biphenyls, polycyclic aromatic hydrocarbon compounds, and petroleum hydrocarbons in the soil at the Property. (*Id.*)  After several revisions, Defendant finalized the IMW in 2021. (*Id.* at 16, ¶ 36.)

Following a public comment period running March 30, 2022, through April 29, 2022, DTSC approved the IMW (hereinafter "2021 IMW")[3] on May 31, 2022.  (*Id.*)

On December 6, 2022, DTSC sent Defendant a letter stating that Defendant was out of compliance with prior agreements.  (*Id.* at 17, ¶ 38.)

On January 13, 2023, Plaintiff served on Defendant a Notice of Termination of Leases, providing the requisite 30-day notice under Section 14 of the Lease Agreements.  (*Id.* at 18, ¶ 44.)  After Plaintiff sent the Notice of Termination of Leases, Defendant sent a schedule for implementing the 2021 IMW to DTSC on February 3, 2023.  (*Id.* at 17, ¶ 39.)  A little more than two weeks later, Plaintiff denied Defendant permission to access the Property.  (*Id.*)  On April 11, 2023, Plaintiff entered into a Voluntary Cleanup Agreement with DTSC to promptly carry out the cleanup of the Property under DTSC oversight.  (*Id.* at 18, ¶ 47.)  Plaintiff tendered its claims to Defendant and demanded that Defendant indemnify Plaintiff for the cleanup, as required by the Lease Agreements.  (ECF No. 1 at 18, ¶ 48.)  Defendant responded on June 14, 2023, asserting that Plaintiff's breach of the Lease Agreements excused its obligation to indemnify Plaintiff under those agreements.  (*Id.* at 18, ¶ 49.)

Plaintiff's June 2023 Complaint brings the following causes of action against Defendant: (1) specific performance; (2) breach of contract; (3) breach of the implied covenant of good faith and fair dealing; (4) express contractual indemnity; (5) nuisance; (6) trespass; (7) negligence; (8) waste; (9) equitable and implied indemnity and contribution; (10) contribution under California's Hazardous Substances Account Act; (11) contribution under federal common law; and (12) declaratory relief.  (*Id.* at 19–36, ¶¶ 53–138.)  Plaintiff seeks general damages, the costs of remediating the Property, the total amount of outstanding rent, compensatory damages, an order confirming Defendant's indemnity and defense obligations, Defendant's equitable share of response costs with

---

[3] The parties refer to the IMW finalized by Defendant in 2021 and approved by DTSC in 2022 as the "2021 IMW."  For the sake of consistency, the Court shall as well.

23-cv-01202-JLB

interest, punitive damages, attorney's fees, interest, and costs of suit.  (*Id.* at 36–37.)

Plaintiff and Defendant retained experts.  Dr. Sigrida Reinis, PhD, a licensed Professional Engineer and a Senior Associate with Langan CA, Inc. ("Langan"), prepared an expert report, dated March 24, 2025, on behalf of Defendant ("Expert Report").  (ECF No. 105-11.)  Dr. Reinis also prepared a Rebuttal Report in response to an expert report prepared on behalf of Plaintiff by Michael H. Berman, licensed Professional Engineer, Certified Hazardous Materials Manager, and an employee of Geosyntec.  (ECF No. 105-12 at 2, 4–5.)  Dr. Reinis further provided an addendum report, dated May 15, 2025 ("Addendum Report"), supplementing her Expert Report with updated opinions and additional exhibits.  (ECF No. 105-13.)

Dorinda Shipman ("Shipman"), a licensed Professional Geologist, Certified Hydrogeologist, and Vice President and Principal Hydrogeologist for Langan, also prepared an expert report, dated March 24, 2025, on behalf of Defendant.  (*See* ECF No. 104-10 at 2–3.)  Shipman further prepared a rebuttal report, dated April 16, 2025, in response to an expert report prepared by Helen Dawson, PhD, one of Plaintiff's retained experts.  (ECF No. 104-11 at 2, 4.)

In July 2025, Plaintiff simultaneously filed the instant Motion (ECF No. 105), and a Motion to Exclude Certain Opinion Testimony of Shipman.  (ECF No. 104).

## II.    LEGAL STANDARD

The Federal Rules of Evidence provide that expert testimony is admissible "if the proponent demonstrates to the court that it is more likely than not that":

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  As the Ninth Circuit has explained:

23-cv-01202-JLB

> Under *Daubert* [*v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 594 (1993)] and its progeny . . . a district court's inquiry into admissibility is a flexible one. *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted). "[T]he trial court must assure that the expert testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" *Id.* at 564 (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993)). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.* at 565 (citation and internal quotation marks omitted). "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Id.* at 564 (citation omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car*, 738 F.3d at 969. Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969–70.

*City of Pomona v. SQM N. Am. Corp.*, 750 F.3d 1036, 1043–44 (9th Cir. 2014). "Challenges that go to the weight of the evidence are within the province of a fact finder, not a trial court judge," as the judge "should not make credibility determinations . . . reserved for the jury." *Id.* at 1044. Determining admissibility under Rule 702 is within the district court's discretion, and the proponent of an expert's testimony bears the burden of establishing its admissibility. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 158 (1999); *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025) ("confirm[ing] that a proponent of expert testimony must always establish the admissibility criteria of Rule 702 by a preponderance of the evidence and that there is no presumption in favor of admission").

23-cv-01202-JLB

Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). "That said, an expert witness cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008) (citation omitted).

### III.    MOTION TO EXCLUDE

#### A. Rule 702(b)—Sufficiency of Evidence

##### 1. Whether there is adequate factual support for Dr. Reinis's position in Opinion 1 that Defendant should not be required to contribute to Plaintiff's water management costs

###### a. Arguments

Plaintiff argues that Dr. Reinis's conclusion in Opinion 1 that Defendant need not compensate Plaintiff for stormwater management costs totaling $224,398.60 lacks sufficient evidentiary support and is therefore inadmissible. (ECF No. 105-1 at 11–12.) Plaintiff takes issue with Dr. Reinis's opinion that Plaintiff would have had to implement stormwater management measures even if Defendant had not leased the Property, because: (i) Plaintiff obtained its own construction stormwater discharge permit when it took over remediation; and (ii) until 2005, Plaintiff used the northern and central portions of the Property "as part of its own, broader stormwater management system, allowing surface water runoff from adjacent [Plaintiff]-owned and -operated parcels (e.g., railroad tracks) to flow onto these two relatively low-lying parcels being leased by [Defendant.]" (*Id.* at 11 (quoting ECF No. 105-11 at 7).) Dr. Reinis opines that Plaintiff would have incurred the same stormwater management costs even if Defendant had not leased the Property. (*Id.*)

Plaintiff asserts that after terminating the Lease Agreements, it incurred stormwater management costs in the course of remediating the Property in accordance with the IMW. (*Id.*) Plaintiff contends that Defendant would have had to perform stormwater management

23-cv-01202-JLB

had it implemented the IMW. (*Id.* at 12.)  This was "work that [Defendant] itself had proposed, that DTSC regulators had approved[.]"  (*Id.* (citing ECF No. 105-5 at 14–15).) Plaintiff highlights Dr. Reinis's acknowledgment during her June 12, 2025, deposition that Defendant was required to carry out stormwater management by the terms of the IMW. (*Id.* at 13 (citing ECF No. 105-14 at 7–8, 10–11).)

Further, according to Plaintiff, Defendant's contamination of the Property and the "moonscape" caused by excavation of the impacted soil heightened the risk that stormwater runoff could entrain hazardous waste constituents and migrate to neighboring properties. (*Id.* at 11–12) (citing ECF No. 105-5 at 14, 19 (2021 IMW); ECF No. 105-7 at 14 (TRC Revised Remedial Action Completion Report, 2023)).  According to Plaintiff, these conditions "added substantial complexity to the stormwater permit."  (*Id.* at 12.)

Plaintiff argues that this portion of Dr. Reinis's opinion must be excluded because, even if Plaintiff would have needed to implement a water management system regardless of its implementation of the IMW, Dr. Reinis improperly assumes, without factual support or analysis, that implementation of such a hypothetical water management system would have cost exactly as much as (not less than) the water management system actually implemented under the IMW.  (*Id.* at 11–13.)

Defendant counters that the challenged portion of Opinion 1 possesses sufficient evidentiary support and is therefore admissible.  (ECF No. 111 at 7–9.)  Defendant contends that evidence supports Dr. Reinis's conclusions regarding "overall directional flow and [Plaintiff's] historic lack of water management at the site[4] until implementation of the IMW."  (*Id.* at 8 (citing ECF No. 105-11 at 30 (Dr. Reinis's Expert Report, Exhibit 1.2, Figure 4 (Surface Water Flow)); ECF No. 105-13 at 16 (Dr. Reinis's Addendum Report, Exhibit 1.4 ("Hand-Drawn Sample Locations, Markup," May 1986))).)  Further, Defendant asserts that Plaintiff ignores Dr. Reinis's second, independent explanation for

---

[4] Dr. Reinis uses the term "site" in her Expert Report to refer to the "BNSF-owned parcels."  (ECF No. 105-11 at 4.)

23-cv-01202-JLB

excluding these costs: that the mobilization of Plaintiff's contractor prior to the approval of the grading plan caused these costs which could otherwise have been avoided and were therefore unreasonable and unnecessary. (*Id.* at 8.)

### b. Analysis

Dr. Reinis's Opinion 1 reads as follows:

> BNSF took over the remediation of the Central and Northern parcels after terminating PSI's lease and obtaining their own construction stormwater discharge permit. With that permit, BNSF took on full responsibility for stormwater management for the formerly leased parcels and the adjacent parcels that BNSF owns. Furthermore, since the beginning of PSI's leaseholds in 1981 and through at least 2005, BNSF continued to utilize this area as part of its own, broader stormwater management system, allowing surface water runoff from adjacent BNSF-owned and-operated parcels (e.g., railroad tracks) to flow onto these two relatively low-lying parcels being leased by PSI, from which it eventually was discharged into the city's stormwater sewer system via a drop inlet at Civic Center Drive. In other words, these stormwater management measures would have had to be implemented by BNSF even if PSI had not leased those two parcels. For both of these reasons, PSI should not be required to contribute to the "water management" costs incurred by BNSF during remediation of those parcels.
>
> - Exhibits:
>
>> o 1.1 – Notice of Intent, General Permit to Discharge Storm Water Associated with Construction Activity, February 07, 2023
>>
>> o 1.2 – Figure 4, Envirologics Inc., Final IMW, January 2005
>>
>> o 1.3 – American Integrated Services (AIS), APP#7, 09/22/2023

(ECF No. 105-11 at 7.) Dr. Reinis's Opinion identifies $224,398.60 as the disputed amount invoiced for water management. (*Id.*) Dr. Reinis opines that "BNSF approved contractor

requests for payment that included charges ostensibly related to remediation of BNSF's parcels but were in fact related to preparing the parcels for redevelopment or that were needed to address BNSF's stormwater management issues." (*Id.* at 5.)

