UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BNSF RAILWAY COMPANY,<br><br>                                  Plaintiff,<br><br>v.<br><br>PACIFIC STEEL, INC.,<br><br>                                  Defendant. | Case No.:  23-cv-01202-JLB<br><br>**ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>**[ECF Nos. 103, 106]** |

Before the Court are a Motion for Partial Summary Judgment ("Plaintiff's Motion") filed by Plaintiff BNSF Railway Company ("Plaintiff" or "BNSF") and a Motion for Partial Summary Judgment ("Defendant's Motion") filed by Defendant Pacific Steel, Inc. ("Defendant" or "PSI").  For the reasons set forth below, Plaintiff's Motion is **GRANTED**, in part, and **DENIED**, in part.  Defendant's Motion is **GRANTED**, in part, and **DENIED**, in part.

## I.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff is the owner of property located in National City, San Diego County, California ("the Property").  (ECF No. 1 at 3, ¶ 6.)  In 1977, Plaintiff's predecessor in

1

interest, the Atchison, Topeka & Santa Fe Railway Company ("ATSF"), as lessor, executed a lease agreement ("1977 Lease" or "1977 Lease Agreement") with Scrap Disposal, Inc. ("SDI"), as lessee, for the use of the northern and central portions of the Property for the handling and storage of scrap materials. (*Id.* at 3, ¶ 7.) In 1978, ATSF and SDI entered into a second lease agreement ("1978 Lease" or "1978 Lease Agreement")[1] covering the southern portion of the Property. (*Id.* at 7, ¶ 12.)

In May 1980, SDI filed for protection under Chapter 11 of the United States Bankruptcy Code. (ECF No. 90-14 at 3.) In July 1981, a trustee in SDI's bankruptcy proceedings assumed the Lease. (ECF No. 90-9 at 2-3.) The bankruptcy trustee assigned the Leases to Western States Investment Corporation, which in turn assigned the Leases to San Diego Steel, Inc. ("SDS"). (*Id.*; ECF No. 96-1 at 2, ¶ 3.) In August 1981, SDS filed a Certificate of Amendment of Articles of Incorporation changing its name to Pacific Steel, Inc. ("PSI"). (ECF No. 90-13 at 5; *see also* ECF No. 103-2 at 2, (Plaintiff's Separate Statement of Undisputed Facts ("PSSUF")) ¶ 2.) In November 1982, the United States Bankruptcy Court for the Southern District of California entered an order approving a liquidating plan of reorganization for SDI. (ECF No. 90-14.)

Plaintiff commenced the instant litigation against Defendant on June 29, 2023, seeking "redress against its former tenant [Defendant] . . . for damaging [Plaintiff's] property located immediately adjacent to and west of [Defendant's] property at 1700 Cleveland Avenue in National City, California . . . and for failing to pay rent." (ECF No. 1 at 2, ¶ 1.) In its Complaint, Plaintiff alleges the following:

Defendant operated a scrap metal recycling business on the Property pursuant to the Lease Agreements. (*Id.* at 2 and 11, ¶¶ 1 and 16.) The Lease Agreements contain

---

[1] The 1977 Lease Agreement and the 1978 Lease Agreement were amended in 1983. (ECF Nos. 80-11 & 80-12.) The original lease agreements and the supplemental lease agreements shall be referred to collectively as the "Leases" or the "Lease Agreements."

23-cv-01202-JLB

provisions for payment of rent[2] and indemnification by Defendant for all loss, damage, or expense incurred by Plaintiff arising out of Defendant's use of the Property, including any "fines, penalties, clean-up and disposal costs." (*Id.* at 4–11, ¶¶ 8–15.)

The California Department of Toxic Substances Control ("DTSC") sued Defendant for environmental violations in 2004 and 2015, and the state court ordered Defendant to investigate and remediate the contamination. (*Id.* at 2, ¶ 1.)

As part of a July 2004 stipulated judgment, Defendant agreed to monetary terms and to enter into a Corrective Action Consent Agreement with DTSC. (*Id.* at 12–13, ¶¶ 21–22.)  As part of the Corrective Action Consent Agreement, Defendant submitted a draft Interim Measures Workplan ("IMW") containing proposals to remediate contamination and to reduce the threat of the release of hazardous waste or hazardous constituents on the Property. (*Id.* at 13, ¶ 23.)  DTSC approved the IMW in September 2005. (*Id.*, ¶ 24.)

During inspections of the Property between 2010 and 2013, DTSC observed several violations of the Hazardous Waste Control Law ("HWCL"), the California Health and Safety Code, and the 2004 stipulated judgment. (*Id.* at 14, ¶ 28.)  In 2015, DTSC sued Defendant again, alleging that Defendant had "committed multiple violations of the HWCL," including by storing hazardous waste without authorization and by violating other provisions of the HWCL and the terms of the 2004 stipulated judgment. (*Id.* at 15, ¶ 30.)  In a stipulated judgment approved by the state court in January 2016, Defendant agreed to both injunctive and monetary terms and conditions. (*Id.* at 16, ¶¶ 32–33.)  In May 2019, Defendant submitted another draft IMW to DTSC. (*Id.* at 35, ¶ 35.)  Defendant's draft IMW identified elevated concentration of metals, polychlorinated biphenyls, polycyclic aromatic hydrocarbon compounds, and petroleum hydrocarbons in the soil at the Property. (*Id.*)  After several revisions, Defendant finalized the IMW in 2021. (*Id.* at 16, ¶ 36.)

---

[2] Plaintiff contends that Defendant failed to comply with its rental payment obligations under the Lease Agreements, and that Defendant owes Plaintiff approximately $1,066,679 in unpaid rent, plus interest. (ECF No. 1 at 18, ¶¶ 41–43.)

23-cv-01202-JLB

Following a public comment period running March 30, 2022, through April 29, 2022, DTSC approved the IMW (hereinafter "2021 IMW")[3] on May 31, 2022.  (*Id.*)

On December 6, 2022, DTSC sent Defendant a letter stating that Defendant was out of compliance with prior agreements.  (*Id.* at 17, ¶ 38.)

On January 13, 2023, Plaintiff served on Defendant a Notice of Termination of Leases, providing the requisite 30-day notice under Section 14 of the Lease Agreements.  (*Id.* at 18, ¶ 44.)  After Plaintiff sent the Notice of Termination of Leases, Defendant sent a schedule for implementing the 2021 IMW to DTSC on February 3, 2023.  (*Id.* at 17, ¶ 39.)  Several weeks later, Plaintiff denied Defendant permission to access the Property.  (*Id.*)  On April 11, 2023, Plaintiff entered into a Voluntary Cleanup Agreement with DTSC to promptly carry out the cleanup of the Property under DTSC oversight.  (*Id.* at 18, ¶ 47.)  Plaintiff asserts that it remediated the Property in accordance with the 2021 IMW.  (ECF No. 80-3 at 6, ¶ 19.)  Plaintiff tendered its claims to Defendant and demanded that Defendant indemnify Plaintiff for the cleanup, as required by the Lease Agreements.  (ECF No. 1 at 18, ¶ 48.)  Defendant responded on June 14, 2023, asserting that Plaintiff's breach of the Lease Agreements excused its obligation to indemnify Plaintiff under those agreements.  (*Id.* at 18, ¶ 49.)

Plaintiff's June 2023 Complaint brings the following causes of action against Defendant: (1) specific performance; (2) breach of contract; (3) breach of implied covenant of good faith and fair dealing; (4) express contractual indemnity; (5) nuisance; (6) trespass; (7) negligence; (8) waste; (9) equitable and implied indemnity and contribution; (10) contribution under California's Hazardous Substances Account Act; (11) contribution under federal common law; and (12) declaratory relief.  (*Id.* at 19–36, ¶¶ 53–138.) Plaintiff seeks general damages, the costs of remediating the Property, the total amount of outstanding rent, compensatory damages, an order confirming Defendant's indemnity and

---

[3]  The parties refer to the IMW finalized by Defendant in 2021 and approved by DTSC in 2022 as the "2021 IMW."  For the sake of consistency, the Court shall as well.

defense obligations, Defendant's equitable share of response costs with interest, punitive damages, attorney's fees, interest, and costs of suit.  (*Id.* at 36–37.)

On July 18, 2025, Plaintiff and Defendant filed the instant cross-Motions for Partial Summary Judgement (ECF Nos. 103, 106).  Plaintiff opposes Defendant's Motion (ECF No. 112) and Defendant opposes Plaintiff's Motion (ECF No 109).  Each party filed a reply.  (ECF Nos. 115 (Defendant), 117 (Plaintiff).)  The Court held a hearing on June 25, 2026.  (ECF No. 163.)

## II.   LEGAL STANDARD

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  As another Court in this District has explained,

> A fact is material when, under the governing substantive law, it could affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

> The movant always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex* [*Corp. v. Catrett*], 477 U.S. [317], 323, 106 S.Ct. 2548 [(1986)].  The moving party can satisfy this burden by: (1) presenting evidence that negates an essential element of the nonmoving party's case; or (2) demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. *Id.* at 322–23, 106 S.Ct. 2548. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

> If the movant fails to discharge this initial burden, summary judgment must be denied, and the court need not consider the nonmoving party's evidence. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 159–60, 90 S.Ct. 1598, 26 l.Ed.2d 142 (1970).  If the moving party meets this initial burden, however, the nonmoving

23-cv-01202-JLB

party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see also Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995) ("The mere existence of a scintilla of evidence in support of the non-moving party's position is not sufficient." (citing *Anderson*, 477 U.S. at 242, 252, 106 S.Ct. 2505)). Rather, the nonmoving party must "go beyond the pleadings" and by "the depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 . . . (quoting Fed. R. Civ. P. 56(e)).

When making this determination, the [C]ourt must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *See Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he is ruling on a motion for summary judgment." *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

*Williams & Cochrane, LLP v. Rosette*, 631 F. Supp. 3d 884, 901–02 (S.D. Cal. 2022), *aff'd*, No. 8:16-cv-00099-JLS-KES, 2024 WL 1651666 (9th Cir. Apr. 17, 2024). "The role of the Court is not to resolve disputes of fact but to assess whether there are any factual disputes to be tried." *ShopKo Stores Operating Co., LLC v. Balboa Cap. Corp.*, No. 816CV00099JLSKES, 2017 WL 3579879, at *5 (C.D. Cal. July 13, 2017). "Once the moving party carries its initial burden, the adverse party 'may not rest upon the mere allegations or denials of the adverse party's pleading,' but must provide affidavits or other sources of evidence that 'set forth specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001)). "Following this same rubric, a court may grant summary adjudication on part of a claim or defense, based on the standards applicable to a motion for summary judgment." *See Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*, 426 F. Supp. 2d 1101, 1105 (E.D. Cal. 2006)

23-cv-01202-JLB

(citing Fed.R.Civ.P. 56(a), (b); *State of California v. Campbell,* 138 F.3d 772, 780 (9th Cir.1998)).

"[W]hen parties submit cross-motions for summary judgment, '[e]ach motion must be considered on its own merits." *Fair Hous. Council of Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations and quotation marks omitted).[4]

The substantive law governing Plaintiff's breach of contract claims in this diversity action is California law. *See Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 818 (9th Cir. 2014) (citation omitted). "Whether evidence on a particular issue is sufficient to raise a question of fact for the jury, however, is governed by federal law." *Id.*

## III.   DEFENDANT's MOTION

For the reasons summarized below, Defendant asks the Court to enter summary judgment in its favor on the following claims levied by Plaintiff: (1) specific performance (first cause of action); (2) breach of contract (second cause of action); (3) breach of the implied covenant of good faith and fair dealing (third cause of action); (4) express contractual indemnity (fourth cause of action); and (5) declaratory judgment (twelfth cause of action). (ECF No. 106-1 at 13-14.)

### A.   Plaintiff's material breach of the Lease Agreements

#### 1.   Defendant's Argument

Defendant contends that Plaintiff's actions terminating the Lease Agreements, barring Defendant from the Property, and usurping Defendant's remediation efforts constituted a material breach of contract by frustrating an essential purpose of those agreements, thus discharging Defendant's obligation to perform. (ECF No. 106-1 at 14-16 (citing *Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (Cal. Ct. App. 2011); *De Burgh v.*

---

[4]  "If the court does not grant all the relief requested by the motion, it may enter an order stating any material fact—including an item of damages or other relief—that is not genuinely in dispute and treating the fact as established in the case." Fed. R. Civ. P. 56(g).

23-cv-01202-JLB

*De Burgh*, 39 Cal. 2d 858, 863 (1952); *Walker v. Harbor Bus. Blocks Co.*, 181 Cal. 773, 778 (1919)).  Further, Defendant maintains that it "had substantially performed its contractual obligations," as it "had undertaken [] lengthy, complex remedial investigation pursuant to state regulatory oversight and was nearing the proverbial finish line," noting that DTSC had approved the IMW, Defendant had confirmed it would implement the IMW, and Defendant was working on the implementation schedule submitted to DTSC on February 3, 2023. (*Id.* at 16.)  Moreover, Defendant asserts that Plaintif's insistence that Defendant violated hazardous waste standards was "simply a red herring," as Plaintiff failed to provide Defendant with notice of noncompliance in accordance with Sections 20 and 22 of the Lease Agreements and did not request that Defendant take reasonable action to cure the alleged noncompliance.  (*Id.*)  Defendant contends that Plaintiff "gambled that it could take control of the remediation and use the threat of litigation to coerce [Defendant] into surrendering."  (*Id.*)

## 2.    Plaintiff's Argument

Plaintiff counters that Defendant fails to identify a genuine dispute of material fact regarding its assertion that Plaintiff materially breached the Lease Agreements.  (ECF No. 112 at 15-17.)  Plaintiff asserts that it terminated the Lease Agreements in accordance with Section 14.[5]  (*Id.* at 16 (citing ECF Nos. 112-3, 112-29, 112-31).)  Further, Plaintiff

---

[5] Section 14 of the Lease Agreements provides as follows:

> This Lease may be terminated at any time by either party by serving thirty (30) days' written notice of termination upon the other party, stating therein the date that such termination shall take place, and upon the expiration of the time specified in such notice this lease and all rights of Lessee hereunder shall absolutely cease and determine; but upon any such termination Lessee shall be entitled to have refunded by Lessor a proportionate part of any rentals paid in advance.