In her Addendum Report, Dr. Reinis explained:

There is no change to the above opinion, although one new exhibit has been added to those presented in the original expert report. The purpose of Exhibit 1.4 is to provide a reference to an earlier point in time that establishes the ground surface elevation and drainage features. However, upon review of documents referenced in BNSF's rebuttal expert reports and re-review of previously received information, I found evidence to support the deduction of the same $224,398.60 for a second, altogether different reason, which is that BNSF's general contractor AIS was authorized to mobilize to the site and begin work approximately four months before BNSF's consultant TRC had an approved grading plan. Consequently, BNSF unnecessarily spent tens of thousands of dollars on "standby" and "moving water following rain events[."] As Mr. Berman notes in lines 33 and 35 on page 5 of Table 2 of his expert report (Geosyntec-Berman, 2025), TRC was engaging in "permitting" activities as late as June 2023 (their invoice is dated July 19, 2023); these activities included "additional grading plan revisions[."] This indicates that the general contractor, AIS, was allowed to mobilize to the site approximately four months before TRC finally obtained an approved grading plan. As can be seen in the excerpts from AIS' seven invoices included as Exhibit 1.5, AIS invoiced (March, April, May, and June 2023) a total of $205,784.85 for standby and moving water after rain events; these costs would not have been incurred if AIS had been authorized to mobilize only after an approved grading plan was obtained in July of 2023. Subsequently, AIS partially suspended their work on the site, with no invoice submitted in July of 2023. Then, on their final invoice, for August 2023, AIS again invoiced for "demobilization" and "remobilization" of the water management personnel and equipment. In summary, TRC delayed the construction work by not obtaining an approved grading permit in a timely manner and thereby caused certain construction costs totaling $224,398.60 to be unnecessarily incurred.

23-cv-01202-JLB

New Exhibits:

- 1.4 – "Sample Locations" figure, May 1986, annotated

- 1.5 – Amounts Invoiced by AIS for "Water Management" While Waiting for TRCs Grading Plan and After Site Had Dried Out

(ECF No. 105-13 at 98.)

It is well established that

> [t]he district court's "responsibility to screen expert testimony," *Elosu* [*v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1020 (9th Cir. 2022)], encompasses the requirement that expert testimony be "based on sufficient facts or data," Fed. R. Evid. 702(b). This element "requires foundation." *Elosu*, 26 F.4th at 1025. The "key inquiry" is "whether an expert had sufficient factual grounds on which to draw conclusions." *Hyer v. City & County of Honolulu*, 118 F.4th 1044, 1056 (9th Cir. 2024) (citation omitted).

*Engilis*, 151 F.4th at 1051.

The Court finds that Dr. Reinis's conclusion in Opinion 1 that Defendant need not compensate Plaintiff for stormwater management costs totaling $224,398.60 survives the Court's gatekeeping review. In essence, Dr. Reinis reasons that Defendant need not reimburse Plaintiff for stormwater management costs totaling $224,398.60 that were incurred over the course of remediating the Property in 2023, because Plaintiff permitted stormwater to flow onto the Property from 1981 through at least 2005 as part of its own "broader stormwater management system," such that Plaintiff would have had to implement these stormwater management measures even if Defendant had not leased the Property. (*See* ECF No. 105-11 at 7.)

Exhibit 1.1, a State Water Resources Control Board Notice of Intent, General Permit to Discharge Storm Water Associated with Construction Activity dated February 7, 2023, identifies Plaintiff as the property owner and the "Contractor/Developer." (ECF No. 105-

11 at 28.) The section of Exhibit 1.1 titled "Construction Site Information" identifies the construction site as "BNSF Former Pacific Steel Inc Lease Site," with an address of 1700 Cleveland Avenue, Nationale City, California 91950, and indicates that construction lasted from May 15, 2023, to January 17, 2025. (*Id.*) "Type of Construction" is listed as "Other: Remediation." (*Id.*)

Exhibit 1.2 to Dr. Reinis's Expert Report, dated July 29, 2004, and titled "Figure 4, Surface Water Flow," consists of a diagram identifying, among other things, "storm water sample collection points" and the "direction of flow" (presumably of stormwater). (*Id.* at 30.) This diagram arguably lends support for Dr. Reinis's Opinion 1, as it contains arrows indicating that "run-on" water may have flowed onto the Property from Plaintiff's adjacent property, at least as of 2004, and also identifies a "concrete brow ditch drainage to municipal storm drain at Civic Center Drive" along the border of the Property. (*See Id.*)

Exhibit 1.3 is an invoice from American Integrated Services, Inc., dated September 22, 2023, identifying the cost of soil remediation activities performed on behalf of Plaintiff. (*Id.* at 32.) The invoice includes a Schedule of Values for the project, which identifies $224,398.60 as the amount invoiced for water management. (*Id.* at 33.) Water management costs are itemized as follows: Standby, $109,613.05; Demobilization, $30,085.00; Remobilization, $29,700.55; Water Management (Moving water following rain events), $55,000.00. *Id.* Exhibit 1.3 also contains a list identifying quantities of Quarry Produced Imported Fill Soil obtained during August 2023 and numerous 2023 invoices generated by Superior Ready Mix Concrete, L.P. for fill sand. (*Id.* at 34-50.)

Dr. Reinis's Addendum Report supplements the Expert Report with Exhibit 1.4 in order "to provide a reference to an earlier point in time that establishes the ground surface elevation and drainage features." (ECF No. 105-13 at 5.) Exhibit 1.4 is a hand-drawn sketch of a drainpipe, fence, drainage ditch, and runoff ditch, which states that water and sediment samples were collected on various dates in 1986 and 1987. (*Id.* at 16.)

23-cv-01202-JLB

The exhibits summarized provide a foundation for Dr. Reinis's opinion that Plaintiff would have had to incur the costs for stormwater management even if Defendant had not leased the Property.

The Court notes that Dr. Reinis conceded at her deposition that if Defendant had implemented the IMW, it would have had to carry out stormwater management related to the construction activities, as, "in [her] experience, any . . . earth-moving project above a certain size is required to have prepared and implement[ed] a stormwater management plan or stormwater pollution prevention plan." (ECF No. 105-14 at 7-8.)[5]  However, this does not necessarily undermine the argument that Defendant's indemnification obligation should not include a water management system Plaintiff would have had to create irrespective of Defendant's tenancy.

Plaintiff also challenges the admissibility of Dr. Reinis's opinion on the basis that Dr. Reinis opines that the full amount of the water management costs should be offset without evaluating whether the cost of Plaintiff's hypothetically necessary water management system would have been the same regardless of Defendant's activities on the Property.  The Court acknowledges that Dr. Reinis engaged in no such analysis.[6]  Although this certainly weakens the foundation for Dr. Reinis's opinion, the Court cannot conclude that her use of the actual water management system costs as a stand-in for what Plaintiff's costs would have been hypothetically is not entirely without foundation.    "Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion." *Primiano*, 598 F.3d at 564.

---

[5] In response to the question, "Earlier we agreed that if PSI had implemented the [IMW], it would also have incurred costs relating to stormwater management, correct?" Dr. Reinis responded in the affirmative.  (ECF No. 105-14 at 10-11.)

[6] When asked whether she had reviewed any "BNSF-created documents" or any "regulatory documents regarding BNSF's stormwater management system," Dr. Reinis testified, "No, I have not." (*Id.* at 10.)

23-cv-01202-JLB

For the Court's gatekeeping purposes, Dr. Reinis adequately explained and supported her position that Plaintiff would have been required to expend resources on a water management system regardless of Defendant's use of the Property.  With respect to Defendant's argument that Dr. Reinis offers insufficient support for taking the position that implementation of this hypothetical water management system would offset—dollar for dollar—the expenditure Plaintiff made implementing the water management system mandated by the IMW that resulted from Defendant's use of the Property, the Court determines that this is an area for cross-examination; it does not render this portion of the opinion inadmissible.

The Court therefore concludes that Defendant has established by a preponderance of the evidence that the challenged portion of Opinion 1 possesses the requisite foundation to pass muster under *Daubert*.  Plaintiff's Motion as to Opinion 1 is **DENIED**.[7]

**2.**   **Whether there is an adequate factual basis for the portion of Dr. Reinis's Opinion 3 pertaining to backfilling to the Site's original grade pursuant to the 2021 IMW**
  **a. Arguments**

Plaintiff challenges Dr. Reinis' conclusion in Opinion 3 that backfilling to the Site's original grade was not necessary to implement the 2021 IMW, contending that this portion of Opinion 3 is inadmissible due to lack of evidentiary support.  (ECF No. 105-1 at 13-16.)  Plaintiff maintains that Opinion 3 contains an "egregious omission," as Dr. Reinis failed to address the following DTSC-approved requirements in the 2021 IMW:

> PSI plans to import clean fill to replace soil that has been excavated and then to restore the BNSF parcel to its original grade.  On average, the northern and central BNSF areas are approximately 2 to 6 feet below **the original grade when they were leased to PSI**.  Accordingly, after excavation the soil

---

[7] As to Dr. Reinis's other basis for concluding that Defendant need not compensate Plaintiff for stormwater management costs totaling $224,398.60, this is challenged by Plaintiff in this motion.  (*See* ECF No. 116 at 4 n.3.)

samples collected from 4 feet bgs[8] in the northern BNSF area will be approximately 5 feet below the restored original grades. This substantial clean fill layer will also serve to protect human health and the environment from the TPH concentrations at depth.

. . .

A significant amount of suitable imported soil **must be returned to the BNSF property to restore the approximate original surface elevations**. It is assumed that, after removal of impacted soils, the central and northern BNSF areas will be at approximately 5 to 6 feet below the original grade over an area of approximately 110,000 square feet. All fill material will be certified as clean in accordance with DTSC requirements and documentation will be provided in the final report.