(ECF No. 112-3 at 3; ECF No. 112-31 at 3.)

23-cv-01202-JLB

contends that denying Defendant post-termination access to the Property and assuming Defendant's remediation efforts did not frustrate an essential purpose of the Lease Agreements, where the essence or purpose of those agreements was to permit Defendant to use the Property for the handling and storage of scrap materials in compliance with applicable law, conditioned on the payment of rent.  (*Id.* at 16.)  Moreover, Plaintiff maintains that the Lease Agreements did not accord Defendant post-termination access to the Property or a right to control remediation.  (*Id.* at 17.)  Plaintiff notes that it terminated the Lease Agreements when Defendant refused to resume remitting rent payments and ceased all remediation activity on the Property.  (*Id.*)

### 3. Analysis

Defendant asserts that Plaintiff materially breached the Lease Agreements by terminating the Leases, barring access to the Property, and usurping the remediation process.  (ECF No. 106-1 at 16.)

"When a plaintiff's 'failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract.'"  *Williams & Cochrane, LLP v. Rosette*, 631 F. Supp. 3d 884, 902 (S.D. Cal. 2022), *aff'd*, No. 23-55166, 2024 WL 1651666 (9th Cir. Apr. 17, 2024) (quoting *Brown v. Grimes*, 192 Cal. App. 4th 265, 277 (Cal. Ct. App. 2011)).

"Whether a given breach is material or essential, or not, is a question of fact." *Bemis v. Whalen*, 341 F. Supp. 1289, 1291 (S.D. Cal. 1972).

Defendant has not established that there is no genuine dispute of material fact that Plaintiff materially breached the contract, entitling Defendant to summary judgment in its favor on this issue.  Whether Defendant had a right, as opposed to only a duty, to remediate the property under the terms of the Lease Agreements is a mixed question of fact and law disputed by the parties.  Therefore, Defendant's motion for summary judgment based upon Plaintiff's breach is **DENIED**.

///

///

23-cv-01202-JLB

**B.** **Plaintiff is precluded from recovery due to repudiation of indemnity**

**1.** **Defendant's Argument**

Defendant asserts that it was providing "full indemnity" to Plaintiff until Plaintiff rejected that indemnity by entering into a "side agreement" with DTSC to assume Defendant's remediation efforts. (ECF No. 106-1 at 22.) Insisting that Plaintiff's rejection of this indemnity was a "voluntary and an intentional litigation ploy," Defendant further maintains that Plaintiff's "conduct represents a material breach of contract[.]" (*Id.*)

**2.** **Plaintiff's Argument**

Plaintiff counters that it did not repudiate the right to indemnification under the Lease Agreements. (ECF No. 112 at 18.) Plaintiff asserts that the Lease Agreements did not entitle Defendant to elect whether to indemnify Plaintiff through remediation or by providing reimbursement for the cost of Plaintiff's remediation efforts. (*Id.*) Thus, Plaintiff contends that taking over remediation did not constitute a repudiation of indemnity by Defendant, because the Lease Agreements expressly provide for indemnity in the form of reimbursement. (*Id.*) Further, Plaintiff insists there is no dispute that it pursued indemnity by seeking reimbursement for the outlay of costs necessitated by Defendant's failure to complete remediation, where Defendant "indefinitely paused all remediation work since at least September 2020." (*Id.* at 19.)

**3.** **Analysis**

Defendant cites no authority and provides no legal analysis in support of its repudiation argument. (ECF No. 106-1 at 22-23.) Defendant cannot prevail on a motion for summary judgment based upon an argument that is not developed both legally and factually. *See United States v. Aguilar*, 782 F.3d 1101, 1108 (9th Cir. 2015) (holding that although "the burden of alleging a potentially meritorious defense [was] minimal," the court would not "manufacture" arguments for defendants, where defendants provided meager argument and failed to cite applicable legal authority) (citations and internal quotation marks omitted); *see also Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) (deeming plaintiff's claim "waived due to his failure to present a specific, cogent argument

23-cv-01202-JLB

for [the court's] consideration," reasoning that "a bare assertion does not preserve a claim").

Defendant's motion for summary judgment based upon repudiation is therefore **DENIED**.[6]

## C.    Plaintiff breached the implied covenant of good faith and fair dealing

### 1.    Defendant's Argument

Defendant asserts that Plaintiff breached the implied covenant of good faith and fair dealing "by subterfuge, abuse of power and evasion of the spirit of the bargain." (ECF No. 106-1 at 19.)  Thus, Defendant maintains that Plaintiff "is not entitled to contract damages due to its own bad faith conduct." (*Id.* at 20.)  Defendant contends that since at least 2017, Plaintiff was aware that Defendant maintained access to the Property solely for the purpose of effecting remediation. (*Id.*)  According to Defendant, Plaintiff "devised a strategy to terminate the Leases on 30 days' notice, knowing [Defendant] could not finish the remediation in 60 days (30 days' notice plus 30 days form termination), and terminate [Defendant's] and its consultants' access to the leasehold." (*Id.*)  Defendant maintains that Plaintiff "sought to take over the remediation and control the IMW implementation," thereby violating Defendant's "right" under Section 16[7] of the Lease Agreements to

---

[6]   Defendant's overarching argument—that Plaintiff cannot recover under its remediation claim because Plaintiff stopped Defendant's remediation, remediated itself, and opted to pursue financial indemnification instead—is captured in its argument that Plaintiff breached the covenant of good faith and fair dealing when Plaintiff "sought to take over the remediation and control the IMW implementation," thereby violating Defendant's "right" under Section 16 of the 1977 Lease Agreement to "restore the leasehold." (ECF No. 106-1 at 20.)  Substantively, this argument of Defendant's is addressed in that section.

[7]   At the hearing on June 25, 2026, Defendant argued, for the first time, that the right to remediate is to be found primarily in Section 22 of the 1983 Amendment to the 1977 Lease and the Section 20 of the 1983 Amendment to the 1978 Lease. (*See* ECF No. 164 at 9, 13.)  This was not argued by Defendant in its Motion or in its Opposition to Plaintiff's Motion. (*See* ECF Nos. 106-1, 109.)  The Court will not consider arguments raised for the first time at oral argument.

"restore the leasehold." (*Id.*)  Defendant also points out that Plaintiff sent Defendant notice of lease termination just two days after Defendant informed Plaintiff on January 11, 2023, that it would implement the IMW.  (*Id.*)  Further, Defendant notes that Plaintiff barred Defendant from the Property on February 22, 2023, ten days after termination of the Lease Agreements took effect.  (*Id.*)

### 2.  Plaintiff's Argument

Plaintiff counters that it did not breach the implied covenant of good faith and fair dealing.  (ECF No. 112 at 25-27.)  Rather, Plaintiff asserts that it exhibited good faith by permitting Defendant to pursue its investigation and remediation of the Property over the course of decades and by granting years of rent relief so Defendant could afford to engage in remediation, even where such "leeway" was not required by the Lease Agreements. (ECF No. 112 at 27.)

### 3.  Analysis

"It has long been recognized in California that '[t]here is an implied covenant of good faith and fair dealing in every contract that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'"  *Kransco v. Am. Empire Surplus Lines Ins. Co.*, 23 Cal. 4th 390, 400 (2000), *as modified* (July 26, 2000) (quoting *Comunale v. Traders & General Ins. Co.*, 50 Cal.2d 654, 658 (1958)); *see also Liberty Surplus Ins. Corp. v. Ledesma & Meyer Constr. Co.*, No. CV 12-00900-RGK (SPx), 2012 WL 12896220, at *3 (C.D. Cal. June 19, 2012) (explaining that as "a claim for breach of the implied covenant of good faith and fair dealing arises under state law, California law will govern").

A "breach of the implied covenant of good faith and fair dealing involves something beyond breach of the contractual duty itself."  *Chateau Chamberay Homeowners Ass'n v. Associated Int'l Ins. Co.*, 90 Cal. App. 4th 335, 345 (Cal. Ct. App. 2001), *as modified on denial of reh'g* (July 30, 2001) (citation and quotation marks omitted).  "Breach of a specific provision of the contract is not a necessary prerequisite to a claim for breach of the implied covenant of good faith and fair dealing."  *Brehm v. 21st Century Ins. Co.*, 166 Cal.

23-cv-01202-JLB

App. 4th 1225, 1236 (Cal. Ct. App. 2008), *as modified* (Oct. 6, 2008) (citation and brackets omitted). Rather, "allegations of breach of the implied covenant of good faith and fair dealing must show that the conduct of the defendant, whether or not it also constitutes a breach of a consensual contract term, demonstrates a failure or refusal to discharge contractual responsibilities." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App. 3d 1371, 1395 (Cal. Ct. App. 1990) (citation and quotation marks omitted). "The covenant is implied as a supplement to the express contractual covenants, to prevent a contracting party from engaging in conduct that frustrates the other party's rights to the benefits of the agreement." *Brehm*, 166 Cal. App. 4th at 1235 (citation and brackets omitted). Simply stated, the burden imposed is "'that neither party will do anything which will injure the right of the other to receive the benefits of the agreement.'" *Chateau Chamberay Homeowners Ass'n*, 90 Cal. App. 4th at 345 (citation and quotation marks omitted). Thus, "[t]he scope of the duty of good faith and fair dealing depends upon the purposes of the particular contract because the covenant is aimed at making effective the agreement's promises." *Kransco*, 23 Cal. 4th at 400 (citation and quotation marks omitted).

Defendant asserts that Plaintiff violated the implied covenant of good faith and fair dealing by triggering the 30-day remediation period with its termination of the Lease Agreements, barring Defendant from the Property, and usurping Defendant's remediation efforts, all of which constituted "subterfuge, abuse of power and evasion of the spirit of the bargain." (ECF No. 106-1 at 19.)

With respect to how Plaintiff allegedly deprived Defendant of its "right . . . to receive the benefits of the agreement," as required for a showing of a violation of the implied covenant of good faith and fair dealing (*Kransco*, 23 Cal. 4th at 400), Defendant repeatedly asserts a "right to restore the Lease Area" and its "right to remediate the leasehold." (ECF No. 106-1 at 20-21.) Thus, Defendant essentially asserts that Plaintiff acted in bad faith by interfering with its asserted right to remediate the Property.

13

"The covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another." *3500 Sepulveda, LLC v. Macy's W. Stores, Inc.*, 980 F.3d 1317, 1324 (9th Cir. 2020) (quoting *Carma Devs. (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 372 (1992)). In such circumstances, "[t]he party with discretionary power must exercise such power in good faith and through 'objectively reasonable conduct.'" *Id.* (quoting *Badie v. Bank of Am.*, 67 Cal. App. 4th 779, 796 (Cal. Ct. App. 1998)). "The issue of whether the implied covenant of good faith and fair dealing has been breached is ordinarily 'a question of fact unless only one inference [can] be drawn from the evidence.'" *In re Bank of Am. California Unemployment Benefits Litig.*, 674 F. Supp. 3d 884, 933 (S.D. Cal. 2023), *on reconsideration in part*, No. 21MD2992-GPC(MSB), 2024 WL 3174380 (S.D. Cal. June 25, 2024) (quoting *Hicks v. E.T. Legg & Assocs.*, 89 Cal. App. 4th 496, 508 (2001)).

Here, Defendant raises a dispute, for determination by the jury, as to whether Plaintiff's conduct "demonstrate[d] a failure or refusal to discharge contractual responsibilities" through the alleged interference with Defendant's remediation of the Property. *Careau & Co.*, 222 Cal.App.3d at 1371. Thus, there is a dispute of material fact and Defendant's Motion is **DENIED** to the extent it is based upon a theory of Plaintiff's breach of the implied covenant of good faith and fair dealing.

**D.     Defendant was excused from performing due to impossibility**

**1.     Defendant's Argument**

Defendant contends that its performance under the Lease Agreements is excused pursuant to the doctrine of impossibility. (ECF No. 106-1 at 16-18 (citing *Baird v. Wendt Enters., Inc.*, 248 Cal. App. 2d 52, 55 (Cal. Ct. App. 1967) (stating that "there is no liability for breach of a contract [where] performance has been made impossible by operation of law"); *Oosten v. Hay Haulers Dairy Emp. & Helpers Union*, 45 Cal. 2d 784, 788 (1955)). Defendant quotes *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland* to support the proposition that "'[i]f the impossibility of performance arises directly or even indirectly from the acts of the promisee, it is a sufficient excuse for nonperformance by the promisor.