(*Id.* at 15 (quoting ECF No. 105-5 at 18, 21) (emphasis added).) Further, Plaintiff asserts that Dr. Reinis failed to "refute DTSC's conclusion that backfilling was necessary to protect human health and the environment[.]" (*Id.* at 15-16 (citing ECF No. 105-14 at 12-14)).) Plaintiff also insists that Dr. Reinis's assumption that Plaintiff's restoration of the Property to its original grade was motivated by "redevelopment purposes" lacks any factual basis. (*Id.* at 16 (quoting ECF No. 105-11 at 9).)

Defendant counters that Plaintiff "appears to have missed the point of . . . Opinion 3," asserting that Dr. Reinis does not opine that backfilling to the original grade was "totally unnecessary," but rather that Plaintiff failed to produce any evidence that would support what "original grade" means or how it is calculated. (ECF No. 111 at 9.) Further, Defendant contends that Dr. Reinis's Opinion 3 correctly calls into question the level of the original grade, where the 2021 IMW contains a "material uncertainty" on this point. (*Id.* at 10.)

### b. Analysis

Dr. Reinis's Opinion 3 reads as follows:

---

[8] The acronym "bgs" refers to "below ground surface." (ECF No. 105-5 at 15.)

PSI should not be required to contribute to the cost of site improvements made for the sole benefit of BNSF, i.e., above and beyond those tasks needed for site remediation, including raising the grade, presumably for redevelopment purposes, and constructing a berm to divert BNSF's stormwater run-on.

- Exhibits:
  o 3.1 - AIS APP#7, 09/22/2023
  o 3.2 – AIS APP#6, 08/10/2023

| Line Items | Description | Amount Invoiced | Comment/ Calculation |
|---|---|---|---|
| 4 a | Contaminated Soil – Loading and Managing Trucks | 15,676 tons | Tonnage related to remediation. |
| 5 a | Purchase and Import of Approved Fill Material | 28,011[6] tons for a total of $605,593.59 [7] | 15,676 tons @ $16.75/t = $262,573 is reasonable, for backfilling of excavations. Balance, of $343,021, is for extra material brought on-site to raise grade and facilitate redevelopment. |
| 5 b | Place Backfill and Compact to Specifications | 28,011 tons for a total of $154,058.75. | 15,676 tons @ $5.50/t or $86,218 is reasonable. Balance, of $67,841, is for extra material brought on-site to raise grade and facilitate redevelopment. |
| 5 c | Compaction Testing and Reporting | Lump sum of $32,400. | $18,132 is reasonable. Balance, of $14,268, is for extra material brought on-site to raise grade and facilitate redevelopment. |
| 5 e | Place Berm on Western Perimeter to Prevent Run-On + repairs | $55,400.00 | $0 is acceptable; the entire $55,400 is for extra work related to raising grade. |
| Amount Deducted from Invoiced Total: | | | $ 343,021.00 |
| | | | $ 67,841.00 |
| | | | $ 14,268.00 |
| | | | $ 55,400.00 |
| | | | $ 480,530.00 |

23-cv-01202-JLB

(ECF No. 105-11 at 9.)[9]

The 2021 IMW provides that Defendant shall "restore the BNSF parcel to its original grade." (ECF No. 105-5 at 18.) Dr. Reinis opines that Defendant "should not be required to contribute to the cost of site improvements made for the sole benefit of BNSF, i.e., above and beyond those tasks needed for site remediation, including raising the grade, presumably for redevelopment purposes, and constructing a berm to divert BNSF's stormwater run-on." (ECF No. 105-11 at 9.) Defendant recharacterizes Dr. Reinis's conclusions in Opinion 3 as, "BNSF exceeded any reasonable backfilling that could have been required to 'restore the approximate original surface elevations' as part of the implementation of the IMW" and that "BNSF's contractor instead created a construction-ready commercial development pad." (*See* ECF No. 111 at 9.)

In its reply, Plaintiff maintains that "Dr. Reinis deducted *all* of BNSF's backfilling costs because . . . she presumed *all* such costs to be for redevelopment purposes." (ECF No. 116 at 5 (citing ECF No. 105-11 at 9) (emphasis added).)

When asked during her deposition whether remediating the Property in accordance with the IMW would have required Defendant to restore the Property to the approximate original surface elevations, Dr. Reinis answered, "Yes, the work plan says original grade, it has those words in it." (ECF No. 105-14 at 14.) In response to the question, "Was bringing this clean fill onto the [P]roperty to restore the parcel to its original grade unrelated to the remediation that was approved by DTSC?" Dr. Reinis responded, "Well, what we don't know is what that original grade was." (*Id.* at 12.) Dr. Reinis explained that she "ha[d] not seen any documentation, such as topographic maps, that would indicate what the grade was before PSI arrived on the site or began their lease." (*Id.*)

---

[9] Exhibits 3.1 and 3.2 consist of numerous invoices from American Integrated Services, Inc. billed to Plaintiff for, among other work, the purchase, import, and placement of backfill. (ECF No. 105-11 at 9, 73-95.)

23-cv-01202-JLB

Defendant has not established that it is more likely than not that this portion of Dr. Reinis's Opinion 3 is: (1) based on sufficient facts or data; (2) the product of reliable principles and methods; and (d) the result of the reliable application of the principles and methods to the facts of the case. Despite Defendant's recharacterization of Dr. Reinis's opinion as one where she eliminated only the costs related to grading above what is required by the IMW, this is simply not supported by her report or her calculations. Dr. Reinis recognized as reasonable and necessary only those costs associated with backfilling excavated areas. She removed everything that went toward raising the grade. This is inconsistent with what she acknowledged were the requirements of the IMW.

Defendant's assertion that the burden is on Plaintiff to establish what the original grade was misses the mark. It is Plaintiff's burden to establish the requirements of Rule 702 as to Dr. Reinis's opinion testimony. Dr. Reinis *presumed* that any expenditure of resources spent on raising the grade was for redevelopment purposes and done for the sole benefit of Plaintiff. Dr. Reinis made no effort to make any distinction between what fill was required to return the Property to its original grade as opposed to some higher grade she presumed Plaintiff selected to improve the utility of the Property. On the contrary, Dr. Reinis never suggests anywhere in her report that she takes issue with the *degree* to which the grade was raised; she rejected all costs associated with raising the grade without analysis of what was required by the IMW. Only when asked repeatedly to acknowledge that the IMW required returning the Property to the original grade to serve a remedial purpose ("To [bury]10 the – more deeply the soil that was contaminated with hydrocarbons"), did Dr. Reinis offer that she had no documentation establishing the original grade. (ECF No. 116-2 at 12-13.) Again, there is no discussion of this in Dr. Reinis's report, and no basis for the Court to conclude that this was the reason Dr. Reinis

---

10 Transcribed, presumably erroneously, as "vary."

23-cv-01202-JLB

opined that no money expended on raising the grade on the Property was reasonably and necessarily expended.

The Court thus concludes that Defendant fails to establish the admissibility of the challenged portion of Opinion 3. *See Engilis*, 151 F.4th at 1049.

**3.** **Whether there is adequate factual support for Dr. Reinis's conclusion in Opinion 8 that Defendant incurred $6,291,228.74 in remediation costs**

**a. Arguments**

Plaintiff contends that Dr. Reinis's conclusion in Opinion 8 that Defendant incurred $6,291,228.74 in remediation costs is inadmissible under Rule 702(b) for two reasons. (ECF No. 105-1 at 16.)  Plaintiff asserts that nearly 60 percent of Defendant's alleged remediation costs ($3,748,985.73) lack supporting evidence of "any actual costs incurred," as that portion is based on Plaintiff's remediation estimates. (*Id.* at 16.)  With regard to the portion of Defendant's remediation costs purportedly supported by documentation ($2,542,243.01), Plaintiff maintains that "Dr. Reinis only identifies limited evidence suggesting that [Defendant] made payment of $570,679.33," and that the remaining $1,971,563.68 is supported by estimates or invoice summaries, rather than "actual evidence of payment." (*Id.* at 16-17.)  Further, Plaintiff asserts that Dr. Reinis acknowledged during her deposition that she did not have proof of payment on which to rely:

> [Question:] [O]n what basis do you conclude that PSI incurred these costs and that they should be recoverable from [Plaintiff]?
>
> [Answer:] So as a -- speaking from the perspective of a consultant, generally speaking, if we were to produce a summary like this, I think it would match quite closely with payments received. And generally, we expect payment within 60 to 90 days, depending on the contract terms.  So someone in [SCS Engineer's (SCS)] position I don't think would continue to work for a client if they weren't paid in full and promptly.  So based on that experience, I have reason to believe that PSI actually reimbursed SCS for all of this work.

19

23-cv-01202-JLB

(*Id.* at 20 (quoting ECF No. 105-11 at 20-21).).)[11]  Moreover, Plaintiff maintains that the DTSC "oversight costs" identified by Dr. Reinis in her Addendum Report were based on "a print-out of a check register later produced by [Defendant]."  (*Id.* at 17 (citing ECF No. 105-14 at 6, 22) (Dr. Reinis's deposition testimony regarding a check register evidencing checks made out to DTSC as reimbursement for oversight costs); ECF No. 105-13 at 27-37 (Exhibit 8.2 to Reinis Addendum Report)).)  With respect to the oversight costs reflected in the check register, Plaintiff notes that during the relevant time period, Defendant was subject to DTSC oversight for its own property as well, and the check register does not indicate whether payment pertained to the leased property or Defendant's property.  (*Id.* at 19.)  Dr. Reinis acknowledged in her deposition that some portion of these oversight costs could be for remediation of Defendant's own property.  (ECF No. 105-14 at 25-26.)

Plaintiff also challenges the log attached as Exhibit 8.1, which purportedly contains costs invoiced to Defendant by SCS and Environmental Business Solutions (EBS) as unsubstantiated by "invoices, work orders, or any other documentary evidence that courts traditionally consider proof of payment."  (ECF No. 105-1 at 19 & 19 n.10 (citing *City of Wichita, Kansas v. Trs. of APCO Oil Corp. Liquidating Tr.*, 306 F. Supp. 2d 1040, 1092 (D. Kan. 2003) (deeming response costs in a CERCLA action sufficiently documented where "each invoice include[d] simple descriptions of the task being completed, as well as some indication of whether the charges were for labor or other direct expense")).)  For instance, Plaintiff asserts that "the SCS prepared list in Dr. Reinis's Exhibit 8.1 does not provide nearly enough information to attribute those costs to remediation or to conduct a 'reasonable and necessary' analysis."  (*Id.* at 20.)