23-cv-01202-JLB

This is [based] upon the principle that he who prevents a thing may not avail himself of the nonperformance which he has occasioned.'" (ECF No. 106-1 at 17 (quoting *Oakland Bulk & Oversized Terminal, LLC v. City of Oakland*, 112 Cal. App. 5th 519, 546 (Cal. Ct. App. 2025), *review denied* (Sept. 17, 2025)).  Thus, Defendant insists that "[n]onperformance of a contract in accordance with its terms is excused if performance is prevented by the conduct of the adverse party."  (*Id.*)

Defendant asserts that "since the 1980's," it has "invested millions of dollars and years of effort in assessing and remediating potential impacts at the [] Property," and that Plaintiff "was aware that [Defendant] had committed to the implementation of the IMW[.]" (*Id.* at 17.)  Defendant maintains that despite this knowledge, Plaintiff elected to terminate the Lease Agreements without cause, deny Defendant access to the Property, and enter into a voluntary agreement with DTSC in April 2023, thus preventing Defendant "from exercising its contractual rights to remediate the leasehold and comply with DTSC's binding orders."  (*Id.*)  Thus, Defendant insists that Plaintiff rendered it impossible for Defendant "to complete its contractual duty under the Leases."[8] (*Id.*)  Defendant also notes that the Lease Agreements contained a separate provision requiring restoration of the Property to its original state within 30 days following termination of the agreement, which Defendant asserts would have been "impossible given applicable regulatory requirements." (*Id.* at 18.)  Further, Defendant observes that Plaintiff "took about the same time to implement the IMW as [Defendant's] team had estimated—approximately 23 months." (*Id.*)

### 2.   Plaintiff's Argument

Plaintiff counters that Defendant's impossibility defense fails, because the Lease Agreements did not accord Defendant the right to indemnify Plaintiff through remediation.

---

[8] Defendant's asserted impossibility defense goes only to its obligation to remediate the Property.  It does not go to its obligations to adhere to applicable laws and refrain from damaging the Property.

23-cv-01202-JLB

(*See* ECF No. 112 at 23.)  Further, Plaintiff reasons that Defendant "contradicts itself by asserting that Section 16 [of the Lease Agreements] is simultaneously unenforceable under the doctrine of impossibility (as the remediation could not be completed in 30 days), but enforceable to the extent that it gives [Defendant] the right to 'restore the Premises to substantially the state in which they were' prior to [Defendant's] tenancy."  (*Id.* (quoting ECF No. 103-46 at 4; ECF No. 103-47 at 4).)  Asserting that it could have terminated the Lease Agreements when Defendant illegally stored hazardous waste on the Property in the mid-1980's, Plaintiff points out that it permitted Defendant to spearhead remediation on the Property for decades and that it even agreed to provide rent relief for many months to facilitate Defendant's remediation efforts.  (*Id.* at 24.)  Moreover, Plaintiff contends that it "did not invoke the Section 16 termination pathway," as it did not make a demand on Defendant under that section that Defendant "remove the Improvements and restore the premises."  (*Id.* (quoting ECF No. 103-46 at 4; ECF No. 103-47 at 4).)

### 3.    Analysis

The common-law doctrine of impossibility, now more commonly known as the doctrine of impracticability, "excuses what would otherwise be a breach of contract under very limited and narrowly defined circumstances."  *Mull v. Motion Picture Indus. Health Plan*, 41 F.4th 1120, 1131 & 1131 n.10 (9th Cir. 2022).  To successfully mount the affirmative defense of impossibility or impracticability, a party must establish:

> (1) the occurrence of an event that makes performance impossible or impracticable, (2) the event occurred through no fault of the party seeking relief (3) the event was unexpected in the sense that its non-occurrence was a basic assumption of the agreement of the parties and (4) the language of the contract or the circumstances warrant a reallocation of the risk of impracticability to another party.

*Gonzalez v. Cmty. Mortuary, Inc.*, 119 Cal. App. 5th 1006, 1026 (Cal. Ct. App. 2026) (citations omitted); *see also Taylor-Edwards Warehouse & Transfer Co., of Spokane v. Burlington N., Inc.*, 715 F.2d 1330, 1336 (9th Cir. 1983) ("The ultimate inquiry for purposes of the impossibility defense is whether the intervening changes of circumstance

were so unforeseeable that the risk of increased difficulty or expense should not properly be borne by the promisor."). The defendant bears the burden of establishing impossibility or impracticability of performance as an affirmative defense to a plaintiff's breach of contract claim. *See Nguyen v. Stephens Inst.*, 529 F. Supp. 3d 1047, 1056 (N.D. Cal. 2021). "[T]he defense of impracticability of performance . . . sounds in equity and carries no right to trial by jury." *Gonzalez*, 119 Cal. App. 5th at 1027 (holding that the trial court erred in submitting the equitable defense of impracticability to the jury). Nevertheless, a "court ha[s] discretion to seek assistance from the jury in deciding questions of fact that need[] to be resolved to determine whether the elements of the impracticability defense ha[ve] been satisfied." *Gonzalez*, 119 Cal. App. 5th at 1031; *see also id.* at 1030 (explaining that a "'trial court has discretion whether to submit an equitable defense to the jury' when the equitable issues required to resolve the defense are intertwined with legal issues that relate to legal claims triable to a jury") (quoting *Unilogic, Inc. v. Burroughs Corp.*, 10 Cal. App. 4th 612, 622 (Cal. Ct. App. 1992)).

To evaluate the applicability of the doctrine of impossibility to this case, the Court first looks to what breach Defendant asserts should be excused under the doctrine. Defendant does not assert that it was impossible for Defendant to remediate the Property. On the contrary, Defendant asserts that it was ready, willing and able to remediate the Property, if given another 23 months to do so. Rather, Defendant maintains that it was impossible to finish remediation once Plaintiff terminated the Leases and barred it from the Property and it was certainly impossible to complete the remediation within 30 days of the termination of the Leases. ("Upon termination, the contract required PSI, as tenant, to restore the BNSF Property to its original state within 30 days, which would be impossible given applicable regulatory requirements." (ECF No. 106-1 at 18.))

To prevail on this affirmative defense, Defendant would have to show that Defendant's "performance [was] made impracticable without [its]" fault, *Mull*, 41 F.4th at 1131, and that "the intervening changes of circumstance were so unforeseeable that the risk of increased difficulty or expense should not properly be borne by the [defendant],"

17

*Taylor-Edwards Warehouse & Transfer Co.*, 715 F.2d at 1336.

Defendant cannot prevail on summary judgment on this defense because Defendant does not even endeavor to establish undisputed facts as to any elements of this affirmative defense, other than impracticability itself.  Specifically, Defendant does not address, much less set forth undisputed facts, as to (1) the event rendering the performance impossible occurring through no fault of the party seeking relief,  or (2) the event being unexpected in the sense that its non-occurrence was a basic assumption of the agreement of the parties.

Defendant's motion for partial summary judgment based upon impossibility fails for a second reason.  In analyzing the applicability of the doctrine of impossibility in this matter, the Court looks at what breach Defendant maintains was rendered impossible. Defendant argues two things: (1) that completion of remediation was impossible after Plaintiff terminated the Leases and took over the remediation efforts itself; and (2) finalizing remediation within 30 days of termination was impossible. Specifically, Defendant asserts that restoring the Property within 30 days would have been impossible "due to current environmental regulatory requirements and the fact that the baseline, 'original' condition of the property at the time PSI assumed the Leases was unknown." (ECF No. 109 at 8-9.)

The first argument fails because Plaintiff is not taking the position that Defendant breached by failing to remediate after Plaintiff took over remediation.  Rather, Plaintiff is taking the position that Defendant failed to indemnify Plaintiff by financial payment after Plaintiff took over remediation.  Defendant makes no argument that the doctrine of impossibility applies to excuse its alleged breach for failure to indemnify by reimbursing Plaintiff for its remediation efforts.[9]

---

[9]  As part of this argument, Defendant states, "The fact that BNSF created the impossibility to intentionally frustrate PSI's ability to continue providing indemnification through remediation further supports the argument that PSI should be relieved of all indemnification obligations under the leases, as discussed further below." (ECF No. 106-1 at 17-18.  This language holds the suggestion that Defendant is referring, again, to its

23-cv-01202-JLB

Similarly, Defendant's second position, that impossibility excuses any breach based upon the failure to complete remediation within 30 days of the termination of the leases, fails because Plaintiff has abandoned its position that this is a breach upon which Plaintiff relies. Plaintiff states unequivocally in its Reply that it is not relying on Defendant's purported failure to remediate the Property within the limited window following termination as a theory of breach:

> PSI also argues "impossibility of performance" because PSI states that it could not complete remediation of the BNSF Property within 60 days, a requirement it incorrectly reads into Section 16 of the Leases. However, BNSF has not demanded in this litigation that PSI complete remediation of the BNSF Property within 60 days. Instead, BNSF has demanded that PSI hold BNSF harmless and indemnify BNSF for the costs BNSF incurred in implementing PSI's 2021 IMW and that PSI pay BNSF the rent BNSF is owed. PSI's empty citation to the doctrine of impossibility does not excuse PSI's failure to satisfy its indemnity obligations or to pay rent to BNSF.

(ECF No. 117 at 5–6.)  Although Plaintiff's counsel attempted to distance Plaintiff from this disavowal at oral argument, Plaintiff is bound by the representations in its Reply.

Defendant has failed to address the elements of this defense and has failed to establish that there is a breach that is still at issue in this case for which impossibility could serve as a defense.

Defendant's motion for partial summary judgment on the basis of the affirmative defense of impossibility is **DENIED**.

///

///

---

alleged right to remediate instead of indemnifying through financial reimbursement.  To the extent that Defendant is arguing interference with a *right*, rather than excuse of a *breach*, this goes to its arguments of unclean hands or breach of the implied covenant of good faith and fair dealing, not impossibility.

**E.    Plaintiff is precluded from recovery by the doctrine of unclean hands**

**1.    Defendant's Argument**

Defendant contends that "the record reflects [Plaintiff's] unclean hands in sabotaging [Defendant's] efforts to work with DTSC on the remediation, barring [Defendant's] access to the site and concocting the scheme to seize control and use threats of litigation costs to get what it could not obtain through negotiation." (ECF No. 106-1 at 22.) Defendant insists that Plaintiff, as a "billionaire landlord," exploited the requirement in the Lease Agreements that Defendant restore the Premises to substantially their original state within 30 days of termination of the agreement "as a means of coercion." (*Id.*)[10] Thus, Defendant maintains that "[t]he power imbalance between the parties and [Plaintiff's] unclean hands unquestionably impacted the present contractual dispute." (*Id.*)

**2.    Plaintiff's Argument**

Contrary to Defendant's position that Plaintiff had unclean hands or breached the implied covenant of good faith and fair dealing, Plaintiff asserts that it worked with Defendant for more than five years while Defendant was unable to pay rent in order to help Defendant move forward with remediation. (ECF No. 112 at 25.) Prior to terminating the Leases, Plaintiff asserts that Defendant had stopped moving forward with remediation and never resumed paying rent. (*Id.*) Specifically as to the claim of unclean hands, Plaintiff maintains that Defendant "has offered no evidence to demonstrate that [Plaintiff] used its 'financial ability' [to] take advantage of [Defendant]—a subsidiary of one of the largest steel companies in Mexico (Grupo Simec)—nor has it offered any evidence of [Plaintiff] using threats of litigation in the years prior to the Leases' termination." (*Id.* at 27 (citing ECF No. 112-14 at 4-5).)

///

///

---

[10] Defendant presumably cites Section 16 of the Lease Agreements. (*See* ECF No. 106-5 at 4; ECF No. 106-6 at 4.)

23-cv-01202-JLB

### 3. Analysis

"In California, the unclean hands doctrine applies not only to equitable claims, but also to legal ones." *Adler v. Fed. Rep. of Nigeria*, 219 F.3d 869, 877 (9th Cir. 2000), *as amended on denial of reh'g and reh'g en banc* (Aug. 17, 2000)). Specifically, unclean hands can be available as an affirmative defense to a contract claim. *hiQ Labs, Inc. v. LinkedIn Corp.*, 639 F. Supp. 3d 944, 962 (N.D. Cal. 2022). Courts apply a three-part test for the application of unclean hands: (1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries." *Padideh v. Moradi*, 89 Cal.App.5th 418, 426 (2023); *E. W. Bank v. Rio Sch. Dist.*, 235 Cal. App. 4th 742, 751 (Cal. Ct. App. 2015); *Jaramillo v. County of Orange,* 200 Cal.App.4th 811, 820 (Cal. Ct. App. 2011); *Kendall–Jackson Winery, Ltd. v. Superior Court*, 76 Cal.App.4th 970, 978 (Cal. Ct. App. 1999).

Further, "[t]he doctrine of unclean hands requires unconscionable, bad faith, or inequitable conduct by the plaintiff in connection with the matter in controversy." *Fladeboe v. Am. Isuzu Motors Inc*., 150 Cal. App. 4th 42, 56 (2007), *as modified* (Apr. 24, 2007) (citing *General Elec. Co. v. Superior Court* (1955) 45 Cal.2d 897, 899–900)). In evaluating "the applicability of the unclean hands defense, '[t]he focus is the equities of the relationship between the parties, and specifically whether the unclean hands affected the transaction at issue.'" *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 667 (9th Cir. 2012) (quoting *Jaramillo v. County of Orange,* 200 Cal.App.4th 811, 820 (Cal. Ct. App. 2011)). "California law precludes an unclean hands affirmative defense where there is no establishment of improper conduct to begin with." *Biller v. Toyota Motor Corp.*, 668 F.3d 655, 668 (9th Cir. 2012) (citing *Kendall–Jackson Winery, Ltd. v. Superior Court*, 76 Cal.App.4th 970, 978 (Cal. Ct. App. 1999).