Likewise, Plaintiff maintains that Dr. Reinis's opinion regarding "calculated remediation-related costs" (*i.e.*, the "undocumented costs") totaling $3,748,985.73 is

---

[11] Plaintiff notes that when asked, "Did you review any work orders for any of the costs identified in 8.1 of your expert report?" Dr. Reinis replied, "I don't recall seeing any." (ECF No. 105-1 (quoting ECF No. 105-14 at 20).)

23-cv-01202-JLB

inadmissible on the basis that it lacks supporting documentation or evidence of "any actual costs that PSI incurred." (*Id.* at 18).

Defendant acknowledges that it does not possess records of the remediation efforts initiated nearly 40 years ago. (ECF No. 111 at 11.) Nevertheless, Defendant maintains that Dr. Reinis's calculation of Defendant's remediation costs is supported by "extensive documentary evidence." (*Id.*) Defendant asserts that half of the costs calculated by Dr. Reinis are documented, citing Exhibits 8.1 and 8.2 to Dr. Reinis's Expert Report. (*Id.* (citing ECF No. 105-11 at 127-73).) With regard to the other half of its remediation costs, Defendant contends that Dr. Reinis relied on a conservative cost estimate approach "derived from her review of [Plaintiff's] own contractor's pricing in its base bid; approximate waste volumes, based on hazardous waste manifests; the approximate timeframe that those costs were incurred, adjusting for inflation; and her experience and professional judgment," as evidenced in Exhibit 8.3. (*Id.* (citing ECF No. 105-11 at 175-95).) Defendant insists that "[a]lthough Dr. Reinis does not have the benefit of 40 years of remediation record keeping, she does have well-established facts, based on reports, regulatory communications, lab data and waste manifests that provide the timeframe, type and volume of media remediated, all of which inform the approximate cost of remediation." (*Id.* at 12.) Further, Defendant asserts that "[t]hese arguments must be borne out through litigation, not by the gatekeeping of the Court." (*Id.*) Moreover, Defendant contends that Plaintiff's arguments go to the weight of the challenged portion of Opinion 8 as evidence, rather than the sufficiency of supporting evidence. (*Id.*)

### b. Analysis

Opinion 8 reads, in relevant part:

> PSI conducted its activities under State environmental regulatory agency oversight ([Regional Water Quality Control Board ("RWQCB")], followed by DTSC), sought to maximize resource recovery and thereby minimize the volume of waste requiring landfilling, and conducted those activities while seeking to maintain a viable business operation at its National City location.

23-cv-01202-JLB

Resource recovery is considered a beneficial use that is in the public interest.

All of the costs detailed in Exhibits 8.1, 8.2, and 8.3 and summarized in the table below are reasonable and necessary for remediation of the two parcels leased by PSI from BNSF. PSI incurred other remediation costs during this timeframe, including but not limited to their regulatory counsel's services. However, such costs are not included in the exhibits or table below and have not been factored into the calculations in this report.

The total cost to PSI of the remediation work on the two parcels that it leased from BNSF addressed in this report is calculated to be $6,807,485.23. Of that total, documentation was located for approximately $3,103,596.68, mainly including PSI's consultant's financial records and regulatory correspondence. The balance of $3,703,888.55 is calculated, based on BNSF's contractor AIS' pricing in their base bid; approximate waste volumes, based on documents; the approximate timeframe that those costs were incurred, based on documents; and my experience and professional judgement. Investigation continues and, if additional documentation is obtained, I will review and update my calculations as appropriate.

The calculated $3,703,888.55 in PSI-incurred remediation costs addressed in this report was derived using a conservative approach, for example: California tax on waste disposal, payable by the waste generator, is not included; the materials processing cost (e.g., Paydirt) was likely greater than $5 per ton; the unit rate applied to handling and disposal of the "fluff" is the non-hazardous materials rate, even though it was taken to Mexicali under hazardous waste manifests; and remediation activities that may have occurred but are not documented are not included.

I reserve the right to amend these calculations as new documentation is obtained.

(ECF No. 105-11 at 12 (footnotes omitted).)

Dr. Reinis cites the following exhibits:

23-cv-01202-JLB

• 8.1 – Remediation-related Costs Invoiced to PSI by EBS and SCS Engineers, with attachments.
• 8.2 – Regulatory oversight costs.
• 8.3 – Summary of Wastes Handled and Off-hauled by PSI from BNSF Sites and Calculated Costs, with attachments:

o Figure 1 from Woodward-Clyde Consultants, Soil Contamination Investigation – Area of Former Fluff Pile, August 28, 1989.  [(ECF No. 105-11 at 177.)]

o Hand-drawn "Sample Locations" figure, May 1986. [(ECF No. 105-11 at 178.)]

o Latham-Watkins letter to DTSC, October 29, 2009.  [(ECF No. 105-11 at 179-87.)]

o PSI letter to DTSC, October 17, 2005.  [(ECF No. 105-11 at 189-91.)]

o Table from SCS Engineers, Final Stockpile Sampling Report, November 19, 2010.  [(ECF No. 105-11 at 192-93.)]

o Letter from Brownstein Hyatt Farber Schreck to California Department of Justice, July 29, 2015.  [(ECF No. 105-11 at 194-95.)]

o Not attached (available in project file): 375 hazardous waste manifests documenting off-haul of "fluff" to Mexicali, Mexico, 1987 and 1990

(*Id.* at 13.)

In the Addendum Report, Dr. Reinis supplemented and amended Opinion 8, as follows:[12]

---

[12] The language in the supplemented and amended Opinion 8, as set forth here, is the same as in the initial report, except that the original figure for Defendant's total remedial work was revised downward from $6,807,485.23 to $6,291,228.74 (-$516,256.49), of

23

23-cv-01202-JLB

The total cost to PSI of the remediation work on the two parcels that it leased from BNSF addressed in this report is calculated to be $ 6,291,228.74. Of that total, documentation was located for approximately $ 2,542,243,01, mainly including PSI's and their consultant's financial records and regulatory correspondence. The balance of $ 3,748,985.73 is calculated, based on BNSF's contractor AIS' pricing in their base bid; approximate waste volumes, based on documents; the approximate timeframe that those costs were incurred, based on documents; and my experience and professional judgement. Investigation continues and, if additional documentation is obtained, I will review and update my calculations as appropriate. The calculated $ 3,748,985.73 in PSI-incurred remediation costs addressed in this report was derived using a conservative approach, for example: California tax on waste disposal, payable by the waste generator, is not included; the materials processing cost (e.g., Paydirt) was likely greater than $5 per ton; the unit rate applied to handling and disposal of the "fluff" is the non-hazardous materials rate, even though it was taken to Mexicali under hazardous waste manifests; and remediation activities that may have occurred but are not documented are not included. I reserve the right to amend these calculations as new documentation is obtained.

///

///

///

///

///

///

///

which the original figure for documented remediation was adjusted downward from $3,103,586.68 to $2,542,243.01 (-$561,343.67), and the original figure for calculated remediation expenses was adjusted upward from $3,703,888.55 to $3,748,985.73 (+45,097.18).

24

23-cv-01202-JLB

| Documented Remediation-related Costs | | |
|---|---|---|
| Description | Service Provider | Cost |
| Site Investigations | SCS | $ 329,310.41 |
| Soil Management Plans (SMP and PMP) | SCS | $ 21,462.30 |
| Air Monitoring Program | SCS | $ 6,800.75 |
| Groundwater Monitoring Program | SCS | $ 811,371.68 |
| Stormwater Compliance (sampling, analysis, and reporting)[3] | SCS | $ 781,818.54 |
| Regulatory Oversight[4] | RWQCB and DTSC | $ 591,479.33 |
| **Subtotal** | | **$ 2,542,243,01** |
| Calculated Remediation-related Costs | | |
| Description | Quantity (tons) | Cost |
| Off-haul of "fluff" piles to San Diego landfill, Mexicali, and USPCI Utah | 6,350 | |
| Off-haul of trash to Copper Mountain landfill | 248 | |
| Paydirt and other treatment/waste minimization processes | 13,800 | $ 3,748,985.73 |
| Off-haul of Cal Haz material | 8,757 | |
| Off-haul of non-hazardous material | 520 | |
| Off-haul of RCRA material | 7,452 | |
| **Subtotal** | | **$ 3,748,985.73** |
| **GRAND TOTAL** | | **$ 6,291,228.74** |

(ECF No. 105-13 at 8–9.) Dr. Reinis provided the following updated exhibits:

- 8.2 (updated) – Regulatory oversight costs, with attachment.

- 8.3 (updated) – Summary of Wastes Handled and Off-hauled by PSI from BNSF Sites and Calculated Costs, with attachments:

    o Page 5 From Bechtel Preliminary Assessment, July 28, 1993.

    o Figure 1 from Woodward-Clyde Consultants, Soil Contamination Investigation – Area of Former Fluff Pile, August 28, 1989.

    o Hand-drawn "Sample Locations" figure, May 1986. o Latham-Watkins letter to DTSC, October 29, 2009.

23-cv-01202-JLB

o PSI letter to DTSC, October 17, 2005.

o Table from SCS Engineers, Final Stockpile Sampling Report, November 19, 2010.

o Letter from Brownstein Hyatt Farber Schreck to California Department of Justice, July 29, 2015.

o Jakim Engineers, Incorporated, Letter of Transmittal, including 32 hazardous waste manifests documenting off-haul of "fluff" to Mexicali, Mexico, 1990.

o Not attached (available in project file):

- 375 hazardous waste manifests documenting off-haul of "fluff" to Mexicali, Mexico, 1987 and 1990.

(*Id.* at 10.)

### 1. Documented Costs

Dr. Reinis cites Exhibits 8.1 and 8.2 in support of the claimed "documented costs." The first page of Exhibit 8.1, titled "Remediation-related Costs Invoiced to PSI," consists of a printout summary[13] of invoices for work performed on behalf of Defendant by consultants EBS and SCS Engineers. (ECF No. 105-11 at 128.) The summary does not indicate the years during which Defendant purportedly incurred the alleged expenses. (*Id.*) The general task descriptions corresponding to each amount do not readily indicate whether the work performed related to remediation, or the site on which the services were rendered. (*Id.*)

---

[13] Each section of the printout has a unique "Project Number," and a brief reference such as "1600 and 1700 Cleveland Avenue, National City" (ECF No. 105-11 at 129), "Pacific Steel Facility Investigation" (*Id*. at 131), or "Pacific Steel, Stormwater Srvc, CA" (*Id*. at 134). The project identifier in each section is followed by numbered tasks with brief descriptions, such as "Prep for Fieldwork," "Drilling/Sampling," "Well Sampling," and "Waste Disposal." (*Id*. at 131.) There are no dates associated with the sections or the entries.