In its motion for partial summary judgment on the basis of unclean hands, Defendant does not address the first factor: analogous case law. *E. W. Bank v. Rio Sch. Dist.*, 235 Cal. App. 4th at 751. Defendant merely recites general legal principles and fails to cite, much less analyze, analogous case law regarding the application of unclean hands. Thus,

23-cv-01202-JLB

Defendant fails to establish entitlement to summary judgment as to this defense. *See hiQ Labs, Inc.*, 639 F. Supp. 3d at 962 (granting summary judgment against plaintiff's assertion of the affirmative defense of unclean hands as to defendant's counterclaims, where plaintiff "cited no analogous case law supporting the application of the unclean hands defense to the facts" of the case, holding that "[f]ailing to meet the first prong of the three-part test 'alone is sufficient to warrant the denial of the defense'") (quoting *E. W. Bank v. Rio Sch. Dist.*, 235 Cal. App. 4th 742, 751 (Cal. Ct. App. 2015)).  Further, Defendant cannot prevail on summary judgment with respect to the affirmative defense of unclean hands without establishing that there are no genuine disputes of material facts to be resolved.  Here, the issue is whether Plaintiff's actions in terminating the leases and assuming responsibility for implementing the IMW were unconscionable, inequitable, or exhibited bad faith such that Plaintiff should be barred from recovery even if it establishes breach by Defendant. Plaintiff factually disputes that it acted in bad faith, unconscionably, or inequitably.  (ECF No. 112-1 at 8, 13-14, 16-18 (Plaintiff's Opposition to Defendant's Separate Statement of Undisputed Facts ("PRSSUF")) ¶¶ 13, 18, 20, 23.)  Specifically, Plaintiff puts forth evidence that, among other things, Defendant had ceased remediation work by September 25, 2020 due to cash flow problems; Defendant did limited work thereafter; Defendant did not have the financial resources to conduct the remediation; and Plaintiff did not refuse to "negotiate a lease termination and access agreement" with Defendant in 2017, but rather mistakenly interpreted Defendant's 2017 communication as a notice of termination.

Defendant has not established that there is no genuine dispute of material fact as to the unconscionability of Plaintiff's conduct, such that Defendant prevails on Plaintiff's indemnity claim on summary judgment.  The Court therefore **DENIES** Defendant's Motion with respect to the affirmative defense of unclean hands.

## F.      Derivative claims

### 1.      Defendant's Argument

Defendant contends that the Court should grant summary judgment against Plaintiff

as to its claims for Specific Performance and Declaratory Judgment.  (*Id.* at 23.)[11] Defendant asserts that because Plaintiff barred Defendant from the Property and completed remediation itself, "there is no specific performance of contract that can be ordered that is distinct from [Plaintiff's] contractual claims for damages and indemnification[.]"  (*Id.*) Further, Defendant maintains that Plaintiff's claim for declaratory relief "is simply an alternative way for [Plaintiff] to try to achieve the same remedy as its breach of contract claims[.]"  (*Id.*)

## 2.    Plaintiff's Argument

Plaintiff acknowledges that when it filed its Complaint, it sought specific performance and declaratory relief, because it had not yet initiated remediation of the Property, and that remediation "is now essentially complete and there remains little future work to be performed."  (ECF No. 112 at 28.)  Nevertheless, Plaintiff maintains that because Defendant's obligations survive termination of the Lease Agreements, "[t]o the extent property damage or other compensable issues are identified at the BNSF Property in the future, [Plaintiff] may have future claims against [Defendant] related to such issues arising under the Lease" Agreements.  (*Id.*)  Further, Plaintiff asserts that future claims

---

[11]  In its first cause of action, titled Specific Performance, Plaintiff alleges that Defendant violated the Lease Agreements by failing to pay rent, contaminating the Property in violation of applicable environmental laws, failing to remediate the Property, and failing to indemnify Plaintiff for the cost of remediation.  (ECF No. 1 at 19-21.) Plaintiff asks the Court to order Defendant to fulfill its obligations under Sections 3, 6, 7, 8, 16, and 22 of the 1977 Lease Agreement and Sections. 3, 6, 7, 8, 16, and 20 of the 1978 Lease Agreement.  (*Id.* at 21.)

Through its twelfth cause of action, titled declaratory relief, Plaintiff asserts that Defendant has breached various provisions of the Lease Agreements and, further, that Defendant is liable to Plaintiff under the California Hazardous Substance Account Act. (*Id.* at 33, 35.)  Plaintiff contends in the Complaint that "[a] judicial determination is necessary and appropriate at this time to determine what rights the parties have with respect to the contentions presently disputed."  (*Id.* at 36.)

23-cv-01202-JLB

against Defendant may arise under the California Hazardous Substances Account Act ("HSAA").  (*Id.* at 28.)  Plaintiff contends that Defendants fails to take into account the HSAA claims levied in the Complaint, which specifically include claims for declaratory relief for future costs and are not limited by Plaintiff's breach of contract claims.  (*Id.*)

### 3.    Analysis

Defendant contends that the Court should grant summary judgment against Plaintiff on Plaintiff's claims for specific performance and declaratory judgment.  (ECF No. 106-1 at 23.)  Defendant asserts that because Plaintiff barred Defendant from the Property and completed remediation, the Court cannot order specific performance pursuant to the Lease Agreements.  (*Id.*)

To obtain the remedy of specific performance, a plaintiff must show the following:

> (1) the inadequacy of his legal remedy; (2) an underlying contract that is both reasonable and supported by adequate consideration; (3) the existence of a mutuality of remedies; (4) contractual terms which are sufficiently definite to enable the court to know what it is to enforce; and (5) a substantial similarity of the requested performance to that promised in the contract.

*Bank of S. California, N.A. v. Everest Nat'l Ins. Co.*, No. 22-CV-00737-GPC-RBB, 2022 WL 3636334, at *5 (S.D. Cal. Aug. 23, 2022) (quoting *Tamarind Lithography Workshop, Inc. v. Sanders*, 143 Cal. App. 3d 571, 575 (Cal. Ct. App. 1983)).[12]

Here Plaintiff fails to identify any remaining obligation it seeks to compel Defendant to perform, other than payment of rent and indemnification, for which Plaintiff seeks a

---

[12] "[U]nder California law, specific performance is a remedy for breach of contract, not an independent claim."  *Bank of S. California, N.A.*, 2022 WL 3636334, at *4 (quoting *Griffin v. Green Tree Serv.*, LLC, 166 F. Supp. 3d 1030, 1055 (C.D. Cal. 2015)); *see also Guidiville Rancheria of California v. United States*, 5 F. Supp. 3d 1142, 1159 (N.D. Cal. 2013), *aff'd in part, rev'd in part*, 704 F. App'x 655 (9th Cir. 2017) ("Specific performance is a contract remedy derivative of Plaintiffs' breach of contract claim, rather than a separate cause of action").

23-cv-01202-JLB

judgment of damages.   *See Bank of S. California, N.A.*, 2022 WL 3636334, at \*5 (noting that the remedy of specific performance is available to a plaintiff upon demonstrating, *inter alia*, "the inadequacy of his legal remedy").

Therefore, the Court **GRANTS** Defendant's Motion for Summary Judgment on Plaintiff's claim for specific performance.

Plaintiff also pleaded declaratory judgment as a cause of action.[13]  (*See* ECF No. 1 at 35–36); *see also Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989) (stating that "a declaratory judgment is best considered a remedy, not a cause of action"); *Kimball v. Flagstar Bank F.S.B.*, 881 F. Supp. 2d 1209, 1219 (S.D. Cal. 2012) ("Declaratory relief is not an independent cause of action, but instead a form of equitable relief.").  This is supportable so long as Plaintiff also "plead[s] a predicate claim upon which the request for declaratory relief." *U.S. Specialty Ins. Co. v. Advanced Gen. Constr.*, No. 2:24-CV-05975-SPG-SSC, 2025 WL 2684030, at \*6 (C.D. Cal. July 11, 2025) (holding that because the Complaint did not plead a predicate claim upon which the request for declaratory relief as to the insurance policy was based, plaintiff did not sufficiently plead its cause of action for declaratory relief as to the insurance policy).

Defendant maintains that Plaintiff's request for declaratory relief "is simply an alternative way for [Plaintiff" to try to achieve the same remedy as its breach of contract claims[.]"  (ECF No. 106-1 at 23.)  Plaintiff asserts, however, that its "HSAA claims

---

[13]  The Declaratory Judgment Act states that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration[.]" 28 U.S.C. § 2201(a). "In considering whether declaratory relief is appropriate, a court must inquire whether "there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'" *IP Glob. Invs. Am., Inc. v. Body Glove Ip Holdings, LP*, No. 2:17-cv-06189-ODW (AGR), 2019 WL 121191, at \*2 (C.D. Cal. Jan. 7, 2019) (quoting *Md. Cas. Co. v. Pac. Coal & Oil Co.*, 312 U.S. 270, 273 (1941)).

pleaded in the Complaint . . . specifically include claims for declaratory relief for future costs." (ECF No. 112 at 28.)

Thus, the Court **DENIES** Defendant's Motion with respect to Plaintiff's claim for declaratory relief.

### G.   Conclusion

For the reasons set forth above, Defendant's Motion for Summary Judgment in its favor on the claim of specific performance is **GRANTED**.  Defendant's Motion for Summary Judgment in its favor on the following claims levied by Plaintiff: (i) breach of contract (second cause of action); (ii) breach of implied covenant of good faith and fair dealing (third cause of action); (iii) express contractual indemnity (fourth cause of action); and (iv) declaratory judgment (twelfth cause of action) is **DENIED**.

## IV.   PLAINTIFF'S MOTION

### A.   Plaintiff's Arguments[14]

Plaintiff argues that the Court should grant summary judgment as to its claims for breach of contract (Count 2) and breach of contractual indemnity (Count 4) as to the 1977 Lease Agreement, because the elements of those claims are satisfied and no genuine issue of material fact exists as to that claim.  (ECF No. 103-1 at 22-28.)

Plaintiff contends that the first element of its breach of contract claim is satisfied, because Defendant does not dispute that it was a party to the 1977 Lease Agreement.  (*Id.* at 22.)  Further, the 1977 Lease Agreement[15] contained indemnity provisions.  (*Id.* at 22.)

---

[14]   Although Plaintiff argued the elements of its claims for breach of contract and breach of contractual indemnity together, for the sake of clarity, the Court addresses the breach of contract claim for unpaid rent separately from the breach of contractual indemnity claim and the remainder of the breach of contract claim going to violations of law, damage to the Property and indemnification.

[15]   Plaintiff notes that it "is not seeking summary judgment on its claim that PSI breached the 1978 Lease because there are factual issues that might preclude summary judgment," explaining as follows:

23-cv-01202-JLB

Plaintiff asserts that the second element is satisfied, because it performed under the 1977 Lease Agreement by leasing the Property to Defendant. (*Id.* at 23 (citing ECF No. 103-46).) Further, Plaintiff maintains that it properly terminated the 1977 Lease Agreement in accordance with Section 14, which provides that the agreement may be terminated at any time by either party upon 30 days' notice. (*Id.*) Moreover, Plaintiff contends that it provided rent relief, at Defendant's request, to permit Defendant to conduct the remediation required by DTSC, but that Defendant failed to advance the remediation or to pay rent to Plaintiff. (*Id.*) Plaintiff also insists that Defendant's "many breaches of the 1977 Lease [Agreement], beginning no later than 1987 when the Water Board issued the 1987 Cleanup and Abatement Order to [Defendant] to clean up its contamination, excused any alleged non-performance by [Plaintiff]." (*Id.*)

With regard to the third element, Plaintiff asserts that Defendant breached the lease in multiple ways. (*Id.*) Plaintiff contends that Defendant breached Sections 6(a)–(b), 7–9, 16, and 22 of the 1977 Lease Agreement by extensively contaminating the Property in violation of state and local environmental law and failing to indemnify Plaintiff for the cost of remediation. (*Id.* at 25–26, 26 n.10 (citing ECF No. 103-2 at 4–5, PSSUF ¶ 6).) Plaintiff asserts that "[o]ther than in a single 1992 letter, until this litigation began, [Defendant]

> Specifically, PSI has claimed (erroneously) that BNSF waived its rights under the 1978 Lease with respect to the southern portion of the BNSF Property because BNSF did not demand rent payments for that portion of the Property starting in 2002, and there was an agreement—never identified—that PSI was not occupying that Property. However, the facts at trial will show that PSI continued to occupy and use that Property, as PSI's expert witness Dorinda Shipman admitted after reviewing aerial photographs depicting PSI's activities and soil [sic] piles on the BNSF Property.