23-cv-01202-JLB

The first page of Exhibit 8.2, titled "Regulatory Oversight Costs," and dated May 15, 2025, lists sums purportedly paid by Defendant to the California RWQCB from 2001 to 2004, and to DTSC from 2004 to 2025. (ECF No. 105-13 at 27.) The column containing the sums purportedly paid is titled "PSI Check Register." (*Id.*) In support of the summary, Dr. Reinis provided correspondence with RWQCB and DTSC and a printout of Defendant's check register. (*Id.* at 28–32.) The Check Register identifies the "Account Reference" and "Name" as DTSC but does not detail the nature or location of the work performed that was subject to the regulatory oversight. (*Id.*)

When evaluating the admissibility of expert opinion testimony, a Court first asks whether it is more likely than not that the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. *See* Fed. R. Evid. 702(a). With respect to the purportedly "documented" costs of $2,542,243.01, Dr. Reinis brings no scientific, technical, or other specialized knowledge to her opinion. The first five lines of the chart of "Documented Remediation-related Costs in the Addendum to Dr. Reinis's report have costs that add up to $1,950,763.68. This sum, and the subtotals that add up to it, are from Exhibit 8.1. Every figure in Exhibit 8.1 is transferred directly from the printout summary of invoices. The last line of the chart of Documented Remediation-related Costs, described as "Regulatory Oversight," with an amount of $591,479.33, is the total from Exhibit 8.2. The figures in Exhibit 8.2 adding up to $591,479.33 are simply transferred from the check register.[14] (*See* ECF No. 105-13 at 9, 27.) Dr. Reinis did not evaluate, analyze, or modify these figures—she simply

---

[14] The only exception is the first three entries for 2001, 2002, and 2003, totaling $20,800 out of the total of $591,478.33. The check registry does not go back that far. For 2001 and 2002, Dr. Reinis calculated the figures by multiplying the rates RWQCB charged ($80) by the hours (for 2001) and estimated hours (for 2002) provided in the July 8, 2002, correspondence from RWQCB to Defendant. (ECF No. 105-13 at 28-30.) This is no more than straightforward multiplication of hours times rate. For 2003, there is no documentation, so Dr. Reinis repeated the amount she calculated for 2002.

23-cv-01202-JLB

transferred them from the invoice summary and check register, respectively. She brought no analysis to bear. There was no application of expertise. Expert testimony is not admissible where it does not aid the jury. *See* Fed. R. Evid. 702(a). This is of particular concern because the source material for the numbers Dr. Reinis put into Exhibits 8.1 and 8.2, and then into her chart of Documented Remediation-related Costs, provide questionable evidentiary support for the costs themselves being expenditures Defendant actually made in remediation of the Property, thus also implicating admissibility under Rule 702(b). With respect to the printout of invoice summaries, as noted above, the general task descriptions corresponding to each amount do not readily indicate whether the work related to remediation or, if so, on what site. Further, as conceded by Dr. Reinis at her deposition, she reviewed no direct evidence of payment of these invoices. (ECF No. 105-14 at 20–21.) With respect to the check register, the register itself does not indicate why the amounts were paid to DTSC, and Dr. Reinis testified that she never saw the checks themselves:

> [Question:] Okay. Does this register indicate the reason that these checks were mailed to DTSC?
>
> [Answer:] Not specifically, no.
>
> [Question:] Okay. Did you review any of these checks that are identified in this register?
>
> [Answer:] I've not seen the checks.
>
> . . .
>
> [Question:] Did you review any invoices from which these checks were produced?
>
> [Answer:] I did not. I did not see them.

(*Id.* at 25-26.) As noted by Plaintiff and acknowledged by Dr. Reinis during her deposition,

a portion of the payments to DTSC could have pertained to regulatory oversight costs incurred with respect to Defendant's property or their ongoing operations, rather than remediation of the leased property. (*See id.*)

For these reasons, Dr. Reinis is precluded from rendering an expert opinion as to the "documented" costs in the amount of $2,542,243.01. That is not to say that Defendant cannot endeavor to admit the evidence of these expenditures,[15] but Dr. Reinis cannot render an expert opinion that this amount was expended in remediation of the property or that it was reasonable and necessary.

## 2. Calculated Costs

Dr. Reinis cites Exhibit 8.3 in support of the "calculated remediation-related costs" (*i.e.*, the "undocumented costs") totaling $3,748,985.73. The first page of Exhibit 8.3 is a "Summary of Wastes Handled and Offhauled by PSI from BNSF Sites and Calculated Costs" during 1982, 1988, 2006, 2009, 2012, and 2015. (ECF No. 105-13 at 39.) The summary is supported by an excerpt from a 1993 Preliminary Assessment issued by Bechtel Environmental Inc., stating that hazardous "fluff material" was disposed of between 1981 to 1984; a chart, dated August 10, 1989, indicating the approximate location of soil boring at 1700 Cleveland Avenue, National City; a hand-drawn rendering indicating sample locations of, among other things, fluff piles and railroad tracks; a letter from Latham & Watkins LLP dated November 2, 2009, summarizing Defendant's work removing contaminated soil and scrap metal; a photograph from 2004 with superimposed markings identifying the locations of piles and excavated areas; a letter from Defendant to DTSC, dated October 17, 2005, describing Defendant's plan for implementation of the IMW; a table of data generated by SCS Engineers describing, among other things, the estimated processing completion dates of anticipated magnetic processing work; and other correspondence generally describing remediation work performed or otherwise related to

---

[15] The Court is not prejudging the admissibility of this evidence.

23-cv-01202-JLB

Defendant's remediation efforts.  (ECF No. 105-13 at 41–98.)  Most of these documents do not include the cost of the work performed.  Rather, Dr. Reinis analyzed the documentation to draw conclusions about work that was likely performed in the course of Property remediation through the decades and used Plaintiff's contractor AIS's pricing in their base bid and her expertise to calculate what the cost of that work would likely have been.

Although the Court acknowledges Plaintiff's objections to the quality and value of the evidence and assumptions upon which Dr. Reinis builds her calculations, the Court recognizes the challenges of endeavoring to recreate historical events going back decades.  Thus, the Court does not conclude, at this juncture, that Dr. Reinis's calculation of those likely expenditures is so lacking in foundation that it cannot survive the Court's gatekeeping function.  For now, the Court will not strike the portion of Opinion 8 where Dr. Reinis opines on Defendant's calculated remediation-related costs.  *See Engilis*, 151 F.4th at 1050 (citations, brackets, and quotation marks omitted) (holding that "where experts' opinions are not the junk science Rule 702 was meant to exclude, the interests of justice favor leaving difficult issues in the hands of the jury and relying on the safeguards of the adversary system . . . to attack shaky but admissible evidence").  Plaintiff's Motion as to this portion of the opinion, Dr. Reinis's conclusion of the amounts of calculated remediation-related costs, will be denied without prejudice, subject to renewal at trial.

However, because this portion of Dr. Reinis's opinion reflects her calculations of likely costs of work that she concludes, based upon available documentation, was performed by Defendant in remediation of the Property, rather than her conclusion being on direct, detailed evidence of the actual work performed and the actual cost of that work, it is not supportable for Dr. Reinis to testify that "*all of the costs* detailed in Exhibits 8.1, 8.2, and 8.3 and summarized in the table below *are reasonable and necessary* for remediation of the two parcels leased by PSI from BNSF."  (ECF No. 105-11 at 12 (emphasis added).)  Dr. Reinis lacks the factual foundation of precisely what remediation was conducted, when, how, for what reasons, and at what costs.  Defendant has argued the

23-cv-01202-JLB

necessity and propriety of Dr. Reinis bringing her expertise to bear and utilizing the more limited records available to opine on the expenditures of Defendant. (ECF No. 111 at 11–12.) But allowing her to opine on what she calculates was likely expended is a far cry from allowing her to testify that "all" the costs she details were reasonable and necessary. Although Defendant's argument urges otherwise, "conservative" estimation does not equate to "reasonable and necessary."

Plaintiff's Motion as to Opinion 8 is therefore **GRANTED** in part and **DENIED** in part, without prejudice.

> ### 4. Whether there is adequate factual support for Dr. Reinis's opinion that prior tenants contaminated the Property

> #### a. Arguments

Plaintiff argues that Dr. Reinis's opinion in the conclusions to her Expert Report and Addendum Report that prior tenants "had previously operated on those parcels, resulting in a variety of impacts to soils and groundwater" should be excluded on the basis that Dr. Reinis "offers no analysis or support for this opinion." (ECF No. 105-1 at 21-23 (quoting ECF No. 105-11 at 14; ECF No. 105-13 at 11).) Further, Plaintiff asserts that in rendering the same opinion in her Rebuttal, Dr. Reinis relied on inadmissible opinions set forth in Shipman's March 24, 2024 Expert Report and April 16, 2025 Rebuttal Report. (*Id.* at 21-22 (citing ECF No. 105-12 at 6–7).) Plaintiff contends that "[a]ssessing whether prior tenants' activities contaminated the BNSF Property is outside of the scope of Dr. Reinis's designated expertise, which centers on remediation practices, not backward-looking source attribution." (*Id.* (citing ECF No. 105-16 (Defendant's February 11, 2025 Expert Disclosure).) Plaintiff also maintains that "Dr. Reinis's testimony as to the sources of contamination on the Site must be excluded."[16] (*Id.* at 22.) Moreover, Plaintiff insists that

---

[16] Plaintiff cites the following portion of Dr. Reinis's deposition testimony:

23-cv-01202-JLB

"[Dr.] Reinis's testimony should also be excluded to the extent it relies on" any opinions rendered by Shipman deemed inadmissible by the Court. (*Id.* at 22–23.)

Defendant provides no counterargument.

### b. Analysis

As this portion of Plaintiff's Motion is unopposed, it is granted. *See In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Pracs., & Prods. Liab. Litig.*, 295 F. Supp. 3d 927, 1015 (N.D. Cal. 2018) (stating that courts will not "*sua sponte* raise and resolve legal arguments which the parties have not briefed").

Notwithstanding this basis for granting this portion of Plaintiff's Motion, the Court also addresses the merits.