(ECF No. 103-1 at 7 n.1.)

never asserted that the metals and PCB contamination on the BNSF Property were not related to PSI's operations." (*Id.* at 25.)  According to Plaintiff, Defendant admitted that it has not indemnified Plaintiff for remediation costs.  (*Id.* at 26 (citing ECF No. 103-2 at 8, PSSUF ¶ 13).)  Further, Plaintiff maintains that "[Defendant] need not be the *sole* cause of the contamination that [Plaintiff] remediated to be liable for indemnity under the Lease." (*Id.*)

Moreover, Defendant failed to remit monthly rent payments in accordance with the 1977 Lease Agreement.  (*Id.* at 27.) Plaintiff acknowledges that it agreed to provide rent relief to Defendant on a month-to-month basis, contingent on "continuous aggressive progress" in Defendant's remediation efforts.  (*Id.* (citing ECF No. 103-2 at 9, PSSUF ¶ 15).)  Plaintiff maintains that Defendant failed to qualify for rent relief during certain months between 2018 and 2020.  (*Id.*)  According to Plaintiff, by September 2020, Defendant ceased making progress with remediation and failed to resume making rent payments.  (*Id.* (citing ECF No. 103-2 at 9–10, PSSUF ¶ 16).)

As to the fourth element, Plaintiff asserts that it suffered damages in the form of remediation expenditures and unpaid rent.  (*Id.* at 27–28.)  Plaintiff maintains that the amount of damages can be readily determined but does not seek a determination of damages at present.  (*Id.*)

## B.  Defendant's Arguments

Defendant counters that the Court should deny the Motion, because genuine disputes of material fact remain regarding Plaintiff's claims for breach of the 1977 Lease Agreement and breach of contractual indemnity.  (ECF No. 109 at 7–17.)  Defendant contends that a genuine dispute of material fact exists regarding whether Plaintiff performed under the 1977 Lease Agreement, asserting that Plaintiff breached the agreement by barring Defendant from the Property and commandeering Defendant's remediation efforts.  (*Id.* at 8.)  Maintaining that Plaintiff has known since at least 2017 that Defendant's tenancy on the Property "was strictly for purposes of remediation access," Defendant insists that Plaintiff "used outdated, impossible to satisfy lease terms to control PSI's actions." (*Id.* at

23-cv-01202-JLB

8.)  Specifically, in 2017, Plaintiff said that if Defendant terminated the Lease Agreements, Plaintiff would enforce the provision requiring the restoration of the Property to its original condition within 60 days.  (*Id.* at 8-9.)  Defendant asserts, however, that restoring the Property within that timeframe would have been impossible "due to current environmental regulatory requirements and the fact that the baseline, 'original' condition of the property at the time PSI assumed the Leases was unknown."  (*Id.* at 8-9.)  Thus, Defendant alleges that Plaintiff "concocted a plan" to terminate the Lease Agreements, usurp Defendant's remediation efforts, and then seek indemnification from Defendant.  (*Id.* at 9.)

As to the element of Defendant's breach, Defendant first points out that Plaintiff did not terminate the Leases for noncompliance with regulatory standards but relied, instead, on the general, no fault provisions of the Leases.  (*Id.* at 10.)  Defendant argues that the doctrine of impossibility or impracticability excuses Defendant's breach.  (*Id.*)  Defendant further asserts that a genuine dispute of material fact exists[16] regarding whether the 1977 Lease Agreement "cover[s] indemnification under the particular factual scenario here," insisting that the term "indemnify" as used in the 1977 Lease Agreement "has a narrow meaning, of reimbursement for losses to third party claims, as opposed to the broader meaning adopted by [Plaintiff] of reimbursement of any claimed loss," and contending that indemnification agreements generally pertain to third-party claims.  (*Id.* at 14 (citing *Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010, 1024 (Cal. Ct. App. 2011)).)  Defendant also maintains that a genuine dispute of material fact regarding whether Plaintiff participated in "contributing acts" resulting in contamination of the Property precludes summary judgment as to Plaintiff's claim for breach of the indemnification agreement.  (*Id.* at 14.)  Defendant contends that pursuant to Plaintiff's interpretation of Section 9 of the

---

[16]  At oral argument, Defendant definitively took the position that the issue of whether the Lease Agreements provide for third-party indemnity or direct indemnity constitutes "a legal question."  (ECF No. 164 at 12); *see also id.* at 9 (stating that whether the Lease Agreents provide for third-party indemnity or direct indemnity is "a question of contract interpretation for the Court to make").  Counsel for plaintiff agreed.  (*Id.* at 20.)

23-cv-01202-JLB

1977 Lease Agreement, "even a drop of contamination on the BNSF Property would trigger the indemnity and leave [Defendant] on the hook to indemnify [Plaintiff] for any and all cleanup costs no matter the source." (*Id.* at 14–15.) Defendant insists that pursuant to Section 9, because Plaintiff "participate[d] in [] contributing acts or omissions" resulting in contamination of the Property, "the loss, damage or expense arising therefrom" should "be borne by the parties [] equally." (*Id.* at 15 (quoting ECF No. 103-46 at 3).) Defendant maintains that it "is indisputably *not* the *sole* source of contamination, but rather one of many potential contributory sources of contamination on the BNSF Property" such as prior tenants. (*Id.*) Further, Defendant asserts that it has been seeking contribution from Plaintiff for cleanup costs since at least February 1992. (*Id.* at 15.) Moreover, Defendant maintains that "whether [Plaintiff] participated in contributing acts directly, via its historic railroad operations onsite or upgradient runoff, or indirectly, by virtue of its numerous prior tenants' industrial operations that predated [Defendant's] operations" constitutes a genuine dispute of material fact. (*Id.* at 15–16.)

Defendant also reasons that because the 1977 Lease Agreement is a standard form contract, it should be construed against the drafter pursuant to the doctrine of contra proferentem. (*Id.* at 16.)

Finally, Defendant asserts that assuming, *arguendo*, the indemnity provision in the 1977 Lease Agreement extends beyond third-party claims, a genuine dispute of material fact remains regarding whether Plaintiff rejected that indemnity by terminating the Leases in 2023, barring Defendant's access to the Property, and approaching DTSC to take over Defendant's remediation efforts. (*Id.* at 17.)

### C.    Breach of Contract—Failure to Pay Rent

Most of Defendant's arguments in opposition to Plaintiff's Motion arise factually and legally from the time of notice of termination forward. Specifically, Defendant argues that Plaintiff's actions terminating the 1977 Lease, barring Defendant from the Property, and wresting control of remediation from Defendant preclude summary judgment in Plaintiff's favor as these actions amount to breach by Plaintiff, breach of the covenant of

23-cv-01202-JLB

good faith and fair dealing, unclean hands, and impossibility.  These arguments address Defendant's alleged indemnification obligations arising out of its failure to adhere to applicable laws and its damage to the Property through contamination.

Defendant makes a separate argument as to Plaintiff's breach of contract claim for unpaid rent.  Therefore, the Court will address the rent issue separately.

### 1.     Applicable Law

To establish entitlement to summary judgment on a claim for breach of contract, a plaintiff must show that no reasonable juror viewing the summary judgment record could find by a preponderance of the evidence anything other than: (i) the existence of a contract; (ii) Plaintiff's performance or excuse for nonperformance; (iii) Defendant's breach; and (iv) resulting damages.  *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 818 (9th Cir. 2014) (citing *Abdelhamid v. Fire Ins. Exch.*, 182 Cal.App.4th 990 (Cal. Ct. App. 2010)).  "Where the *fact* of damages is certain, the amount of damages need not be calculated with absolute certainty.  The law requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation." *Hot Rods, LLC v. Northrop Grumman Sys. Corp.*, 242 Cal. App. 4th 1166, 1184 (Cal. Ct. App. 2015) (citation and quotation marks omitted).

### 2.     Analysis

#### a.     Existence of a valid contract

The parties do not dispute the validity of the 1977 Lease Agreement.  (*See* ECF No. 109-2 at 2, (Defendant's Response to Plaintiff's Separate Statement of Undisputed Facts ("DRSSUF")) ¶ 2.)

#### b.     Plaintiff's performance

Plaintiff performed pursuant to the contract by permitting Defendant to "use the [p]remises exclusively as a site for [the] handling and storage of scrap materials."  (ECF No. 103-46 at 2, § 6(a)).  Although Defendant asserts that Plaintiff barred Defendant from the Property ten days after the Notice of Termination of Leases took effect, (ECF No. 106-

23-cv-01202-JLB

1 at 19), there is no dispute of fact that Plaintiff had use of the Property until then.[17]

### c.    Defendant's breach and damages

Plaintiff contends that although it "did grant rent relief for many months between 2018 and 2020, it did not do so for all months."[18]  (ECF No. 103-1 at 27.)  Defendant counters that genuine disputes of material fact remain regarding whether Defendant is liable to Plaintiff for unpaid rent under the 1977 Lease Agreement, thereby precluding summary judgment.  (ECF No. 109 at 11.)

In its Statement of Undisputed Facts, Plaintiff presents evidence that there were 14 months during the period of April 2018 through May 2021 that Plaintiff did not approve rent relief, and that Defendant "never paid rent for those months."  (ECF No. 109-2 at 8–9, DRSSUF ¶ 15.)[19]  Plaintiff further presents evidence that there was no rent relief as of

---

[17]  On January 13, 2023, Plaintiff sent Defendant the Notice of Termination of Leases, which became effective on February 12, 2023.  (ECF No. 106-26 at 9, DSSUF ¶ 21; *see also* ECF No. 106-19 at 7.)  Plaintiff barred Defendant from the Property on or around February 22, 2023.  (ECF No. 106-26 at 9, DSSUF ¶ 22.)

[18]  Plaintiff states elsewhere in its brief that it "granted rent relief for approximately 22 months between 2018 and *2021*."  (ECF No. 103-1 at 20 (emphasis added).)

[19]  Plaintiff submitted a declaration from Cary Hutchings, Director of Corporate Real Estate for Plaintiff, in which he declared:

> However, based on my review of the relevant documents, BNSF's business records, and my personal knowledge, and as reflected in <u>Exhibit 17</u>, I can confirm that there were approximately 14 months between April 2018 and May 2021 for which there is no record that BNSF granted rent relief and PSI nonetheless did not pay rent, including August 2018, December 2018, October 2019, January 2020, June 202, July 2020, August 2020, September 2020, October 202, November 2020, December 2020, January 2021, March 2021, and April 2021.

(ECF No. 103-45 at 7.)

23-cv-01202-JLB

May 2021, and no rent was paid thereafter. (ECF No. 103-2 at 9–10, PSSUF ¶ 16.) Among other things, for evidentiary support, Plaintiff relies on a September 25, 2020, email from Ryan Waterman, counsel for Defendant, advising that Defendant needed to "pause on implementing the work plan" due to the economic downturn from the pandemic (ECF No. 103-58 at 2) and on a May 18, 2021, letter from counsel for Plaintiff in which it was relayed:

> By way of this letter, BNSF formally requests that PSI provide, by June 1, 2021 (1) a comprehensive update of the project status including a remediation schedule that will implement the interim remedial action as soon as technically feasible, and a budget showing the total anticipated cost of clean-up activities as well as a plan and timeline for removing all site improvements and restoring the Property consistent with the Lease requirements, and (2) a plan and schedule for paying all delinquent rental payments.
>
> . . . Until the requested information is provided, no further requests for waiver of rent will be considered.

(ECF No. 103-61 at 3.)

For the time period from April 2018 through May 2021, Defendant does not deny that it did not remit rent payments during those months, but rather denies Plaintiff's representation only "in so far as [Plaintiff] characterizes rent relief as ending in May 2021 or that there were months in that timeframe that [Plaintiff] did not waive rent. . . ." (ECF No. 109-2 at 8–9, DRSSUF ¶ 15.) For the time period between May 2021 and February 2023, Defendant does not deny that it did not remit payments but rather denies whether "there was any obligation to pay rent." (ECF No. 109-2 at 8–9, DRSSUF ¶ 16.) As evidence, Plaintiff provides a chain of email communications from the spring of 2018 between Mr. Waterman, counsel for Defendant, and Marisa Blackshire, Senior General Attorney for Plaintiff, that includes a May 8, 2018, communication from Ms. Blackshire stating:

23-cv-01202-JLB

> BNSF proposes that PSI provide an update regarding progress prior to the last day of the month.  BNSF will respond within 15-business days regarding rent forgiveness.  If at any time BNSF finds that PSI is not proceeding in good faith and in a timely manner, then BNSF may terminate rent forgiveness with fifteen (15) days' written notice to PSI, with PSI's obligation to pay rent coming due on the first day of the month following BNSF's notice (i.e., if BNSF gives notice on April 15, then PSI's next rent payment would be due on May 1).

(ECF No. 109-1 at 8).  In addition, Defendant relies on a document provided by Plaintiff in discovery that indicates Plaintiff put billing to Defendant on hold in August 2021, because the unpaid rent "was deemed uncollectible and ha[d] been accrued as bad debt," and was "unlikely to be collected."  (*Id*. at 13.)  Defendant argues that this is evidence that Plaintiff did not invoice Defendant for rent after August 2021.  Defendant relies on no further evidence on this issue.