Echoing Shipman's conclusion in Opinion 2 of the Shipman Report that prior tenants caused soil and groundwater contamination on the Property prior to 1981, Dr. Reinis opines that "[a]t the time that PSI leased the two parcels from BNSF, numerous entities had previously operated on those parcels, resulting in a variety of impacts to soils and groundwater."[17] (ECF No. 105-11 at 14; ECF No. 105-13 at 11.)  As held by the Court in the companion order regarding Plaintiff's Motion to Exclude Certain Opinion Testimony of Defendant's Expert Witness Dorinda Shipman, Shipman's analysis in Opinion 2 with

---

[Question:] As part of your expert report, did you conduct your own analysis of these sources of contamination that [Defendant] addressed?

[Answer:] If I understand your question correctly, the answer would be no.  I relied on the information that my colleague Dorinda Shipman presented in her report.

ECF No. 105-14 at 16.

[17] When asked at her deposition whether she had conducted her own analysis of the "sources of contamination that PSI addressed," Dr. Reinis responded in the negative, explaining that she "relied on the information that [her] colleague Dorinda Shipman presented in her report." (ECF No. 105-14 at 16.)

respect to PCBs, including her conclusion that "PCBs found in other portions of the BNSF sites were not likely released by PSI activities," is inadmissible.  (ECF No. 104-10 at 37.) Although this is only a portion of Shipman's contamination opinion, Dr. Reinis does not specify the portions of Shipman's opinion on which she relies or apportion her conclusion based on the different aspects of Shipman's opinion.  The Court thus also excludes Dr. Reinis's parallel opinion.  *See Walker v. Conagra Brands, Inc.*, No. 8:20-cv-01679-FWS-KES, 2023 WL 8885148, at *11 (C.D. Cal. Sept. 21, 2023) (excluding expert opinion regarding product design and safety, where the expert relied on inadmissible opinions rendered by another expert and where the second expert "did not conduct an independent investigation of the underlying evidence relevant to the product design conclusions"); *cf. In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1078–79 (C.D. Cal. 2013) ("Because [the underlying expert's] testimony on software bugs is itself admissible, [another expert] may rely upon it to the extent his opinions build on [the underlying expert's] testimony.").  The Court recognizes that

> [i]n a complex case, the opinions of multiple experts may be presented.  That is, a number of expert opinions may be necessary to establish a party's theory of liability or to fully defend against liability.  Thus, courts have considered to what extent an expert opinion may be based on the opinions of other experts.  Generally, although a party's expert testimony may build upon itself, in no instance does the Court relax the admissibility threshold of any given expert opinion, and each opinion remains subject to the underlying requirement that it be premised upon "sufficient facts or data" of the type generally relied upon by experts in the relevant field.

> More specifically, expert opinions may find a basis in part "on what a different expert believes on the basis of expert knowledge not possessed by the first expert."  *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002).  Indeed, this is common in technical fields.  *Id.*  For example, a physician may rely for a diagnosis on an x-ray taken by a radiologist, even though the physician is not an expert in radiology.  *Id.*  "[T]here

is no general requirement that the [underlying] expert testify as well." *Id.*

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F. Supp. at 1066.  Here, however, as the "soundness of the underlying expert judgment is in issue, [Dr. Reinis] cannot merely act as a conduit for the underlying expert's opinion." *Id.* (citation and quotation marks omitted).  "Moreover, more scrutiny will be given to an expert's reliance on the information or analysis of another expert where the other expert opinions were developed for the purpose of litigation." *Id.* (citing *In re Imperial Credit Indus., Inc. Sec. Litig.,* 252 F.Supp.2d 1005, 1012 (C.D. Cal. 2003)).

The Court therefore finds, on this additional basis, that Dr. Reinis's challenged conclusion is inadmissible.[18]  *See McCoy v. DePuy Orthopaedics, Inc.*, No. 22-CV-2075 JLS (SBC), 2024 WL 1705952, at *16 (S.D. Cal. Apr. 19, 2024) (citing *Walker*, 2023 WL 8885148, at *11) ("[A]n expert witness cannot simply parrot the opinions of other experts . . . without conducting an independent investigation of the underlying evidence.") (citations and quotation marks omitted); *San Francisco Baykeeper v. City of Sunnyvale*, 627 F. Supp. 3d 1085, 1100 (N.D. Cal. 2022) (excluding expert opinion to the extent based on other expert evidence deemed inadmissible, explaining that "[i]n general, an expert whose proffered testimony relies on another expert's theories that have been or may be excluded as unreliable should also be excluded"); *see also In re Chathode Ray Tube (CRT) Antitrust Litig.*, No. C-07-5944 JST, 2017 WL 10434367, at *2 (N.D. Cal. Jan. 23, 2017) ("Where an expert bases her opinion on – or simply repeats – the unreliable opinion of another expert, a district court may properly exclude the first expert's testimony.").

///

---

[18] The Court notes that Dr. Reinis only relied on this expert opinion of Shipman's in forming her conclusion about the reasonableness of cost sharing.  Because, as set forth below, the Court separately finds that Dr. Reinis's opinion about cost sharing is inadmissible under Rule 704, there is no need for Dr. Reinis to incorporate and restate this portion of Shipman's opinion.

**B. Rule 702(c)—Reliability of Methods**

    **1.    Whether Dr. Reinis utilized a reliable method to conclude in Opinion 4 that the costs incurred by Plaintiff's consultant should be reduced in proportion to the costs incurred by Plaintiff's contractor**

        **a.    Arguments**

Plaintiff argues that the Court should deem inadmissible under Rule 702(c) the portion of Dr. Reinis's Opinion 4 concluding that the management costs of Plaintiff's primary environmental consultant, TRC, should be reduced by 32%, thus resulting in a $176,104.81 deduction.[19] (ECF No. 105-1 at 23.) Plaintiff contends that Opinion 4 "relies on a clearly unreliable methodology that equates remediation costs to so-called 'management costs,'" where TRC "was primarily associated with direct oversight, screening, and confirmation sampling during the scoping and planning phase for the remediation," and did not manage other contractors. (*Id.* at 24 (citing ECF No. 105-10 at 9-10 (Rebuttal Expert Report of Michal H. Berman in response to Dr. Reinis's Expert Report)).) Further, Plaintiff highlights Dr. Reinis's deposition testimony that she "essentially deducted from the total that TRC invoiced the same percentage, which worked out to 32 percent of . . . what [she] deducted from AIS's total amount," because she "just felt like, you know, making it proportional was reasonable." (*Id.* at 24 (quoting ECF No. 105-14 at 15).) Thus, Plaintiff asserts that Dr. Reinis fails to demonstrate a reliable methodology supporting her opinion that TRC's costs should be reduced based upon her analysis of the reasonableness of AIS's costs, particularly where "this reduction was made without applying the same 'reasonable and necessary' analysis to each task invoiced by TRC." (*Id.*)

---

[19] After initially recommending a 33% reduction in TRC's total costs in Opinion 4 of her Expert Report (ECF No. 105-11 at 10), Dr. Reinis reduced the proposed reduction to 32% in the Addendum (ECF No. 105-13 at 7).

Defendant counters that Dr. Reinis applied a reliable methodology in the form of a "proportionality principle" to determine that the proposed 32% reduction of the costs incurred by AIS, Plaintiff's contractor, warrant a corresponding 32% reduction of TRC's oversight costs.  (ECF No. 111 at 13.)

**b. Analysis**

Opinion 4 reads as follows:

> BNSF paid for TRC's management of their 2023 remediation efforts on the two BNSF parcels, beginning with the preparation of bid documents and continuing through observation of the removal of all materials excavated and import and placement of clean fill.  Given that some of the construction activities for which BNSF was invoiced were not related to remediation or are otherwise above and beyond what is reasonable, as described elsewhere herein, TRC's allowable management costs should be proportional to the allowable remediation costs.  In other words, TRC's oversight and management costs for tasks such as procurement, import, placement, grading, and compaction testing of an extra 12,335 tons of fill and berm construction that were done for purposes other than the DTSC required remediation should be deducted as not recoverable.

- Exhibit:

o 4.1 – BNSF Summary Table, Bates no. BNSF000001

| Description | Source | Amount |
| --- | --- | --- |
| 1.Total Invoiced by AIS | AIS APP#7 | $ 2,636,147.43 |
| 2.Total Deducted | Opinion 1 | $ 224,398.60 |
|  | Opinion 2 | $ 155,860.86 |
|  | Opinion 3 | $ 480,518.00 |
|  |  | $ 860,777.46 |
|  |  | i.e., 33% of total |
| 3. Total Invoiced by TRC | Summary | $ 471,332.02 |
| 4.Total Deducted | 33% of $471,332.02 | $ 155,539.57 |

(ECF No. 105-11 at 10.)

Exhibit 4.1 summarizes AIS invoices from March 2023 through September 2023 and TRC invoices spanning September 2022 to November 2023.  (*Id.* at 97.)  The column

23-cv-01202-JLB

titled "Comments" indicates that AIS performed, among other things, water management and fill import excavation, and TRC performed a pre-excavation survey, work related to "permitting," and remediation oversight. (*Id.*)

In the Addendum Report, Dr. Reinis concluded that "a more detailed review of project documents" supported lowering the proposed reduction to 32%. (ECF No. 105-13 at 7.) Dr. Reinis also attached Exhibit 4.2 for the purpose of providing "a more complete tabulation of all the invoices paid by [Plaintiff.]" (*Id.*) Dr. Reinis explained as follows:

> 1. As detailed under Opinion 1, TRC delayed the construction work by approximately four months by not providing an approved grading plan before AIS mobilized to the site in March of 2023, thereby causing a total of $224,398.60 to be invoiced by AIS for unnecessary work while they waited for the approved grading plan. During that same timeframe – March through early July of 2023 (line items 29, 30, 31, 32, and 34, Table 2, Berman expert report) – TRC's activities ostensibly included "fieldwork oversight[,"] with their invoices totaling $179,350.06. *The costs associated with project delays caused by BNSF's consultant – both construction costs and consultant costs – should be deducted as not recoverable from PSI.*
>
> 2. As can also be seen in the table included as Exhibit 4.2, at least four months' invoices (April, August, September, and November 2024) totaling $23,678.06 were for preparation of and revisions to the Soil Management Plan (SMP) (TRC, 2024). As stated in the introduction, the SMP applies to "post-remedial" commercial, industrial, and construction activities. The preparation of the SMP was therefore done to support redevelopment and should be deducted as not recoverable from PSI.
>
> • Additional Exhibit:
>
>   o 4.2 – Updated BNSF Summary Table, Bates no. BNSF023851-BNSF02385, annotated

(*Id.* (emphasis added).)