Without citing to its Opposition to Defendant's Separate Statement of Undisputed Facts, Defendant contends that "testimony at trial will establish that [Plaintiff] agreed to waive rent as long as [Defendant] was working towards a plan to remediate the BNSF Property," and "will further establish that [Defendant] never ceased working towards completion of the remediation until [Plaintiff] denied access to the BNSF Property, making it physically impossible for [Defendant] to implement the IMW."  (ECF No. 109 at 12 (citing *KB Salt Lake III, LLC v. Fitness Int'l, LLC*, 95 Cal. App. 5th 1032, 1058 (2023)).)  Thus, Defendant maintains that it is not liable to Plaintiff for unpaid rent, because Plaintiff agreed to suspend the obligation to pay rent indefinitely, so long as Defendant continued its remediation efforts.  (*See id.*)

This does not create a dispute of material fact, at least with respect to rent owed after May 2021.  The Court cannot rely on representations about what testimony at trial will establish; the Court can only consider evidence provided by the parties in the statements of undisputed facts.  Plaintiff has provided evidence that Plaintiff notified Defendant in writing by at least May 18, 2021, that no further requests for waiver of rent would be

considered unless certain conditions precedent were met,[20] and there was no further rent relief thereafter.  Defendant has provided no evidence to the contrary.  Specifically, Defendant neither asserts nor provides evidence that it met any of Plaintiff's requirements that Defendant provide, by June 1, 2021: (1) a comprehensive update of the project status including a remediation schedule that will implement the interim remedial action as soon as technically feasible, and a budget showing the total anticipated cost of clean-up activities as well as a plan and timeline for removing all site improvements and restoring the Property consistent with the Lease requirements; and (2) a plan and schedule for paying all delinquent rental payments. Nor does Defendant provide evidence, or even assert, that Plaintiff thereafter relented its position and agreed to rent relief without satisfaction of those conditions.  Defendant provides no evidence of communications related to rent relief after the May 18, 2021, letter. [21]

Where the moving party meets its initial burden of establishing the absence of a genuine issue of material fact, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).  Here, as to the obligation to pay rent, Plaintiff has established there is no genuine dispute of material fact as to breach.

Because there is no dispute that Defendant breached its duty to pay rent, at least for a period of time, Plaintiff has also established that it suffered damage.  Plaintiff does not

---

[20] This writing contravenes Defendant's assertion—unsupported by a declaration or any other evidence—that "BNSF has produced no evidence that it provided PSI with 15 days' written notice of termination of rent forgiveness."  ECF No. 109 at 12.

[21] Defendant presents evidence that no rent was *invoiced* after August 2021.  Even assuming that Defendant had a persuasive argument that this lack of billing creates a dispute of material fact as to whether rent forgiveness resumed in September 2021, this does not account for the failure to pay rent for at least May 2021 through August 2021.

23-cv-01202-JLB

maintain that the amount of damages suffered is not subject to factual dispute and does not seek a determination of damages by this motion.  (ECF No. 103-1 at 28.)

Therefore, the Court **GRANTS** Plaintiff's Motion for Summary Judgment on Count Two for breach of contract based upon failure to pay rent.

### D.   Damage to Property, Failure to Adhere to Applicable Laws, and Breach of Contractual Indemnity

#### 1.  Applicable Law

The elements of breach of contract are set forth above.  *See supra* at 31.  As to breach of contractual indemnity, it is well established that

> an indemnitee seeking to recover on an agreement for indemnification must allege the parties' contractual relationship, the indemnitee's performance of that portion of the contract which gives rise to the indemnification claim, the facts showing a loss within the meaning of the parties' indemnification agreement, and the amount of damages sustained.

*Four Star Elec., Inc. v. F & H Constr.*, 7 Cal. App. 4th 1375, 1379 (Cal. Ct. App. 1992), *reh'g denied and opinion modified* (Aug. 4, 1992).

#### 2.   Analysis

##### a.   Existence of a valid contract

The parties do not dispute the validity of the 1977 Lease Agreement.  (*See* ECF No. 109-2 at 2, DRSSUF ¶ 2.)  Further, although they disagree over the interpretation of the indemnification provisions set forth in the 1977 Lease Agreement, the parties do not dispute that the agreement contains indemnification provisions.[22] (*See* ECF No. 109-2 at 3,

---

[22]  Defendant only disputes Plaintiff's statement of undisputed material fact that "[t]he 1977 Lease required PSI to indemnify BNSF for all loss, damage, or expense arising in any manner out of PSI's use of the Property, any breach by PSI of the Lease, or the sole or contributing acts or omissions of PSI" in that "the terms of the Lease speak for themselves," and only denied it to the extent that Plaintiff "omits a relevant clause of Lease

23-cv-01202-JLB

DRSSUF ¶ 5.)

### b.    Plaintiff's performance

To satisfy the second element, Plaintiff must establish that it performed "that portion of the contract which gives rise to the indemnification claim." *Four Star Elec., Inc.*, 7 Cal. App. 4th at 1379.  Plaintiff provides evidentiary support that it performed under the 1977 Lease Agreement for purposes of its indemnification claim, because it "complied with all lease obligations, including in terminating its Leases with [Defendant]."  (ECF No. 103-2 at 7, DSSUF ¶ 10; *see also* ECF No. 103-1 at 23.)

In its Opposition to Plaintiff's Separate Statement of Undisputed Facts, Defendant disputes this, insisting that Plaintiff "breached the Leases by intentionally blocking [Defendant] from implementing the IMW remediation" and "intentionally interfering with [Defendant's] regulatory agreement with DTSC and numerous other breaches of the covenant of good faith and fair dealing."  (ECF No. 109-2 at 6-7, DRSSUF ¶ 10 (referring, for evidentiary support, to ECF No. 106-26, DSSUF ¶¶ 21-23, 25, and 27).)[23]

In its opposition to Plaintiff's Motion, however, Defendant does not cite to any of this evidence in support of its argument that Plaintiff breached the Leases.  Instead, Defendant cites to evidence to support only two facts: (1) "BNSF has known, since at least

Section 9 that provides for an exception whereby BNSF shares in cost."  (ECF No. 109-2 at 3, DRSSUF ¶ 5.)

[23]    The facts Defendant puts forward in its Separate Statement of Undisputed Material Facts referenced in support of its position that Plaintiff breached the Leases are: (1) on January 13, 2023, Plaintiff sent a Notice of Termination of Leases by Lessor, terminating the Leases upon 30 days pursuant to section 14 (Material Fact 21); on or about February 22, 2023, Plaintiff barred Defendant from future access to the Property (Material Fact 22); (3) Plaintiff began planning to implement Defendant's IMW on the Property as early as August 2022 (Material Fact 23); (4) Plaintiff entered into a Standard Voluntary Agreement with DTSC on April 11, 2023 to remediate the Property (Material Fact 25); and (5) on June 14, 2023, Defendant notified Plaintiff that Plaintiff had breached the Leases by blocking Defendant from implementing the IMW remediation.  (ECF No. 106-26, DSSUF ¶¶ 21-23, 25, and 27.

2017, that PSI's tenancy on the BNSF Property was strictly for purposes of remediation access" (citing to DSSUF ¶12); and (2) "[i]f PSI terminated the Leases, BNSF said that it would enforce the contract provision from the 1970s that required the BNSF Property to be returned to its original condition within 60 days" (citing to Declaration of Stephen Ma in Opposition to Partial Summary Judgment, ¶ 2, Exh. 1).  (ECF No. 109 at 8.)

Moreover, despite asserting that Plaintiff materially breached the 1977 Lease Agreement, Defendant fails to identify any particular provision of the agreement that Plaintiff purportedly breached or to cite any supporting legal authority. *See United States v. Aguilar*, 782 F.3d 1101, 1108 (9th Cir. 2015) (holding that although "the burden of alleging a potentially meritorious defense [was] minimal," the court would not "manufacture" arguments for defendants, where defendants provided meager argument and failed to cite applicable legal authority) (citations and internal quotation marks omitted); *see also Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994) (deeming plaintiff's claim "waived due to his failure to present a specific, cogent argument for [the court's] consideration," reasoning that "a bare assertion does not preserve a claim").  Nonetheless, rather than rejecting Defendant's argument for these reasons, the Court will look to the arguments Defendant made in support of Defendant's Motion for Partial Summary Judgment based on the claims of Plaintiff's breach of contract and Plaintiff's breach of the implied covenant of good faith and fair dealing.

As was addressed above in connection with Defendant's assertion in its Motion that Plaintiff materially breached the Lease Agreements, whether Defendant had a right, as opposed to only a duty, to remediate the property under the terms of those agreements is a mixed question of fact and law.  If it is determined that Defendant had a right, as opposed to only a duty, under the terms of the Lease Agreements to remediate the Property, Defendant has raised a genuine dispute of material fact as to whether Plaintiff breached the 1977 Lease Agreement or breached the implied covenant of good faith and fair dealing by barring Defendant from the Property and assuming Defendant's remediation efforts where Defendant had already invested significant time and resources in remediating the Property.

23-cv-01202-JLB

The Court therefore concludes that Defendant's claim of breach of the implied covenant of good faith and fair dealing precludes entry of summary judgment as to Plaintiff's breach of contract claim for indemnification.

### c.    Defendant's breach by failing to adhere to applicable laws and damaging the Property

The 1977 Lease Agreement provides, in pertinent part:

> 6.(a) Lessee shall use the Premises exclusively as a site for handling and storage of scrap materials.  Lessee covenants that it will not treat, store or dispose of on the Premises 'hazardous waste' or 'hazardous substances', as 'hazardous waste' and 'hazardous substances' may now or in the future be defined by any federal, state, or local governmental agency or body. *In the event the Premises are now or in the future used in generating, handling, or transporting of 'hazardous waste' or 'hazardous substances', Lessee agrees fully to comply with all applicable federal, state, and local laws, rules, regulations, orders, decisions and ordinances (hereinafter referred to as 'Standards') concerning 'hazardous waste' and 'hazardous substances'. Lessee further agrees periodically to furnish Lessor with proof, satisfactory to Lessor, that Lessee is in such compliance.*  In any event, Lessee shall allow Lessor to enter upon the Premises at reasonable times for the purposes of inspection.

(ECF No. 130-47 at 23 (emphasis added).)[24]

---

[24]  Section 6 provides further:

> Should Lessee not comply fully with the above-stated obligations of this Section, notwithstanding anything contained in any other provision hereof, Lessor may, at its option, terminate this Lease by serving five (5) days' notice of termination upon Lessee; but any waiver by Lessor of any breach of Lessee's obligations shall not constitute a waiver of the right to terminate this Lease for any subsequent breach which may occur, or to enforce any other provision of this Lease.  Upon termination, Lessee shall be governed by the two sections of this Lease regarding Lessee's surrender of possession of the Premises.

23-cv-01202-JLB

8. In using the Premises, and in constructing, maintaining, operating and using the Improvements thereon, *Lessee shall comply with any and all requirements imposed by federal or state statutes, or by ordinances, orders, or regulations of any governmental body having jurisdiction thereover* . . . .

(ECF No. 103-50 at 3–4 (emphasis added).)

22. Notwithstanding any other provisions of this Lease, *Lessee shall comply with all statutes, ordinances, rules, regulations, orders and decisions (hereinafter referred to as 'Standards'), issued by any federal, state or local governmental body or agency established thereby (hereinafter referred to as*

(b) Notwithstanding anything contained in the liability sections hereof, in case of a breach of the obligations contained in this Section, or any of them, regardless of the negligence or alleged negligence of Lessor, Lessee agrees to assume liability for and to save and hold harmless Lessor from and against all injuries to any person and damage to property, including without limitation, employe[e]s and property of Lessor and Lessee and all related expenses, including without limitation attorneys' fees, investigators' fees and litigation expenses, *resulting in whole or in part from Lessee's failure to comply with any Standard issued by an governmental authority concerning hazardous substances and/or hazardous waste.* Lessee, at its cost, shall assume the defense of all claims, suits or actions brought for damages, and fines or penalties hereunder, regardless of whether they are asserted against Lessor or Lessee. Lessee also agrees to reimburse Lessor for all costs of any kind incurred as a result of the Lessee's failure to comply with this Section, including, but not limit to, fines, penalties, clean-up and disposal costs, and legal costs incurred as a result of Lessee's generating, handling, transporting, treating, storing, or disposing of 'hazardous waste' or 'hazardous substances' on the Premises.

(ECF No. 130-47 at 23 (emphasis added).)

*'Authority'), relating to Lessee's use of the Premises hereunder. In its use of the Premises, Lessee shall at all times be in full compliance with all Standards, present or future, set by any Authority, including, but not limited to, Standards concerning air quality, water quality, noise, hazardous substances and hazardous waste.*

(ECF No. 103-50 at 4 (emphasis added).)[25]

---

[25] Section 22 provides further:

In the event Lessee fails to be in full compliance with Standards set by any Authority, Lessor may, after giving reasonable notice of the failure to Lessee, and Lessee, within thirty (30) days of such notice, fails either to correct such noncompliance or to give written notice to the Lessor of its intent to contest the allegation of noncompliance before the Authority establishing the Standard or in any other proper forum, take whatever action is necessary to bring the Premises into compliance. *Lessee shall reimburse the Lessor for all costs (including but not limited to, consulting, engineering, clean-up and disposal costs, and legal costs) incurred by the Lessor in complying with such Standards, defending any claim of violation of such Standards in any proceeding before any Authority or court, and paying any fines or penalties imposed for such violations.* Lessee shall assume liability for and shall save and hold harmless the Lessor from any claim of a violation of such Standards regardless of the nature thereof or the Authority or person asserting such claim, which results from Lessee's use of the Premises, whether such claim arises in whole or in part from the negligence or alleged negligence of the Lessor or otherwise. Lessee, at its cost, shall assume the defense of all such claims regardless of whether they are asserted against Lessee or Lessor.

(ECF No. 103-50 at 4 (emphasis added).) Section 22 of the Supplemental Agreement to the 1977 Lease Agreement is identical to Section 20 of the Supplemental Agreement to the 1978 Lease Agreement. (*See* ECF No. 103-50 at 3–4; ECF No. 103-51 at 3–4.)