23-cv-01202-JLB

| Description | Source | Amount |
|---|---|---|
| 1.Total Invoiced by AIS | AIS APP#7 | $ 2,636,147.43 |
| 2.Total Deducted | Opinion 1 | $ 224,398.60 |
| | Opinion 2 | $ 129,575.31 |
| | Opinion 3 | $ 480,518.00 |
| | | $ 834,491.91 i.e., 32% of total |
| 3. Total Invoiced by TRC | Exhibit 4.2 | $ 550,327.54 |
| 4.Total Deducted | 32% of $ 550,327.54 | $ 176,104.81 |

The portion of Opinion 1 of Dr. Reinis's Addendum Report referenced in Opinion 4 of that report reads as follows:

[U]pon review of documents referenced in BNSF's rebuttal expert reports and re-review of previously received information, I found evidence to support the deduction of the same $224,398.60 for a second, altogether different reason, which is that BNSF's general contractor AIS was authorized to mobilize to the site and begin work approximately four months before BNSF's consultant TRC had an approved grading plan. Consequently, BNSF unnecessarily spent tens of thousands of dollars on "standby" and "moving water following rain events[."]  As Mr. Berman notes in lines 33 and 35 on page 5 of Table 2 of his expert report (Geosyntec-Berman, 2025), TRC was engaging in "permitting" activities as late as June 2023 (their invoice is dated July 19, 2023); these activities included "additional grading plan revisions[."]  This indicates that the general contractor, AIS, was allowed to mobilize to the site approximately four months before TRC finally obtained an approved grading plan.  As can be seen in the excerpts from AIS' seven invoices included as Exhibit 1.5, AIS invoiced (March, April, May, and June 2023) a total of $205,784.85 for standby and moving water after rain events; these costs would not have been incurred if AIS had been authorized to mobilize only after an approved grading plan was obtained in July of 2023. Subsequently, AIS partially suspended their work on the site, with no invoice submitted in July of 2023.  Then, on their final invoice, for August 2023, AIS again invoiced for

23-cv-01202-JLB

> "demobilization" and "remobilization" of the water management personnel and equipment. In summary, TRC delayed the construction work by not obtaining an approved grading permit in a timely manner and thereby caused certain construction costs totaling $224,398.60 to be unnecessarily incurred.

(*Id.* at 5.)

Exhibit 4.2, titled Updated BNSF Summary Table, Annotated, provides additional TRC invoices spanning from 2023 to 2025. (*Id.* at 22.)

Contrary to Defendant's assertion, Dr. Reinis's conclusion in Opinion 4 does not flow from a reliable methodology. Dr. Reinis testified at her deposition that she "essentially deducted from the total that TRC invoiced the same percentage, which worked out to 32 percent of . . . what [she] deducted from AIS's total amount," because she "*just felt like, you know, making it proportional was reasonable.*" ECF No. 105-14 at 15 (emphasis added)). However, Dr. Reinis's intuitive sense of reasonableness does not constitute a reliable methodology. *See Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1422 (9th Cir. 1998) (affirming the district court's exclusion of expert opinion testimony, where the expert failed to explain "precisely" how he reached his conclusions regarding the accuracy of his testing measure and "could not point to some objective source . . . to show that he ha[d] followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in his field") (citation, quotation marks, and brackets omitted); *cf. i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010), *aff'd*, 564 U.S. 91 (2011) (citing *Daubert*, 509 U.S. at 593) (holding that the expert's "testimony about the acceptance of the hypothetical negotiation model among damage experts and economists, combined with his methodical explication of how he applied the model to the relevant facts, satisfied Rule 702 and *Daubert*").

It is incumbent upon Defendant, as the proponent of the expert testimony, to "demonstrate[] to the court that it is more likely than not that . . . the testimony is the product of reliable principles and methods." Fed. Rule Evid. 704(c). Here, Defendant asserts in its opposition that "[a]pplying a proportionality principle is sound methodology

23-cv-01202-JLB

because it [] employs a level of intellectual rigor used in the field." (ECF No. 111 at 13.) However, Defendant offers no more than its own assertion to meet its burden. Defendant has provided no case authority where proportionality applied in this fashion has been recognized as methodologically sound. Nor does Defendant provide any evidence, by declaration or otherwise, that that such an application of proportionality is used by experts in the field. Reinis herself certainly does not provide this, testifying, instead, that she "*just felt like, you know, making it proportional was reasonable*." (ECF No. 105-14 at 15 (emphasis added).) As Defendant has the burden of showing that it is more likely than not that the principles and methods used were reliable, and Defendant has not endeavored to make that showing in any meaningful way, the Court must grant this portion of Plaintiff's motion.

Thus, the Court finds that Dr. Reinis's conclusion in Opinion 4 of the Expert Report and the Addendum Report that the total amount invoiced by TRC should be reduced by 32% is inadmissible under Rule 704(c).

> **2.    Whether Dr. Reinis utilized a reliable method to conclude in Opinion 8 that Defendant's "calculated remediation-related costs" totaled $3,748,985.73[20]**

### a. Arguments

Plaintiff argues that Dr. Reinis's conclusion in Opinion 8 that Defendant incurred "calculated remediation-related costs" (*i.e.*, the "undocumented costs") totaling $3,748,985.73 should be excluded pursuant to Rule 702(c) and (d), as it is not the product of a reliable principle or method. (ECF No. 105-1 at 25.) Plaintiff questions why Dr. Reinis "assume[d] all of those costs were reasonable and necessary" when formulating

---

[20] Plaintiff also argues that Dr. Reinis's conclusion in Opinion 8 that Defendant incurred $2,542,243.01 in "documented remediation-related costs" is inadmissible under Rule 702(c) and (d). However, as the Court has already deemed that portion of Opinion 8 inadmissible under Rule 702(b), *see supra* at 19–29, the Court need not address Plaintiff's argument with respect to subsections (c) and (d).

23-cv-01202-JLB

remediation expenses incurred by Defendant yet reduced Plaintiff's claimed remediation costs, where "the cost of AIS's work was a foundational part of both totals." (*Id.* at 26. (citing ECF No. 105-14 at 33-34); *see also id.* n.15 (citing *Long Beach Unified Sch. Dist. v. Santa Catalina Island Co.*, No. 2:19-cv-01139-MEMF-AS, 2024 WL 1639925, at *5 (C.D. Cal. Feb. 14, 2024) (excluding expert opinion regarding the comparison of environmental data between sites, where the expert's opinion lacked "any rigorous attempt to compare the activities at the various sites to each other and connect the activities to the contaminants")).) Further, Plaintiff challenges the sufficiency of Dr. Reinis's explanation that the "calculated remediation-related costs" were "derived using a conservative approach" through the exclusion of certain costs which otherwise might have been included. (*Id.* (quoting ECF No. 105-13 at 9).) Moreover, Plaintiff notes that when asked at her deposition whether her approach was approved or discussed in any treatise, textbook, or other authoritative government document, Dr. Reinis admitted that it was not. (*Id.* at 27 (citing ECF No. 105-14 at 31-32).) Thus, Plaintiff maintains that absent "a meaningful explanation of either her own methodology or any confirmation that this methodology is accepted by professionals in her field," Dr. Reinis's opinion as to "undocumented costs" must be excluded under Rule 7002(c) and (d). (*Id.*)

Defendant counters that "Dr. Reinis' determination that [Defendant's] costs were reasonable and only a portion of [Plaintiff's] costs were reasonable does not *de facto* make her methodology unreliable." (ECF No. 111 at 14.) Defendant asserts that "an analysis of 'reasonable and necessary' is already baked not her estimate for [Defendant] given her gate-keeping choices on what to include (excluding, for instance, California tax on waste disposal) and how to price it (using the lesser price per ton when in doubt as to nature of waste)." (*Id.*) Thus, Defendant maintains that "Dr. Reinis used the same approach— reasonable and necessary—to evaluate all costs," and that she "applied rigorous scrutiny to each category of costs she reviewed." (*Id.* at 15.)

///

///

23-cv-01202-JLB

### b. Analysis

For convenience, the Court again recites Dr. Reinis's conclusion in Opinion 8 of the Addendum Report with respect to "calculation remediation-related costs":

> The total cost to PSI of the remediation work on the two parcels that it leased from BNSF addressed in this report is calculated to be $6,291,228.74. Of that total, documentation was located for approximately $2,542,243,01, mainly including PSI's and their consultant's financial records and regulatory correspondence. The balance of $3,748,985.73 is calculated, based on BNSF's contractor AIS' pricing in their base bid; approximate waste volumes, based on documents; the approximate timeframe that those costs were incurred, based on documents; and my experience and professional judgement. Investigation continues and, if additional documentation is obtained, I will review and update my calculations as appropriate.
>
> The calculated $3,748,985.73 in PSI-incurred remediation costs addressed in this report was derived using a conservative approach, for example: California tax on waste disposal, payable by the waste generator, is not included; the materials processing cost (e.g., Paydirt) was likely greater than $5 per ton; the unit rate applied to handling and disposal of the "fluff" is the non-hazardous materials rate, even though it was taken to Mexicali under hazardous waste manifests; and remediation activities that may have occurred but are not documented are not included.
>
> I reserve the right to amend these calculations as new documentation is obtained.

(ECF No. 105-13 at 8-9 (footnotes omitted).)

Dr. Reinis states that she based her estimation as to Defendant's "undocumented costs" on "BNSF's contractor AIS' pricing in their base bid; approximate waste volumes, based on documents; the approximate timeframe that those costs were incurred, based on documents; and my experience and professional judgement." (*Id.* at 9.)

Plaintiff asserts that Dr. Reinis's approach to estimating Defendant's "calculated

costs" was flawed, because she inconsistently deemed Defendant's claimed remediation costs reasonable and necessary despite the absence of direct evidentiary support while determining that certain of Plaintiff's remediation costs were not recoverable due to lack of documentation.  (*See* ECF No. 105-1 at 26.)  For the reasons set forth in the Court's analysis of the Rule 702(b) challenge to this testimony, the Court has already determined that Dr. Reinis is precluded from opining that the calculated remediation costs were reasonable and necessary.

Plaintiff also criticized Dr. Reinis's methodology because she includes in her estimation all of Defendant's remediation work, including work directed exclusively at hauling waste generated by Defendant.   Opinion 8 addresses only what costs were likely expended by Defendant in remediation of the Property and does not purport to distinguish between costs that should be borne by Defendant and costs that should be borne by Plaintiff.  Including costs that are exclusively the responsibility of Defendant does not undermine the methodology of calculating Defendant's total remediation costs.