23-cv-01202-JLB

Plaintiff contends that Defendant breached the 1977 Lease Agreement by repeatedly failing to comply with requirements imposed by federal and state laws and regulations, agency orders, and court orders, thereby causing "extensive soil contamination at the Property." (ECF No. 103-1 at 25-26 (citing ECF No. 103-2 at 4-6, PSSUF ¶¶ 6-7).) Plaintiff maintains that each violation constitutes a separate breach of the 1977 Lease Agreement. (*Id.* at 25.)

Plaintiff's seventh statement of undisputed fact reads as follows:

> PSI violated federal and state environmental laws in its activities on the BNSF Property, and was the subject of numerous enforcement actions taken by California regulators between 1987 and 2016 relating to PSI's violations of environmental laws and the contamination PSI caused on and around the BNSF Property. For more than 20 years, PSI has been bound by court order and DTSC administrative orders to remediate the contamination at eh BNSF Property but failed to do so.

(ECF No. 103-2 at 5, PSSUF ¶ 7.)  Defendant disputes Plaintiff's statement of fact only "insofar as paragraph 7 implies that any referenced violations were the basis for BNSF's termination of the Lease or that each alleged violation caused contamination at and around the property." (ECF No. 109-2 at 5 (DRSSUF ¶ 7).)  Defendant does not deny or otherwise present evidence refuting that it violated applicable environmental laws and standards in contravention of the 1977 Lease Agreement.  (*See id.*)  It is, therefore, undisputed that Defendant violated Sections 8 and 22 of the 1977 Lease Agreement.

### d.   Facts showing a loss within the meaning of the parties' indemnification agreement (as to breach of indemnity)

To satisfy the third element of the breach of indemnity claim, Plaintiff must prove "facts showing a loss within the meaning of the parties' indemnification agreement." *Four Star Elec., Inc.*, 7 Cal. App. 4th at 1379.  Defendant does not dispute that it was at least a partial source of contamination or damage to the Property, that it failed to complete remediation,

23-cv-01202-JLB

or that it failed to indemnify Plaintiff for the cost of completing remediation of the Property. (*See id.* at 4-5, 8, DRSSUF ¶¶ 6-7, 13 (denying Plaintiff's statement of fact that Defendant refused to indemnify Plaintiff only "in so far as the 'facts' assume a current legal obligation to indemnify BNSF beyond the millions of dollars PSI has already expended"); *see also* ECF No. 109-2 at 3–4, DRSSUF ¶ 5 (denying Defendant's responsibility to indemnify Plaintiff only "insofar as [Plaintiff's] paragraph 5 paraphrases Lease provisions, and in so doing, omits a relevant clause of Lease Section 9 that provides for an exception whereby BNSF shares in cost").)

However, Defendant maintains that a legal dispute exists regarding whether the 1977 Lease Agreement "cover[s] indemnification under the particular factual scenario here," insisting that the term "indemnify" as used in the 1977 Lease Agreement "has a narrow meaning, of reimbursement for losses to third party claims, as opposed to the broader meaning adopted by [Plaintiff] of reimbursement of any claimed loss[.]" (ECF No. 109 at 14; *see also* ECF No. 164 at 9, 12, 20.) Plaintiff counters in its Reply that Defendant fails to identify the relevant provisions of 1977 Lease Agreement "likely because doing so would undermine its argument." (ECF No. 117 at 7.) Thus, Plaintiff asserts that "[b]ecause [Defendant] provides no discussion or argument on any specific Lease provision, its generalized request for a narrow read of unidentified indemnity language should be rejected." (*Id.* at 8.)

At oral argument, the parties agreed that there is no extrinsic evidence to be presented to a jury on this question, and that this is a question of law to be determined by the Court based upon the language within the four corners of the Leases. (*See* ECF No. 164 at 9, 12, 20-21.) The "interpretation of a written instrument becomes solely a judicial function when it is based on the words of the instrument alone" and "when there is no conflict in the extrinsic evidence[.]" *Gonzalez*, 119 Cal. App. 5th at 1031 (citation and quotation marks omitted). Thus, the Court will decide whether the indemnification provisions of the 1977 Lease Agreement provide for direct indemnity or only third-party indemnity.

43

23-cv-01202-JLB

"Indemnity generally refers to third party claims." *Zalkind*, 194 Cal. App. 4th at 1024. However, "this general rule does not apply if the parties to a contract use the term 'indemnity' to include direct liability as well as third party liability." *Id.* (quoting *Dream Theater, Inc. v. Dream Theater*, 124 Cal. App. 4th 547, 555 (Cal. Ct. App. 2004), *as modified on denial of reh'g* (Dec. 28, 2004)). Thus, "[e]ach indemnity agreement is 'interpreted according to the language and contents of the contract as well as the intention of the parties as indicated by the contract.'" *Zalkind*, 194 Cal. App. 4th at 1024 (quoting *Wilshire-Doheny Assocs. Ltd. v. Shapiro*, 83 Cal. App. 4th 1380, 1396 (Cal. Ct. App. 2000)); *see also Myers Bldg. Indus., Ltd. v. Interface Tech., Inc.*, 13 Cal. App. 4th 949, 968–69 (Cal. Ct. App. 1993), *as modified on denial of reh'g* (Mar. 26, 1993) ("The extent of the duty to indemnify is determined from the contract.")

It is well settled that courts "are bound to interpret written instruments according to the parties' intent *as manifested in the written instrument*, if that language is clear and explicit." *PV Little Italy, LLC v. MetroWork Condo. Assn.*, 210 Cal. App. 4th 132, 151 (Cal. Ct. App. 2012) (emphasis in original) (citation omitted). Thus, when interpreting unambiguous contractual provisions, courts must "give effect to the plain and ordinary meaning of the language used by the parties." *People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.*, 107 Cal. App. 4th 516, 524 (Cal. Ct. App. 2003) (citation omitted). "If the contract is capable of more than one reasonable interpretation, it is ambiguous" and the court must "app[ly] the standard rules of interpretation in order to give effect to the mutual intention of the parties[.]" *Id.* at 524–25 (citation omitted). "The mere fact that a word or phrase in a [contract] may have multiple meanings does not create an ambiguity." (*Id.* at 525 (citation and quotation marks omitted). Further "[t]he language in a contract must be construed in the context of that instrument as a whole." *Id.* at 526 (citations and quotation marks omitted). "[I]f possible, the court should give effect to every provision of the contract." *Id.* (citation omitted).

As pointed out by Plaintiff, here, Defendant fails to identify which provisions of the 1977 Lease support its position. The following provisions of the 1977 Lease, and the 1983 Supplement thereto, pertain to indemnity:

> [Section 6(b):] Notwithstanding anything contained in the liability sections hereof, in case of a breach of the obligations contained in this Section, or any of them, regardless of the negligence or alleged negligence of Lessor, Lessee agrees to assume liability for and to save and hold harmless Lessor from and against all injuries to any person and damage to property, including without limitation, employe[e]s and property of Lessor and Lessee and all related expenses, including without limitation attorneys' fees, investigators' fees and litigation expenses, resulting in whole or in part from Lessee's failure to comply with any Standard issued by any governmental authority concerning hazardous substances and/or hazardous waste. Lessee, at its cost, shall assume the defense of all claims, suits or actions brought for damages, and fines or penalties hereunder, regardless of whether they are asserted against Lessor or Lessee. Lessee also agrees to reimburse Lessor for all costs of any kind incurred as a result of the Lessee's failure to comply with this Section, including, but not limited to, fines, penalties, clean-up and disposal costs, and legal costs incurred as a result of Lessee's generating, handling, transporting, treating, storing, or disposing of 'hazardous waste' or 'hazardous substances' on the Premises.

(ECF No. 103-50 at 3.)

> [Section 9:] Lessee agrees to indemnify and save harmless Lessor against all loss, damage or expense which Lessor may sustain, incur or become liable for, including loss of or damage to property or injury to or death of persons and fines or penalties imposed upon or assessed against Lessor, arising in any manner out of (a) the use of the Premises or Improvements by Lessee, (b) any breach by Lessee of the terms, covenants or conditions in this instrument contained, or (c) the sole or contributing acts or omissions of Lessee or the employe[e]s, agents, patrons or invitees of Lessee in, on or about the Premises or Improvements, except that if Lessor shall participate in any such contributing acts or omissions, then the loss, damage or expense arising therefrom shall be borne by the parties hereto equally.

23-cv-01202-JLB

(ECF No. 103-46 at 3.)

[Section 22:] In the event Lessee fails to be in full compliance with Standards set by any Authority, Lessor may, after giving reasonable notice of the failure to Lessee, and Lessee, within thirty (30) days of such notice, fails either to correct such noncompliance or to give written notice to the Lessor of its intent to contest the allegation of noncompliance before the Authority establishing the Standard or in any other proper forum, take whatever action is necessary to bring the Premises into compliance. Lessee shall reimburse the Lessor for all costs (including but not limited to, consulting, engineering, clean-up and disposal costs, and legal costs) incurred by the Lessor in complying with such Standards, and also such costs incurred by the Lessor in abating a violation of such Standards, . . . . defending any claim of violation of such Standards in any proceeding before any Authority or court, and paying any fines or penalties imposed for such violations. Lessee shall assume liability for and shall save and hold harmless the Lessor from any claim of a violation of such Standards regardless of the nature thereof or the Authority or person asserting such claim, which results from Lessee's use of the Premises, whether such claim arises in whole or in part from the negligence or alleged negligence of the Lessor or otherwise. Lessee, at its cost, shall assume the defense of all such claims regardless of whether they are asserted against Lessee or Lessor.

Upon written notice from Lessor, Lessee agrees to assume the defense of any lawsuit, administrative action or other proceeding brought against Lessor by any public body, individual, partnership, corporation, or other legal entity, relating to any matter covered by this Lease for which Lessee has an obligation to assume liability for and/or to save and hold harmless the Lessor. Lessee shall pay all the costs incident to such defense, including, but not limited to, attorneys' fees, investigators' fees, litigation expenses, settlement payments, and amounts paid in satisfaction of judgments. Any and all lawsuits or administrative actions brought or threatened on any theory of relief available at law, in equity or under the rules of any administrative agency shall be covered by this Section, including, but not limited to, the theories of intentional misconduct, negligence, breach of statute

46

> or ordinance or upon any theory created by statute or ordinance, state or federal.

(ECF No. 103-50 at 4.)

The Court concludes that the 1977 Lease Agreement clearly and explicitly manifests the parties' intent to provide for direct indemnity as well as third-party indemnity. *See PV Little Italy, LLC*, 210 Cal. App. 4th at 151. Certainly, as urged by Defendant, some of the language in the relevant paragraphs contemplates third-party indemnity. For example, one sentence of Section 6(b) reads, in part, "Lessee, at its cost, shall assume the defense of all claims, suits or actions brought for damages, and fines or penalties hereunder, regardless of whether they are asserted against Lessor or Lessee." (ECF No. 103-50 at 3.) In addition, Section 9 provides, in part, that "Lessee agrees to indemnify and save harmless Lessor against all loss, damage or expense which Lessor may . . . become liable for, including loss of or damage to property or injury to or death of persons and fines or penalties imposed upon or assessed against Lessor." (ECF No. 103-46 at 3.) Section 22 states, "Lessee shall assume liability for and shall save and hold harmless the Lessor from any claim of a violation of such Standards regardless of the nature thereof or the Authority or person asserting such claim," and further provides that

> [u]pon written notice from Lessor, Lessee agrees to assume the defense of any lawsuit, administrative action or other proceeding brought against Lessor by any public body, individual, partnership, corporation, or other legal entity, relating to any matter covered by this Lease for which Lessee has an obligation to assume liability for and/or to save and hold harmless the Lessor. Lessee shall pay all the costs incident to such defense, including, but not limited to, attorneys' fees, investigators' fees, litigation expenses, settlement payments, and amounts paid in satisfaction of judgments. Any and all lawsuits or administrative actions brought or threatened on any theory of relief available at law, in equity or under the rules of any administrative agency shall be covered by this Section, including, but not limited to, the theories of intentional misconduct, negligence, breach of

47

23-cv-01202-JLB

statute or ordinance or upon any theory created by statute or ordinance, state or federal.

(ECF No. 103-50 at 4.)  But the language that points to third-party indemnity is part of an expression of a much broader indemnity obligation of Defendant.  For instance, the 1977 Lease also contains the following language pointing to direct indemnity obligations beyond those arising from third-party claims:

> [Section 6(b):] Notwithstanding anything contained in the liability sections hereof, in case of a breach of the obligations contained in this Section, or any of them, regardless of the negligence or alleged negligence of Lessor, Lessee agrees to assume liability for and to save and hold harmless Lessor from and against all injuries to any person and damage to property, including without limitation, employe[e]s and property of Lessor and Lessee and all related expenses, including without limitation attorneys' fees, investigators' fees and litigation expenses, resulting in whole or in part from Lessee's failure to comply with any Standard issued by any governmental authority concerning hazardous substances and/or hazardous waste.
>
> . . .
>
> Lessee also agrees to reimburse Lessor for all costs of any kind incurred as a result of the Lessee's failure to comply with this Section, including, but not limited to, fines, penalties, clean-up and disposal costs, and legal costs incurred as a result of Lessee's generating, handling, transporting, treating, storing, or disposing of 'hazardous waste' or 'hazardous substances' on the Premises.