Finally, Plaintiff challenges Dr. Reinis's methodology because Dr. Reinis conceded in her deposition that there are no treatises, textbooks, or authoritative government documents that support using calculated estimates to identify recoverable response costs. (ECF No 105-14 at 31–32.)  This certainly calls into question the reliability of the methodology Dr. Reinis used.  Furthermore, Defendant offered nothing in its opposition explaining this concession or providing alternative support that Dr. Reinis's principles and methods were reliable and that she reliably applied the principles and methods to the facts of this case.  However, rather than grant Plaintiff's motion to exclude that portion of Dr. Reinis's opinion related to calculated remediation estimates at this time, the Court **DENIES** this aspect of Plaintiff's motion without prejudice, subject to renewal at trial.

///

///

///

///

23-cv-01202-JLB

**C. Rule 704(a)—Impermissible Legal Conclusion**

**1. Whether Dr. Reinis's opinion that Plaintiff owes Defendant $1,510,183.37 is inadmissible**

**a. Arguments**

Plaintiff argues that Dr. Reinis's opinion in the Addendum Report that Plaintiff owes Defendant $1,510,183.37 is inadmissible under Rule 704(a). (ECF No. 105-1 at 29 (citing ECF No. 105-13 at 11).)[21] Plaintiff asserts that an expert may not opine regarding the rights, duties, or obligations of parties arising under law or contract. (*Id.* at 30 (citing Fed. R. Evid. 704(a)).) Plaintiff takes issue with the following portion of Dr. Reinis's opinion regarding cost allocation in the Addendum Report:

> At the time that PSI leased the two parcels from BNSF, numerous entities had previously operated on those parcels, resulting in a variety of impacts to soils and groundwater. . . . Therefore, it is reasonable that BNSF share in the costs incurred by PSI for remediation of the two parcels that PSI leased from BNSF.

(*Id.* at 29 (quoting ECF No. 105-13 at 11).)[22] Acknowledging that Dr. Reinis does not expressly reference the Lease Agreements in her Expert Report and Addendum Report, Plaintiff nevertheless maintains that Dr. Reinis's opinion tracks Defendant's legal argument that it should bear only half the cost of remediation pursuant to Section 9 of the Lease Agreements. (*Id.* at 30.) Further, Plaintiff asserts that Dr. Reinis testified at her deposition that Section 9 of the Lease Agreements was the basis for her conclusion that

---

[21] Plaintiff notes that in the "Conclusions" section of her Expert Report, Dr. Reinis initially estimated that Plaintiff owes Defendant $1,891,698.18. (ECF No. 105-1 at 29 (citing ECF No. 105-11 at 14).)

[22] The above-quoted explanation also appears in Dr. Reinis's March 24, 2025 Report. (ECF No. 105-11 at 14.)

44

23-cv-01202-JLB

each party should bear half the cost of remediation.  (*Id.*)  Moreover, Plaintiff takes issue with Dr. Reinis's statement in her Rebuttal Report that "[u]nder both Federal and State law, responsibility for addressing environmental impacts is both joint and several."  (*Id.* at 31 (quoting ECF No. 105-12 at 7).)[23]

Defendant counters that a court may not exclude expert opinion on the basis that it addresses an ultimate issue of fact.  (ECF No. 111 at 15 (citing *Hangarter v. Provident Life & Acc. Ins. Co.*, 373 F.3d 998 (9th Cir. 2004)).  Defendant insists that "[a]lthough Dr. Reinis may be unable to determine ultimate legal liability in the case, she can appropriately compare the balance of total remediation costs as between two remediating parties given her expertise in remediation cost recovery and remediation of hazardous waste sites in California."  (*Id.* at 16.)  Further, Defendant contends that "[i]t is 'sometimes impossible for an expert to render his or her opinion on a subject without resorting to language that recurs in the applicable legal standard.'"  (*Id.* (quoting *In re Packaged Seafood Prods. Antitrust Litig.*, No. 15-MD-2670 DMS (MSB), 2024 WL 331628, at *11 (S.D. Cal. Jan. 29, 2024) (quoting *United States v. Diaz*, 876 F.3d 1194, 1198-99 (9th Cir. 2017))).)

---

[23] The statement appears twice in the Rebuttal Report.  (*See* ECF No. 105-12 at 7, 16.)

Plaintiff acknowledges that Dr. Reinis made this statement in response to the opinion of Michael H. Berman, one of Plaintiff's retained experts, that Defendant was the party responsible for addressing environmental contamination at the Property.  (ECF No. 105-1 at 31 (citing (ECF No. 105-12 at 7).)  Defendant asserts in a footnote that should the Court exclude Dr. Reinis's opinion regarding cost allocation pursuant to Rule 704(a), "then the same standards will require barring Mr. Berman's opinions on reasonable and necessary costs."  (ECF No. 111 at 16 n.2.)  However, Defendant has not moved to exclude Mr. Berman's testimony.  Moreover, "'[a]rguments raised only in footnotes, or only on reply, are generally deemed waived' and need not be considered."  *Khoja v. Orexigen Therapeutics, Inc.*, 498 F. Supp. 3d 1296, 1309 (S.D. Cal. 2020) (quoting *Cheever v. Huawei Device USA, Inc.*, No. 18-CV-06715-JST, 2019 WL 8883942, at *3 (N.D. Cal. Dec. 4, 2019) (quoting *Estate of Saunders v. Comm'r*, 745 F.3d 953, 962 n.8 (9th Cir. 2014))).

23-cv-01202-JLB

**b. Analysis**

As recited above, Federal Rule of Evidence 704(a) provides that "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). "That said, an expert witness cannot give an opinion as to her legal conclusion, *i.e.*, an opinion on an ultimate issue of law. Similarly, instructing the jury as to the applicable law is the distinct and exclusive province of the court." *Nationwide Transp. Fin.*, 523 F.3d at 1058 (citation omitted).

The "Conclusion" section of Dr. Reinis's Addendum Report reads as follows:

> • As summarized in Opinion 7, of the total cost alleged by BNSF to be for "remediation" ($4,301,742.76), the amount that can be reasonably deducted from the total for purposes of cost sharing, as described in the above opinions, is $1,030,880.86. The balance of $3,270,862.00 is reasonable and necessary for implementation of the PSI remediation plan for the BNSF parcels, which DTSC had approved. However, the only reason that BNSF incurred these costs was that it intentionally intervened with DTSC and volunteered to take over completion of the remedy.
>
> • As detailed in Opinion 8, the total cost to PSI of the remediation work they conducted on the two parcels that it leased from BNSF is calculated to have been $ 6,291,228.74. These costs were reasonable and necessary. At the time that PSI leased the two parcels from BNSF, numerous entities had previously operated on those parcels, resulting in a variety of impacts to soils and groundwater. Prior activities included scrap metals processing and recycling (Charles Davis, SDI) and petroleum storage and distribution (Caminol Co., Southern Oil Co., Socal Oil). Therefore, it is reasonable that BNSF share in the costs incurred by PSI for remediation of the two parcels that PSI leased from BNSF.
>
> • In summary:
>
> Recoverable costs paid by BNSF: $3,270,862.00
>
> Portion to be shared by PSI (50%): $1,635,431.00

> Recoverable costs paid by PSI: $6,291,228.74
> Portion to be shared by BNSF (50%): $3,145,614.37
>
> **Amount due to PSI, from BNSF: $1,510,183.37**

(ECF No. 105-13 at 11.)

When questioned at her deposition regarding the basis for her opinion that the parties should share the cost of remediation equally, Dr. Reinis referred to the "[l]anguage in the lease agreement between PSI and BNSF," subsequently identifying Section 9 of the Lease Agreements. (ECF No. 105-14 at 35-40.)[24] "Under California law, the interpretation of a written contract," including a lease agreement, "is a matter of law for the court even though questions of fact are involved." *Southland Corp. v. Emerald Oil Co.*, 789 F.2d 1441, 1443 (9th Cir. 1986). Thus, in opining that the parties should share the cost of remediation pursuant to the Lease Agreements, Dr. Reinis improperly rendered expert opinion regarding "an ultimate issue of law" in contravention of Rule 704(a). *Nationwide Transp. Fin.*, 523 F.3d at 1058 (citation omitted) (holding that the district court did not abuse its discretion in excluding portions of an expert's testimony and report which applied law to the facts of the case and discussed the parties' legal rights, duties and obligations under the law). For the same reasons, the Court deems inadmissible Dr. Reinis's opinion in her Rebuttal Report that "[u]nder both Federal and State law, responsibility for addressing environmental impacts is both joint and several." (ECF No. 105-12 at 7, 16).)

The Court acknowledges that, as pointed out by Defendant, rendering expert opinion may at times necessitate using "language that recurs in the applicable legal standard." *In re Packages Seafood Prods. Antitrust Litig.*, 2024 WL 331628, at *11 (quoting *United States v. Diaz*, 876 F.3d 1194, 1198 (9th Cir. 2017)). Here, however, Dr. Reinis did not

---

[24] Section 9 in the 1977 Lease Agreement is identical to Section 9 in the 1978 Lease Agreement. (*Compare* ECF No. 105-3 at 3, *with* ECF No. 105-4 at 3.)

identify a legal standard, but rather construed the rights and obligations of the parties under the Lease Agreements. *Cf. id.* (rejecting the assertion that two experts "improperly opined on ultimate legal issues" under Rule 704(a) by utilizing terms such as "single economic unit," "agent," and "alter ego," reasoning that "[a]lthough the same words are used in the legal standards on the issues of corporate vicarious liability," the experts did "not purport to instruct the jury" regarding the legal question of vicarious liability). Furthermore, to the extent that Defendant argues that all Dr. Reinis has done is apply math, which may or may not be applicable based upon determinations of liability at trial, Dr. Reinis's opinion would then fail to meet the requirement of Rule 702(a), as she would be bringing no scientific, technical, or other specialized knowledge that would help the trier of fact. The jury is more than capable of dividing a number in two, if the need arises.

For the above-stated reasons, the Court excludes the challenged portions of Dr. Reinis's Addendum Report and Rebuttal Report.

**IV. CONCLUSION**

For the foregoing reasons, Plaintiff's Motion is **GRANTED** in part and **DENIED** in part.

  **IT IS SO ORDERED.**

Dated:  July 2, 2026

_____
Hon. Jill L. Burkhardt
United States Magistrate Judge

23-cv-01202-JLB