(ECF No. 103-50 at 3.)  The language in Section 6(b) requiring Lessee to assume the defense of all claims is but one specified obligation in a paragraph listing multiple components to Defendant's indemnification obligations.  There is nothing about the structure of the paragraph to suggest that the overall obligations are specific to, or limited to, third-party indemnification.  Rather, the plain language of the 1977 Lease makes clear that the provision for third-party indemnity is in addition to any direct indemnity obligations.  *See People ex rel. Lockyer*, 107 Cal. App. 4th at 524 (citation omitted)

(providing that "if possible, the court should give effect to every provision of the contract"); *see also Starlight Ridge S. Homeowners Assn. v. Hunter-Bloor*, 177 Cal. App. 4th 440, 447 (Cal. Ct. App. 2009) (explaining that courts must "consider the contract as a whole and construe the language in context, rather than interpret a provision in isolation").

Similarly, in Section 22, the Lease lists multiple ways Defendant is legally accountable to Plaintiff for any failure to comply with regulations. (*See* ECF No. 103-50 at 3-4.) In addition to the obligation to "assume liability for and [to] save and hold harmless the Lessor from any claim of a violation of such Standards regardless of the nature thereof or the Authority or person asserting such claim," Section 22 imposes upon Defendant the obligation to "reimburse the Lessor for all costs (including but not limited to, consulting, engineering, clean-up and disposal costs, and legal costs) incurred by the Lessor in complying with such Standards, and also such costs incurred by the Lessor in abating a violation of such Standards." (*Id.* at 4.)

Pursuant to Section 9 of the 1977 Lease Agreement, "Lessee agrees to indemnify and save harmless Lessor against all loss, damage or expense which Lessor may sustain, incur or become liable for, *including* loss of or damage to property or injury to or death of persons and fines or penalties imposed upon or assessed against Lessor." (ECF No. 103-46 at 3 (emphasis added).) Under the canon of "the presumption of nonexclusive 'include,'" there is a presumption that items following the word "include" or "including" are non-exhaustive; "include" is usually a word of enlargement, not limitation. *United States v. Herrera*, 974 F.3d 1040, 1048 (9th Cir. 2020) ("This presumption holds that the word include does not ordinarily introduce an exhaustive list.") (citation and quotation marks omitted). Here, in context, the word "including" indicates that what follows is an example of Defendant's indemnification obligation, not the delineation of it. The "plain and ordinary meaning" of the language of the portion of Section 9 quoted above is that Defendant, as Lessee, shall directly compensate Plaintiff, as Lessor, for expenses incurred by Plaintiff remediating harm caused to the Property by Defendant. *People ex rel. Lockyer*, 107 Cal. App. 4th at 524.

23-cv-01202-JLB

At oral argument, Defendant specifically addressed the language of Section 6(b) that reads, "Lessee agrees to assume liability for and to save and hold harmless Lessor from and against all injuries to any person and damage to property, including without limitation, employe[e]s and property of Lessor." (*See* ECF No. 164 at 9.) Defendant posited that the word "property" in this sentence can only refer to personal property, and not the leased land itself, because the parties used the defined term "Premises" to refer to the land that was the subject of the Lease. (*See id.* at 9-10.) In Section 4, when the parties distinguished personal property from improvements, they used the term "personal property" (not a defined term). (ECF No. 103-46 at 2.) In the sentence at issue in Section 6(b), the parties distinguished injury to person from damage to property using the word "property" (also not a defined term). (ECF No. 103-50 at 3.) In Section 6(b), had the parties intended to limit Defendant's liability to damage to personal property, as opposed to damage to the land itself, they presumably would have used the phrase "personal property" as they did in Section 4. Especially in light of the breadth of the indemnity language in each relevant section of the 1977 Lease, the most logical, consistent, and plain meaning of "property" in this sentence in Section 6(b) would be all property—real and personal. *See People ex rel. Lockyer*, 107 Cal. App. 4th at 525 (citation omitted) ("[T]he mere fact that a word or phrase in a [contract] may have multiple meanings does not create an ambiguity.").

This interpretation accounts for the parties' choice not to use the defined term, "Premises," in this sentence. Thus, the Court concludes that the above-quoted provisions clearly evince the parties' intent that Defendant, as Lessee, shall provide direct indemnification to Plaintiff, as Lessor, for loss arising from Defendant's breaches of the 1977 Lease Agreement. *See Zalkind*, 194 Cal. App. 4th at 1027 (holding that the provision of in asset purchase agreement that indemnitor should "indemnify, hold harmless and defend" indemnitees against "any and all" damages and losses incurred by indemnitees arising from "any breach or default by [indemnitor]" under the agreement did "not limit indemnification to third party claims").

23-cv-01202-JLB

Defendant also asserts that any ambiguity in the 1977 Lease Agreement should be construed against Plaintiff, as the drafter of the agreement, pursuant to the doctrine of *contra proferentem*. (ECF No. 109 at 16 (citing *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 186 (2019)).) As noted by Plaintiff in its Reply, however, Defendant fails to specify which lease provisions are purportedly ambiguous in connection with this argument. (ECF No. 117 at 10.) Moreover, the "doctrine known as *contra proferentem* . . . applies only as a last resort when the meaning of a provision remains ambiguous after exhausting the ordinary methods of interpretation," at which point the doctrine "resolves the ambiguity against the drafter based on public policy factors, primarily equitable considerations about the parties' relative bargaining strength." *Lamps Plus, Inc.*, 587 U.S. at 186 (citation and quotation marks omitted). Thus, the doctrine *contra proferentem* "is by definition triggered only after a court determines that it *cannot* discern the intent of the parties." *Id.* at 187. Resort to the doctrine of *contra proferentem* is not necessary here.

Defendant further maintains that the 1977 Lease Agreement should be construed in favor of Defendant, because it was a standard form agreement. (ECF No. 109 at 16.) However, Defendant fails to cite any legal authority in support of its assertion or to otherwise meaningfully develop its argument. *See Aguilar*, 782 F.3d at 1108; *Greenwood*, 28 F.3d at 977. Moreover, the parties supplemented the 1977 Lease Agreement in 1983, thus undermining any suggestion that the agreement was an inflexible contract of adhesion. (*See* ECF No. 164 at 10 (defense counsel's statement at oral argument that Section 22 of the 1977 Lease Agreement, as supplemented in 1983, "was a specifically-bargained for and negotiated term that the parties drafted to define the rights and obligations and remedies relating to environmental law compliance").

The Lease created a direct indemnity obligation and Defendant has undisputedly not indemnified Plaintiff. [26] Thus, Plaintiff has established a loss within the meaning of the

---

[26] Defendant also asserts that Plaintiff rejected any indemnity purportedly owed by Defendant by terminating the Lease Agreements, barring Defendant from the Property, and

23-cv-01202-JLB

indemnification provisions of the 1977 Lease Agreement.  Nevertheless, for the reasons discussed below in connection with Defendant's affirmative defenses, genuine disputes of material fact preclude entry of summary judgment in favor of Plaintiff as to its claim for breach of contractual indemnity.

### e.   Damages

To satisfy the fourth element, Plaintiff must show "the amount of damages sustained." *Four Star Elec., Inc. v. F & H Constr.*, 7 Cal. App. 4th 1375, 1379.  Plaintiff contends that it incurred damages totaling $4,320,390.17 in the form of remediation expenses as a result of Defendant's contamination of the Property in violation of the 1977 Lease Agreement but does not seek a determination of damages at the summary judgment stage.  (ECF No. 103-1 at 27-28.)

In a declaration signed July 7, 2025, Thomas Jones, Senior Manager of Environmental Remediation for Plaintiff, attested, in relevant part:

> 7. Since approximately May 2022, I have been tasked with tracking and recording BNSF's total response costs with respect to the remediation of the BNSF Property, including invoices received for work performed by BNSF's contractors and for the California Hazardous Waste Generation and Handling Fee (a flat-rate per-ton fee imposed by California law in the Government Code and Health and Safety Code on generators of hazardous waste).
>
> 8. Based on my personal knowledge, experience, role overseeing BNSF's remediation of the BNSF Property, and review and recording of invoices and proof of payment associated with the remediation, BNSF's response costs totaled $4,320,390.17.
>
> 9. This total amount is based on a review of bidding documents, invoices, and proof of payment materials that are all business

usurping Defendant's remediation efforts.  (ECF No. 109 at 17.)  However, as with its Motion, Defendant fails to cite any supporting legal authority or develop this argument in a manner that permits review by this Court.  *See Aguilar*, 782 F.3d at 1108; *Greenwood*, 28 F.3d at 977.

23-cv-01202-JLB

records made at or near the time of the remediation and related work. Records of this nature (including bid documents, invoices, proof of payment, and related documents and communications) are made in the ordinary course of BNSF's remediation activities, including of the BNSF Property. Such records are routinely generated and maintained as part of BNSF's activities to investigate and remediate sites such as the BNSF Property and were maintained by me in my role as Senior Manager of Environmental Remediation.

10. I verify that the bid documents, invoices, proof of payment, and related documents and communications establishing BNSF's response costs in the amount of approximately $4,320,390.17 are true and correct to the best of my knowledge.

(ECF No. 103-41 at 3, ¶¶ 7–10.)  Moreover, at a deposition conducted on June 12, 2025, Dr. Sigrida Reinis, one of Defendant's retained expert witnesses, testified that "in looking at the totality of the costs that were incurred by BNSF," including "contractor costs, consultant costs, [and] regulatory oversight, . . . just under 3.3 million . . . was reasonable and necessary to remediate the site in accordance with the [IMW]."  (ECF No. 103-38 at 5-6.)  Thus, Plaintiff establishes that it incurred loss as a result of Defendant's breach of the indemnification provisions of the 1977 Lease Agreement.

Defendant maintains that a triable issue of material fact remains as to whether Plaintiff participated in "contributing acts" of contamination, such that Plaintiff should bear half the cost of remediation pursuant to Section 9(c) of the 1977 Lease Agreement.  (ECF No. 109 at 14.)  Defendant asserts that it "is indisputably *not* the *sole* source of contamination, but rather one of many potential contributory sources of contamination," and that "there can be no reasonable reading of the Leases that obligates PSI to bear the loss or expense arising out of use of the BNSF Property by BNSF or its prior tenants[.]" (*Id.* at 15.)  Further, Defendant contends that it has been seeking BNSF's contribution to cleanup costs since at least February 1992.  (*Id.*)

The Court need not resolve this dispute at the summary judgment stage, as Plaintiff does not seek judgment on the amount of damages to which it is entitled.  *See Meridian*

23-cv-01202-JLB

*Project Sys., Inc. v. Hardin Const. Co., LLC*, 426 F. Supp. 2d 1101, 1105, 1106 n.3 (E.D. Cal. 2006) (noting that plaintiff did not seek determination of damages for its breach of contract claim, but rather filed its motion for partial summary judgment "for the limited purpose of establishing that there was a breach of contract by defendant," further holding that "evidence of damages is not dispositive of plaintiff's motion").

### f.      Affirmative Defenses

### i.      Unclean hands

Plaintiff does not address the affirmative defense of unclean hands in its Motion or in its Reply to Defendant's Opposition.  For the reasons set forth above addressing the doctrine of unclean hands in the context of Defendant's Motion for Partial Summary Judgment, Defendant has raised a genuine dispute of material fact to be determined by the jury.  On this basis, Plaintiff's Motion for Partial Summary Judgment for breach of contract based on damage to property, failure to adhere to applicable laws, and indemnification is **DENIED**.

### ii.      Impossibility

Defendant asserts that the Court should deny Plaintiff's Motion, because its breach of the 1977 Lease Agreement by failing to remediate the Property is excused pursuant the doctrine of impossibility or impracticability.  (*See* ECF No. 109 at 9.)  As explained above, the common-law doctrine of impossibility, now more commonly known as the doctrine of impracticability, "excuses what would otherwise be a *breach* of contract under very limited and narrowly defined circumstances." *Mull v. Motion Picture Indus. Health Plan*, 41 F.4th 1120, 1131 & 1131 n.10 (9th Cir. 2022) (emphasis added).  Also as addressed above, Plaintiff states unequivocally in its Reply that it is not relying on Defendant's purported failure to remediate the Property as a theory of breach:

> PSI also argues "impossibility of performance" because PSI states that it could not complete remediation of the BNSF Property within 60 days, a requirement it incorrectly reads into Section 16 of the Leases. However, BNSF has not demanded in this litigation that PSI complete remediation of the BNSF

> Property within 60 days. Instead, BNSF has demanded that PSI hold BNSF harmless and indemnify BNSF for the costs BNSF incurred in implementing PSI's 2021 IMW and that PSI pay BNSF the rent BNSF is owed. PSI's empty citation to the doctrine of impossibility does not excuse PSI's failure to satisfy its indemnity obligations or to pay rent to BNSF.

(ECF No. 117 at 5-6.)  Although Plaintiff's counsel attempted to distance Plaintiff from this disavowal at oral argument, Plaintiff is bound by the representations in its Reply.  Thus, because Defendant's argument is based upon a breach not being pursued by Plaintiff, as explained above, Defendant's opposition to Plaintiff's Motion on this basis fails.  *See supra* at 18-19.

## V.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** in part and **DENIES** in part Plaintiff's Motion. The Court **GRANTS** in part and **DENIES** in part Defendant's Motion.

**IT IS SO ORDERED.**

Dated:  July 2, 2026

Hon. Jill L. Burkhardt
United States Magistrate Judge

23-cv-01202-JLB